# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------x
UNITED STATES OF AMERICA ex rel.    :
JOHN A. WOOD, and on behalf of the    :
STATES of CALIFORNIA, COLORADO,    :
CONNECTICUT, DELAWARE,    :          10 CV 5645 (JMF)
FLORIDA, GEORGIA, HAWAII,    :
ILLINOIS, INDIANA, LOUISIANA,    :
MASSACHUSETTS, MICHIGAN,    :
MINNESOTA, MONTANA, NEVADA,    :          **THIRD AMENDED COMPLAINT AND**
NEW HAMPSHIRE, NEW JERSEY,    :          **JURY DEMAND**
NEW MEXICO, NEW YORK, NORTH    :
CAROLINA, OKLAHOMA, RHODE    :
ISLAND, TENNESSEE, TEXAS,    :
VIRGINIA, WISCONSIN and the    :
DISTRICT OF COLUMBIA,    :
                                    :
                    Plaintiffs,    :
                                    :
            v.                      :
                                    :
ALLERGAN, INC.,                     :
                                    :
                    Defendant.      :
------------------------------------------------------x

W. Scott Simmer                     Sherrie R. Savett
*(admission pro hac vice pending)*  *(admitted pro hac)*
Thomas J. Poulin                    Arthur Stock
*(admission pro hac vice pending)*  *(admitted pro hac vice)*
Simmer Law Group PLLC               Lane L. Vines
The Watergate, Suite 10-A           *(admitted pro hac vice)*
600 New Hampshire Ave. NW           Berger & Montague, P.C.
Washington, DC  20037               1622 Locust Street
Telephone:  (202) 333-4562          Philadelphia, PA  19103
Facsimile:  (202) 337-1039          Telephone:  (215) 875-3000
                                    Facsimile:  (215) 875-4604

*Counsel for Plaintiff/Relator*

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ........................................................................................................5

II.     JURISDICTION AND VENUE .................................................................................10

III.    PARTIES ...................................................................................................................11

        A.      Plaintiff/Relator John A. Wood ....................................................................11

        B.      Defendants Allergan, Inc. and Allergan plc...................................................12

IV.     SUMMARY OF DEFENDANT'S ILLEGAL CONDUCT .............................................14

        A.      The Purpose of the Kickback Scheme ...............................................................14

        B.      The Manner and Means of Executing the Scheme .................................................15

V.      BACKGROUND OF DRUGS PROMOTED BY ALLERGAN.......................................18

        A.      Acular®, Acular LS®, and Acuvail® (ketorolac ophthalmic solution,
                0.5%, 0.4%, and 0.45%, respectively) .........................................................19

        B.      Zymar® and Zymaxid® (gatifloxacin ophthalmic solution, 0.3% and
                0.5%, respectively)......................................................................................20

        C.      Pred Forte® (prednisolone acetate ophthalmic suspension, 1%) .........................22

VI.     BACKGROUND OF THE REGULATORY FRAMEWORK .........................................22

        A.      The Anti-Kickback Statute ...........................................................................22

        B.      The Prescription Drug Marketing Act .............................................................30

        C.      Prescription Drug Payment under Federal Health Care and Other
                Programs ...................................................................................................32

                1.      The Medicaid Program ........................................................................32

                2.      The Medicare Program .........................................................................32

                3.      Reimbursement under Other Federal Health Care Programs ...................33

        D.      Medicare/Medicaid Caps on Reimbursement for Cataract Surgery .....................34

        E.      Allergan Adopts PhRMA and AdvaMed Codes on Gifts to Health
                Care Professionals......................................................................................37

1

VII.   THE KICKBACK SCHEME WITH REGARD TO THE ALLERGAN DRUGS............39

    A.   Allergan Gives Away Free Goods to Induce Ophthalmologists to Prescribe Allergan Products, Resulting in Improper Government Program Reimbursements .....................................................................39

    B.   Using CCK Agreements to Bribe Healthcare Professionals.................................44

    C.   Using Sample Shipment Agreements to Bribe Healthcare Professionals ............................................................................................71

    D.   Bribing and Rewarding High Prescribers ...........................................................91

        1.   Eye Centers of Ohio ...............................................................91

        2.   Ohio Eye Alliance.................................................................94

    E.   Allergan Provides Additional Inducements, Including Pre-Printed Prescription Pads, Patient Instruction Sheets, and Contributions to Physicians' Favored Charities, to Induce Physicians to Prescribe Its Drug Products ........................................................................................96

VIII.  ALLERGAN'S ILLEGAL KICKBACK ACTIVITIES CAUSED THE SUBMISSION OF FALSE CLAIMS TO FEDERAL PROGRAMS AND *QUI TAM* STATES.................................................................................100

IX.    ALLERGAN CAUSED GOVERNMENT PROGRAM PROVIDERS TO FALSELY CERTIFY COMPLIANCE WITH THE LAW .............................106

X.     ALLERGAN ACKNOWLEDGES ITS VIOLATION OF THE ANTI-KICKBACK STATUTE, AND CHANGES ITS BUSINESS PRACTICES.................108

XI.    ALLERGAN FALSELY CERTIFIES ITS COMPLIANCE WITH CALIFORNIA HEALTH AND SAFETY CODE SECTIONS 119400 AND 119402 ...........................110

XII.   ALLERGAN'S RETALIATION AGAINST RELATOR WOOD .................................111

COUNT I (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1), § 3729(a)(1)(A)) ..............116

COUNT II (Violation of False Claims Act, 31 U.S.C. § 3729(a)(2), § 3729(a)(1)(B)) ..............116

COUNT III (Violation of False Claims Act, 31 U.S.C. § 3729(a)(3), § 3729(a)(1)(C))............117

COUNT IV (Violation of False Claims Act, 31 U.S.C. § 3729(a)(7), § 3729(a)(1)(G)) ...........117

COUNT V (Violation of False Claims Act, 31 U.S.C. § 3730(h))............................................118

COUNT VI (Violation of California False Claims Act)............................................................118

2

COUNT VII (Violation of Colorado Medicaid False Claims Act)...........................................119

COUNT VIII (Violation of Connecticut False Claims Act).........................................................121

COUNT IX (Violation of Delaware False Claims and Reporting Act)......................................122

COUNT X (Violation of District of Columbia False Claims Act)..............................................123

COUNT XI (Violation of Florida False Claims Act) ..................................................................125

COUNT XII (Violation of Georgia False Medicaid Claims Act).................................................126

COUNT XIII (Violation of Hawaii False Claims Act)................................................................127

COUNT XIV (Violation of Illinois False Claims Whistleblower Reward and Protection Act) .128

COUNT XV (Violation of Indiana False Claims and Whistleblower Protection Act)...............130

COUNT XVI (Violation of Louisiana Medical Assistance Programs Integrity Law) ...............131

COUNT XVII (Violation of Massachusetts False Claims Act).....................................................132

COUNT XVIII (Violation of Michigan Medicaid False Claims Act)........................................134

COUNT XIX (Violation of Minnesota False Claims Act) ..........................................................135

COUNT XX (Violation of Montana False Claims Act) ..............................................................137

COUNT XXI (Violation of Nevada False Claims Act)................................................................138

COUNT XXII (Violation of New Jersey False Claims Act) ........................................................139

COUNT XXIII (Violation of New Mexico Medicaid False Claims Act) ...................................140

COUNT XXIV (Violation of New York False Claims Act) ........................................................142

COUNT XXV (Violation of North Carolina False Claims Act) ..................................................143

COUNT XXVI (Violation of Oklahoma Medicaid False Claims Act) .......................................144

COUNT XXVII (Violation of Rhode Island False Claims Act)..................................................146

COUNT XXVIII (Violation of Tennessee Medicaid False Claims Act).....................................147

COUNT XXIX (Violation of Texas Medicaid Fraud Prevention Act).........................................148

COUNT XXX (Violation of Virginia Fraud Against Taxpayers Act) .........................................150

COUNT XXXI (Violation of Wisconsin False Claims for Medical Assistance Law)...............151

3

**THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
FALSE CLAIMS ACT AND STATE LAW COUNTERPARTS**

This is an action brought on behalf of the United States of America and the *Qui Tam*
States by John A. Wood ("Relator"), by and through his attorneys, against defendants Allergan,
Inc. ("Allergan") and Allergan plc (together the "Allergan Defendants"), pursuant to the *qui tam*
provisions of the Federal Civil False Claims Act, 31 U.S.C. § 3729 *et seq.*, and pursuant to the
*qui tam* provisions of the following states: the California False Claims Act, Cal. Gov't Code
§ 12650 *et seq.*; the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-304 *et seq.*;
the Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301a *et seq.*; the Delaware False
Claims and Reporting Act, Del. Code Ann. tit. 6, § 1201 *et seq.*; the District of Columbia False
Claims Act, D.C. Code § 2-308.13 *et seq.*; the Florida False Claims Act, Fla. Stat. § 68.081 *et
seq.*; the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 *et seq.*; the Hawaii
False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*; the Illinois False Claims Whistleblower
Reward and Protection Act, 740 Ill. Comp. Stat. § 175/1 *et seq.*; the Indiana False Claims and
Whistleblower Protection Act, Ind. Code § 5-11-5.5 *et seq.*; the Louisiana Medical Assistance
Programs Integrity Law, La. Rev. Stat. Ann. § 46:439.1 *et seq.*; the Massachusetts False Claims
Act, Mass. Gen. Laws ch. 12, § 5A *et seq.*; the Michigan Medicaid False Claims Act, Mich.
Comp. Laws § 400.601 *et seq.*; the Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq.*; the
Montana False Claims Act, Mont. Code Ann. § 17-8-401 *et seq.*; the Nevada False Claims Act,
Nev. Rev. Stat. § 357.010 *et seq.*; the New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-1
*et seq.*; the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq.*; the New
York False Claims Act, N.Y. State Fin. Law § 187 *et seq.*; the North Carolina False Claims Act,
N.C. Gen. Stat. § 1-605 *et seq.*; the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63,

§ 5053 *et seq.*; the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.*; the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*; the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq.*; the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.*; and the Wisconsin False Claims for Medical Assistance Law, Wis. Stat. § 20.931 *et seq.* ("State *qui tam* statutes" or "*Qui Tam* States").

## I.    INTRODUCTION

1.    This is an action to recover damages and civil penalties on behalf of the United States and the *Qui Tam* States based on Allergan Inc.'s kickbacks made to physicians across the country to unlawfully induce them into prescribing Allergan's brand name cataract surgery-related prescription drugs.  Allergan successfully induced ophthalmologists, including cataract surgeons, by providing, at no cost, a suite of cataract surgery-related goods, including prescription drugs, patient post-surgery supplies, physician-branded patient pre-operative and post-operative surgical instructions, as well as physician-branded pre-printed prescription pads and prescription pad imprint stamps (together, "free goods"), in violation of federal and state anti-kickback laws, which were enacted to protect patients and government-funded health care programs from fraud and abuse by curtailing the pernicious and corrupting influence of bribes on health care decisions.

2.    Since at least 2003, upon Allergan's introduction to the market of its new fourth generation eye drop anti-infective, used heavily by cataract surgeons, Allergan has successfully maximized its profits through the payment of these kickbacks to health care providers treating Medicaid and Medicare cataract patients, in a concerted effort to beat the competition, and thus illicitly maintain and increase its market share.

3.     Allergan's business model involved directing its nationwide army of ophthalmology sales representatives to provide free goods to physicians in order to induce these cataract surgeons to prescribe Allergan drugs Zymar®, Zymaxid®, Acular LS®, and Acuvail®.

4.     Allergan provided to ophthalmologists who performed cataract surgeries, as well as their associated clinics and surgery centers, valuable free goods such as cataract surgery Custom Care Kits ("CCKs") containing "free" prescriptions of multiple Allergan eye care drugs, including Pred Forte® (a topical steroid), Acular®/Acular LS®/Acuvail® (topical NSAIDs), and/or Zymar®/Zymaxid® (topical anti-infectives), along with free advertising and products in the forms of valuable customized instruction sheets and valuable prescription pads for these physicians and their clinics.  The physicians, in turn, provided the free CCKs to their patients, at least one aim of which was influence their cataract provider selection.  Throughout the course of this scheme, Allergan provided these free CCKs as "quid pro quos" contingent on the physician's agreement to prescribe its brand name drugs, instead of the competition's brand name drugs, or generic versions of such drugs.

5.     Allergan knew what it was doing, and why.  Allergan meticulously tracked the prescribing behavior (the "return on investment" or "ROI") of the physicians who received these free goods, to ensure that the Company was getting what it intended to achieve – a sufficient return on its free goods investment.  Documents such as a "Game Plan II" distributed by Allergan Field Sales Trainer William Scruggs from 2006-2008 to the Allergan sales force evidences the Company's tracking of prescriptions, and that the free goods required physician prescribing in exchange.  If physician recipients of Allergan's free goods did not in turn prescribe Allergan's drugs, Allergan acted by terminating supplies of free goods.  Examples follow:

6

- When the return on investment for Community Eye Center in Michigan had declined, Allergan's "Action Plan" was that there would be "[n]o more kits till we see a better return."

- When Great Lakes Ophthalmology began giving away too may CCKs per patient, Allergan notes that it "explained the situation" to the physicians who then told their staff for every CCK they provided to a patient, they would write prescriptions for Allergan drugs.

- When Allergan noticed that Dr. Richard Kaiserman from East Tawas, Michigan (who treated 25% Medicaid patients) was giving away two CCKs per patient (and thus not writing any prescriptions for Allergan drugs), the Allergan representative had the "kit talk" (*i.e.*, the quid pro quo discussion) and told him that it "can't support [with any more free kits] unless your giving 1 kit per pat" (sic).

6.      In 2009, Allergan, under investigation for its illegal Botox marketing schemes, began to change its corrupt business model out of concern that it was illegal.  In an internal PowerPoint slide deck entitled "2009 External Disease Update" provided to the sales force, Allergan propounded "Allergan Business Practices that will Change in 2009." The changes involved ceasing the long-standing practice of giving physicians free cataract surgery CCKs and also stopping the practice of sales representatives assisting in creating customized patient instruction sheets.

> ### Allergan Business Practices that will Change in 2009
>
> - Custom Care Kits will no longer be available for free
> - Representatives will no longer be able to assist in creating Patient Instruction Sheets
> - TSS Dollars will no longer be available
> - Meds Only Contracts will be available for Top 1,000 accounts.
>   - Will now be called Direct Sample Ship
>
> FOR YOUR INFORMATION ONLY. DO NOT DUPLICATE, DETAIL, DISTRIBUTE, OR USE IN ANY PROMOTIONAL MANNER.

7.      The slide deck also includes an admission by Allergan that "Physician's acceptance of free CCKs can be interpreted as being in violation of the Federal Anti-Kickback statutes."

> ### What are the implications of accepting free kits for our customers?
>
> - The Office of Inspector General (OIG) and the Department of Justice (DOJ) use the PhRMA and ADVAMED guidelines to guide them in their investigations and consider them a minimum threshold for compliance
> - Physician's acceptance of free kits can be interpreted as being in violation of Federal Anti-Kickback statutes.
> - The penalty for violation of these statutes on behalf of anyone include; substantial fines, incarceration, and suspension of medical licenses.
> - In addition, PhRMA guidelines have become state law in some states such as California.
>
> FOR YOUR INFORMATION ONLY. DO NOT DUPLICATE, DETAIL, DISTRIBUTE, OR USE IN ANY PROMOTIONAL MANNER.

8.      Even then, however, because these kickbacks had become the key to selling its cataract drugs, Allergan still did not altogether stop giving substantial quantities of its free prescription drugs to physicians' practices.  Thus, even after Allergan stopped providing free

CCKs due to anti-kickback implications, it continued to provide physicians with substantial quantities of free drugs, in exchange for their agreement to prescribe additional Allergan products.  Just as it had with its free CCKs, Allergan again closely monitored its return on investment from the free drugs it provided relative to the prescriptions written by the receiving physician in order to ensure that the Company was achieving what it expected.

9.     Allergan also continued providing its free goods (Allergan referred to these bribes as "resources") to induce physicians to prescribe its drugs.  These included free patient instruction sheets and free pre-printed prescription pads, which specifically advertised the ophthalmologist and clinic and became central to the physician's agreement to participate in the scheme.

10.     Allergan knew that many (if not most) of the patients being treated with Zymar®, Zymaxid®, Acular®, Acular LS®, and Acuvail® were Medicare and Medicaid patients ("Government Program Beneficiaries"), and it intended (a) that its provision of free goods was contingent upon, and would induce, health care professionals to prescribe these drugs; and (b) that its free goods, along with free advertising for physicians and their clinics, would be provided to Government Program Beneficiaries to influence their choice of provider.  The claims for these Government Program Beneficiaries were submitted by pharmacies, and were tainted by kickbacks making them false claims. The claims were reimbursed or paid for by Government Programs, such as Medicaid and Medicare Part D.

11.     Allergan has, *inter alia*, knowingly (a) disregarded federal laws and FDA regulations relating to prohibitions on sampling and illegal kickback schemes; and (b) concealed the fact that shipments of free supplies and free samples of Pred Forte®, Acular®, Acular LS®,

Acuvail®, Zymar®, and Zymaxid® and other Allergan products were illegally being traded in exchange for Acular®, Acular LS®, Acuvail®, Zymar®, and Zymaxid® prescriptions.

12.     Allergan has violated Federal and State Anti-Kickback Statutes, as well as the Federal and State False Claims Acts, and in so doing, has cheated the Federal Government and the *Qui Tam* States into paying hundreds of millions of dollars in prescription drug claims that were not eligible for reimbursement.

13.     This Third Amended Complaint makes no allegations concerning the provision of free services, such as consulting services, provided by Allergan to health care professionals.

## II.     JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1331, and 28 U.S.C. § 1345.  The Court has original jurisdiction of the State law claims pursuant to 31 U.S.C. § 3732(b) because this action is brought under State laws for the recovery of funds paid by the *Qui Tam* States, and arises from the same transaction or occurrence brought on behalf of the United States under 31 U.S.C. § 3730.

15.     This Court has personal jurisdiction over the Defendant because, among other things, Defendant transacts business in this District, and engaged in wrongdoing in this District.

16.     Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c).  Defendant transacts business within this District, and acts proscribed by 31 U.S.C. § 3729 occurred in this District.

17.     The causes of action alleged herein are timely brought because, among other reasons, of efforts by the Defendant to conceal its wrongdoing from the United States and the *Qui Tam* States in connection with the allegations made herein.

### III.    PARTIES

#### A.    Plaintiff/Relator John A. Wood

18.    Plaintiff/Relator John A. Wood ("Relator Wood") is a resident of Ohio.  He received a Bachelor of Science, Sports Management degree from Valparaiso University, Valparaiso, Indiana in May 1998.  Relator Wood was employed by Defendant Allergan as an ophthalmology sales representative from October 2008 to July 6, 2010, when he was unlawfully terminated as a result of his whistle-blowing activity.

19.    While employed at Allergan, Relator Wood was a Senior Territory Manager in the Northeast Ohio district.  Prior to joining Allergan, Relator Wood worked for Pfizer, from 2003 to 2006 as a Cardiovascular Sales Representative, and, from 2006 to October 2008, as a Therapeutic Sales Representative selling ophthalmic products.

20.    Relator Wood held the title of Senior Territory Manager throughout his tenure at Allergan.  In that capacity, Relator Wood called on health care professionals in his assigned territory and, as directed by Allergan, aggressively promoted his assigned drugs, including Pred Forte, Acular®, Acular LS®, Acuvail®, Zymar®, and Zymaxid®.   Relator Wood's compensation package was calculated as base compensation plus a bonus based on progress reaching a predetermined goal for monthly sales growth.  In this way, Allergan tied sales representatives' compensation to the Company's sales growth and incentivized each sales representative to increase sales irrespective of the illegality of its use of kickbacks.

21.    Relator Wood is an original source of the free goods kickback claims in this Third Amended Complaint, and these allegations are not based upon publicly disclosed information. He has provided the government with material information prior to the filing of this Third Amended Complaint in accordance with 31 U.S.C. § 3730(b)(2), including electronic and hard

copy documents, detailed internal Allergan databases which tracked free goods provided to health care professionals throughout the United States, and the impact of those kickbacks on prescribing behavior in connection with private and government program patients, and audio recordings.   Also prior to filing this Third Amended Complaint, Relator Wood brought the wrongdoing described herein to the attention of Allergan.

      **B.**     **Defendants Allergan, Inc. and Allergan plc**

    22.    Defendant Allergan, Inc. has been a pioneer in the development of prescription eye care products, as well as prescription biological products, including Botox.  Allergan, Inc.'s success resulted in the creation and operation of a large specialized eye care division, which has produced, marketed and promoted eye care prescription drugs, including those that are the subject of this lawsuit:  Acular®, Acular LS®, Acuvail®, Zymar®, Zymaxid®, Pred Forte®, as well as non-prescription over-the-counter eye drops Optive® and Refresh®. Allergan has marketed and sold these products for use in the cataract surgery setting, where some 3 million cataract surgeries are performed annually.  Allergan, Inc. has been a global leader in the eye care business and has been one of the fastest-growing eye care companies in the world.  For 2011, Allergan reported $5.35 billion in sales and $934.5 million in profit.  In its fourth quarter 2011 earnings release, Allergan predicted full-year 2012 sales of $5.65 billion to $5.85 billion.

    23.    At all times material hereto, Allergan, Inc. has been and continues to be a Delaware corporation with its principal place of business at 2525 Dupont Drive, Irvine, California 92612.

    24.    On November 16, 2014, Allergan, Inc. and pharmaceutical manufacturer Actavis plc, a company incorporated under the laws of Ireland, entered into an "Agreement and Plan of Merger" ("Merger Agreement"), a combination which resulted in Allergan, Inc. becoming an

indirect wholly-owned subsidiary of Actavis plc, which acquired all of Allergan, Inc.'s assets and assumed its liabilities, including any and all liability in connection with this TAC.

25.     After valuing Allergan, Inc.'s assets and liabilities, Actavis plc agreed to a cash and equity transaction valued at $70.5 billion, creating one of the top ten pharmaceutical companies in the world.

26.     On or about March 17, 2015, Actavis plc announced that it had formally closed on its merger with Allergan, Inc.  Three months later, in June 2015, Actavis plc announced that it changed its name to Allergan plc, in connection with a world-wide rebranding campaign. Actavis plc also announced that its U.S. and Canadian generic drug business would continue to operate under the Allergan name because of the name's familiarity with customers.  Actavis plc added that it would also change its stock symbol to Allergan's "AGN" on the New York Stock Exchange.

27.     Although Actavis plc, now re-named and known as Allergan plc (and henceforth referred to in this TAC as "Allergan plc"), has its principal executive offices in Dublin, Ireland. Allergan plc maintains substantial corporate, manufacturing and distribution offices and facilities in the United States.  For example, Allergan plc operates a "U.S. Administrative Headquarters" located at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey 07054. Allergan plc's "Allergan in the United States" webpage provides detailed addresses for multiple additional Allergan plc offices and facilities in the U.S., including in Parsippany, N.J., Jersey City, N.J., Rockaway, N.J., Fajardo, Puerto Rico and Manati, Puerto Rico.  *See* http://www.allergan.com/about/global-locations/countries/united-states (last checked May 4, 2016).

28.     In addition, Allergan plc, through its subsidiary Anda, Inc., operates one of the United States' largest medicine distribution networks, shipping generic and select brand pharmaceutical products, vaccines, injectables and over-the-counter medicines to more than 60,000 locations, including independent pharmacies, alternate care providers (hospitals, nursing homes and mail order pharmacies), pharmacy chains and physicians' offices. Anda, Inc. is located at and distributes products from its facilities located in Weston, Florida, Groveport, Ohio, and Olive Branch, Mississippi.

29.     As a combined company, Allergan plc and Allergan, Inc. function as one, integrated entity.  Allergan, Inc. has no independent decision-making capabilities and all facets of its operations are dominated, controlled and directed by Allergan plc.  As a result of the control exerted by Allergan plc, all financial gains and losses attributed to Allergan, Inc. inure directly to the benefit or detriment of Allergan plc and its shareholders.

30.     The Allergan Defendants have maintained and continue to maintain a substantial presence, and have maintained continuous, systematic, and substantial contacts with New York, Pennsylvania and the United States, including in this judicial district.  The Allergan Defendants have marketed and sold substantial quantities of its drug products in New York, Pennsylvania and the United States, including in this Judicial District.

## IV.     SUMMARY OF DEFENDANT'S ILLEGAL CONDUCT

### A.     The Purpose of the Kickback Scheme

31.     It was the plan and purpose of Allergan's fraudulent free goods kickback scheme, beginning at least as early as 2003, to provide free supplies and drugs, including Pred Forte®, Acular®, Acular LS®, Acuvail®, Zymar®, and Zymaxid®, in order to induce physicians to

prescribe additional Allergan drugs, including Acular®, Acular LS®, Acuvail®, Zymar®, and Zymaxid® (hereinafter, the "Kickback Scheme").

32.     The physicians, in turn, provided the free CCKs and free samples to Government Program Beneficiaries, along with free advertising for the physicians and the physicians' clinic, at least one aim of which was to influence patients' provider selection.   Allergan knew that distribution of free goods was likely to influence selection of a particular provider and that providers enjoyed the marketing benefits provided by the free drug and customized prescription pads and other articles which set forth the provider's name.   Free drugs and marketing materials for the doctors induced the doctors to prescribe Allergan drugs.

33.     These actions by Allergan constitute violations of the Federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), in that they were taken to induce health care professionals to prescribe Acular®, Acular LS®, Acuvail®, Zymar®, and/or Zymaxid®.

34.     Allergan's provision of free supplies and drug products was made knowingly and with the intent to induce Government Programs to pay for Allergan's drug products.   Allergan did so through a pattern of corrupt and illegal conduct in violation of the AKS, the Prescription Drug Marketing Act ("PDMA"), and the federal False Claims Act and State *qui tam* statutes.

**B.     The Manner and Means of Executing the Scheme**

35.     At all times material hereto, Allergan used its substantial sales force to increase sales of its drugs.   From the beginning of Relator Wood's tenure at Allergan, he (and other new employees from various parts of the country) received training materials from Allergan's corporate headquarters, and training by Allergan, to engage and perpetuate Allergan's nationwide unlawful marketing schemes.   Relator Wood was told by supervisors that these sales

techniques were intended to meet the competition (*i.e.*, Alcon).  In his training, Relator Wood was instructed by Allergan management to offer kickbacks to "buy the business."

36.     At all times material hereto, the Allergan sales teams were organized and separately designated based on which products they promoted.  Allergan's cataract surgery products, which included Acular®/Acular LS®/Acuvail®, Zymar®/Zymaxid®, Pred Forte, as well as non-prescription Optive®/Refresh® eye drops, were promoted by Allergan's Blue and Gold sales teams.

37.     At all times material hereto, sales teams were further separated by geographic territory.  Each territory included four Territory Managers (*i.e.*, sales representatives) whose responsibility it was to detail Allergan drugs to health care professionals.  These four Territory Managers shared responsibility for calling on the same accounts and are collectively referred to as a "Pod."  Each Pod reported to an Area Manager, who was responsible for eight to twelve Territory Managers.  There were 97 Pods in the country, representing 97 sales territories.  Each territory was ranked 1-97 based on its success meeting its sales quota.

38.     Allergan's unlawful marketing schemes were planned, implemented and monitored by the highest levels of Allergan's corporate officers.  Area Managers reported to Regional Sales Directors, who in turn reported to Vice President of Sales for U.S. Eye Care, Dave LeCause.  LeCause reported to Vice President of Sales Joseph Schultz, until Schultz retired in June 2010. Schultz, in turn, reported to Vice President of North American Pharmaceuticals, Julian Gangolli, who reported to CEO David Pyott.

39.     Since Blue and Gold representatives traditionally carried identical products, these teams worked closely together and were ranked almost identically at any time.  The same held true for the Red and Silver teams.  Competition was therefore most pronounced within sales

16

teams, among Pods.  Territory Managers in the same Pod generally worked together to share "resources" such as samples, speaker program budgets, and lunch meetings with top accounts, to ensure that they were maximized to achieve the best return on investment.

40.    In addition to Territory Managers, Allergan employed Specialty Account Managers ("SAMs") to call on retinal specialists, large teaching institutions, and residency programs, where they promoted the full line of Allergan products.  At all times material hereto, there were about fifty Allergan SAMs nationwide, who report to SAM Area Managers.  Their assigned geographic area generally overlapped multiple territories.  In addition, there were twenty Regional Account Managers ("RAMs"), who were responsible for calling on managed care plans and securing favorable formulary status for Allergan's products.  RAMs occasionally rode with Territory Managers to gain insight into how a product's formulary status affects sales.

41.    Relator Wood, like all of Allergan's sales force, was directed by management to implement Allergan's long-standing strategy, whereby Allergan routinely: (a) distributed numerous free supplies and drugs, including large shipments of the Allergan drugs, across the country in order to induce physicians to prescribe (or prescribe greater quantities of) Allergan's drugs; and (b) provided ophthalmologists with free supplies such as pre- and post-surgical dosing instructions and preprinted prescription pads in exchange for their agreement to prescribe Allergan drug products.

42.    Allergan intended its provision of free goods to induce doctors to write more prescriptions for the Allergan drugs. Allergan conducted return-on-investment analyses that revealed that this strategy was successful in inducing writing prescriptions. Allergan used its free goods as a key mechanism to promote its drugs, and created incentives for its sales

17

representatives to broker the free goods for more prescriptions by basing representatives' compensation on the number of prescriptions that doctors wrote.

43.     Defendant Allergan's illegal promotion of its drugs involved the unlawful making of false records or statements and/or causing false claims to be submitted by pharmacies for the purpose of getting the false records or statements to bring about the Federal Government and *Qui Tam* States' payment of false or fraudulent claims.

44.     Defendant Allergan's conduct had a material effect on the Governments' decision to pay for its drug products.  Had the federal Government and *Qui Tam* States known that the prescriptions written for Allergan's brand-name drug products were the intended result of Defendant's unlawful marketing activities, they would not have made such reimbursements.

## V.     BACKGROUND OF DRUGS PROMOTED BY ALLERGAN

45.     At all times material hereto, Allergan manufactured and marketed drugs that treated various ophthalmic conditions, and many of its key customers were ophthalmologists. There are some 15,000 ophthalmologists in the United States, the majority of whom perform eye surgeries, including cataract surgery.  For use pre- and post-cataract surgery, ophthalmologists routinely prescribe topical steroids such as Pred Forte®, anti-infectives such as Zymar® and Zymaxid®, and non-steroidal anti-inflammatory ("NSAIDS") drugs such as Acular®, Acular LS®, and Acuvail®.  Given the significant number of cataract surgeries performed each year in the United States, the market for surgery-related prescription drugs is substantial.

46.     This market is also highly competitive.  In addition to Allergan, at all times material hereto, Alcon, Inc. ("Alcon"), headquartered in Fort Worth, Texas, has a large market presence, selling products that compete head-to-head with Allergan's anti-infectives and

NSAIDs.  Together, Allergan and Alcon dominate the eye care drug market, each possessing approximately 50% of all cataract surgery-related drug sales.

47.    Faced with intense competition from Alcon, Allergan implemented increasingly aggressive – and illegal – strategies to maintain and gain market share.  Allergan's strategy was simple:  provide ophthalmologists with free goods and free supplies to win their business and stave off competition ("The Kickback Scheme").  These free drugs and free supplies included were placed into a CCK which patients were instructed to use pre- and post-surgery.  The CCKs and patient instruction sheets also included valuable advertising and promotion for the physicians, and were used to induce patients to select these physicians for their cataract surgeries.  When Defendant was no longer able to use the CCKs as inducements, it used other free drugs and products as kickbacks as set forth herein.

### A.    Acular®, Acular LS®, and Acuvail® (ketorolac ophthalmic solution, 0.5%, 0.4%, and 0.45%, respectively)

48.    Acular® was originally approved on November 9, 1992, for treatment of allergic conjunctivitis.  In November 1997, its indication was expanded to include treatment of post-surgical inflammation following cataract extraction.

49.    On May 30, 2003, the FDA approved a new formulation of Acular®, branded Acular LS®, which contained ketorolac, the same active ingredient as the original Acular®, but at a reduced concentration of 0.4% instead of the original 0.5%.  The FDA approved Acular LS® for the reduction of ocular pain and burning/stinging following corneal refractive surgery.  Corneal refractive surgery corrects mild-to-moderate nearsightedness, and is also referred to as "LASIK surgery."

19

50.     Until it became available generically in September 2009, a 5 ml bottle of Acular LS® cost between $70 and $100.  As part of its Kickback Scheme, Allergan provided Pred Forte® or other Allergan drugs to numerous ophthalmologists in exchange for their agreement to prescribe Acular LS®.

51.     Beginning in 2009, in order to stem the anticipated loss of revenue from Acular LS® as a result of generic competition, Allergan sought to convert all Acular LS® prescriptions to Acuvail®.  To do so, Allergan also provided free patient CCKs which included Allergan drugs to ophthalmologists in exchange for their agreement to prescribe Acuvail®.

**B.     Zymar® and Zymaxid® (gatifloxacin ophthalmic solution, 0.3% and 0.5%, respectively)**

52.     Zymar® was approved by the FDA on March 28, 2003, for the treatment of acute bacterial conjunctivitis caused by susceptible strains of aerobic Gram-positive bacteria *Cornyebacterium propinquum*, *Staphylococcus aureus*, *Staphylococcus epidermidis*, *Streptococcus mitis*, *Streptococcus pneumoniae*; or aerobic Gram-negative bacteria *Haemophilus influenzae*.  Allergan licenses Zymar® from Kyorin Pharmaceutical Co., Ltd., and has worldwide ophthalmic commercial rights excluding sales in Japan, Korea, Taiwan, and certain other countries in Asia and Europe.

53.     When it was launched, Zymar® was the first "fourth generation" fluoroquinolone approved for treatment of bacterial conjunctivitis, and Allergan intended it as a replacement for its third-generation Ocuflox® (ofloxacin ophthalmic solution), which was about to lose patent protection.

54.     The FDA's limited approval of Zymar® for bacterial conjunctivitis, however, substantially limited its sales potential.  Sales pressure increased when Alcon's competing

20

fluoroquinolone Vigamox® was approved in late 2003, also for treatment of bacterial conjunctivitis.

55.     To drive sales, Alcon provided ophthalmologists, and particularly cataract surgeons, with free patient CCKs that included Pred Forte® and/or other Allergan eye care products in exchange for their agreement to prescribe Zymar®.

56.     In addition to competition from Vigamox®, Allergan also faced the prospect of competition from generic versions of Zymar®.  In 2007, Allergan and its Japanese licensors filed suit against generic Apotex, Inc., which had submitted an Abbreviated New Drug Application to market generic versions of Zymar®.  On June 14, 2010, the United States District Court for Delaware held that the Zymar® '045 patent was invalid for obviousness.  *See Senju Pharmaceutical Co.  Ltd. v. Apotex Inc.*, 07-cv-779-SLR (D. Del.).

57.     In order to mitigate competition from generic equivalents of Zymar®, Allergan sought approval for a follow-on product Zymaxid®, which the FDA approved on May 20, 2010, for treatment of bacterial conjunctivitis.  The only difference between these two drugs is the slight increase in the active ingredient's concentration.  Zymaxid® contains 0.5% gatifloxacin, compared to Zymar®'s 0.3% gatifloxacin.  Allergan's Zymaxid® strategy was to switch physician prescriptions from Zymar®.  Allergan rolled out its Kickback Scheme machinery, directing Allergan's sales representatives to inform physicians that they would only continue to receive free drug shipments if they would agree to switch patients to Zymaxid® from Zymar®.

58.     Allergan continued the Kickback Scheme with regard to Zymaxid®, including provision of its free suite of cataract surgery goods, including Allergan drugs, in exchange for physicians' agreement to prescribe Zymaxid®.

C.    **Pred Forte® (prednisolone acetate ophthalmic suspension, 1%)**

59.    Pred Forte® is an ophthalmic corticosteroid indicated for the treatment of steroid responsive inflammation of the palpebral and bulbar conjunctiva, cornea and anterior segment of the globe.  It was approved by the FDA on May 30, 1973.

60.    A 10 mL bottle of Pred Forte® costs $68.06 at www.DrugStore.com.  As part of its Kickback Scheme, Allergan provided ophthalmologists with massive quantities of free Pred Forte® in exchange for their agreement to prescribe Zymar®, Zymaxid®, Acular LS®, and/or Acuvail®.  The "free" sample of Pred Forte® was generally sufficient for the duration of the entire post-surgical regimen for two cataract surgeries (i.e., for both eyes).

VI.    **BACKGROUND OF THE REGULATORY FRAMEWORK**

A.    **The Anti-Kickback Statute**

61.    In 1972 Congress enacted the Anti-Kickback Statute ("AKS"), codified at 42 U.S.C. § 1320a-7b(b).  It arose out of Congressional concern that payoffs to those who can influence healthcare decisions will compromise sound medical judgment and interfere with the provider-patient relationship, resulting in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population.  Government-funded healthcare programs rely upon the independent medical judgment of healthcare professionals providing care to beneficiaries to ensure that the services and goods used and delivered to beneficiaries are medically necessary, of appropriate quality, and an efficient use of Government funds.  To protect the integrity of Federal healthcare programs from these difficult to detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.

62.     Compliance with the AKS is a precondition to participation as a health care provider under the Affordable Care Act, Medicaid, CHAMPUS/TRICARE, CHAMPVA, the Federal Employee Health Benefit Program, and other federal health care programs.  Moreover, numerous of the States have had+ analogous anti-kickback statutes, making it illegal to offer any form of kickback to induce a healthcare professional to use its products.

63.     The AKS and analogous State laws prohibit any person or entity from making or accepting payment to induce or reward any person for referring, recommending, or arranging for the purchase of any item for which payment may be made under a Federally-funded healthcare program.  42 U.S.C. § 1320a-7b(b)(1) and (2).  Under this statute, manufacturers of pharmaceutical drug products may not offer or pay any remuneration, in cash or kind, directly or indirectly, to induce healthcare professionals or others to order or recommend products that may be paid for by a Federal healthcare program.  The law not only prohibits outright bribes and rebate schemes, but also prohibits any payment in cash or kind that has as one of its purposes inducement of a healthcare provider to use or prescribe the manufacturer's products.  42 U.S.C. § 1320a-7b(b)(1).

64.     In relevant part, the AKS states:

[W]hoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person--

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal healthcare program, or

23

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal healthcare program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b)(2).

65.     AKS promulgating regulations directly prohibit any provider from receiving remuneration paid with the intent to induce referrals that takes into account the "volume or value" of any referrals or business generated.   *See* 42 C.F.R. § 1001.952(f)(2).   Such remuneration amounts to a kickback and can increase the expenditures paid by Government-funded health benefit programs by leading to over-utilization of certain products or services, inducing medically unnecessary and excessive reimbursements.   Kickbacks also effectively reduce patients' healthcare choices, because unscrupulous (or unknowing) physicians steer their patients to various products or services based on the physician's own interests rather than the patients' medical needs.

66.     Proof of an explicit *quid pro quo* is not required to show a violation of the AKS.

67.     Violation of the AKS subjects the violator to exclusion from participation in Federal healthcare programs, civil monetary penalties, and imprisonment of up to five years per violation.  42 U.S.C. § 1320a-7b(b)(7) (criminal sanctions) and 42 U.S.C. § 1320a-7a(a)(7) (civil sanctions).

68.     Instructive here are Special Alerts and Guidance documents issued by HHS with respect to other practice areas, such as pharmaceuticals.   Concern about improper product marketing practices prompted the Inspector General of the Department of Health and Human

24

Services ("HHS") to issue a Special Fraud Alert in 1994 identifying prescription product marketing practices that violate the AKS. Special Fraud Alert: Prescription Drug Marketing Schemes, 59 Fed. Reg. 65,376 (Dec. 19, 1994). Among the suspect practices cited by the Inspector General were payments or gifts to physicians who had offered no particular services of benefit to the product company, but who had generated in the past, or had the potential to generate in the future, a large volume of business for the product company. *Id.*

69.    In May 2003, the Inspector General of HHS released a further Guidance identifying in greater detail several marketing practices of product manufacturers that constitute "kickbacks and other illegal remuneration" infecting Federal healthcare programs. OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731 (May 5, 2003). The 2003 Guidance cautions manufacturers that, whenever a manufacturer provides anything of value to a physician who might use the manufacturer's product(s), the manufacturer should examine whether it is providing a valuable tangible benefit to the physician with the intent to induce or reward referrals.

70.    This Guidance also warned about the use of drug samples to induce physician prescribing: "In some circumstances, if the samples have monetary value to the recipient (e.g., a physician) and are used to treat federal health care program beneficiaries, the improper use of samples may also trigger liability under other statutes, including the False Claims Act and the anti-kickback statute."

71.    For many years there has also been clear guidance from the OIG on what constitutes "free" goods. In a 1997 letter, for example, the OIG clearly articulates its "view that the provision of free goods by a seller to an actual or potential referral source can violate the

anti-kickback statute depending on the circumstances."[1] Further, the OIG explained what it viewed as suspect using the example of giving free computers to physicians. According to the OIG, in some situations, "it appears that the computer has no independent value [to the referral source] . . . and that the purpose of the free computer is not to induce an act prohibited by the statute," whereas in other situations, "the computer has a definite value to the physician," e.g., because it is a "regular personal computer, which the physician is free to use for a variety of purposes," "and, depending on the circumstances, may well constitute an illegal inducement."[2]

72.    When discussing each of these examples, the OIG raises anti-kickback concerns in the situations in which the free goods were provided to the referral source, including the following:

- goods that provide a "tangible benefit" or "financial benefit" to the referral source[3];

- any gift to a referral source that has independent value to such source[4]; or

- supplies for which the referral source would otherwise be obligated to incur costs.[5]

73.    HHS has published safe harbor regulations defining activities that, when properly conformed to the law, are not subject to prosecution or sanctions or other liability under the

---

[1] OIG Letter, "Free Computers, Facsimile Machines and Other Goods" (July 3, 1997), available at http://oig.hhs.gov/fraud/docs/safeharborregulations/freecomputers.htm; *see also* OIG Letter, "Free Prostate Biopsy Needles" (Aug. 4, 1997), available at
http://oig.hhs.gov/fraud/docs/safeharborregulations/freeneedles%20080497.htm.
[2] Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti-Kickback Provisions, 56 Fed. Reg. 35,952, 35,978 (July 29, 1991) (codified at 42 C.F.R. pt. 1001); *see also, e.g.*, OIG Letter, "Provision of Free Goods and Services" (July 1, 1997), available at
http://oig.hhs.gov/fraud/docs/safeharborregulations/provision070197.htm; Fourth in a Series on Health Care Information Technology: Hearing before the Subcomm. on Health of the H. Comm. on Ways and Means, 109th Cong. 16-21 (2006) (statement of Lewis Morris, Chief Counsel to the Inspector Gen., U.S. Dep't of Health & Human Servs.), available at http://purl.access.gpo.gov/GPO/LPS7932 [hereinafter Morris Hearing Testimony].
[3] OIG Adv. Op. 98-16; OIG. Adv. Op. 04-16, at 4,5 (Nov. 18, 2004), available at
http://oig.hhs.gov/fraud/docs/advisoryopinions/2004/ao)416.pdf; OIG Adv. Op. 08-06, at 5 (May 2, 2008), available at http://oig.hhs.gov/fraud/docs/advisoryopinions/2008/AdvOpn08-06.pdf.
[4] OIG Letter, "Free Prostate Biopsy Needles."
[5] OIG Letter, "Free Services Performed by Clinical Laboratories."

AKS.  42 C.F.R. § 1001.952.  Only if the activities precisely conform to the safe harbors' parameters does the law afford protection.  None of the misconduct alleged herein meets any of these safe harbor requirements.

74.    Moreover, healthcare providers are acutely aware that compliance with the AKS is a condition of participation and a condition of payment.  Either pursuant to provider agreements, claims forms, or other documents, healthcare professionals who participate in a Federal healthcare program generally must expressly undertake to comply with the AKS, and thereafter certify (either impliedly or expressly) that they have complied with the applicable Federal rules and regulations, including the AKS.

75.    Any party convicted under the AKS must be excluded (*i.e.*, not allowed to bill for services rendered) from Federal healthcare programs for a term of at least five years.  42 U.S.C. §1320a-7(a)(1).  Even without a conviction, if the Secretary of HHS finds administratively that a provider has violated the statute, the Secretary may exclude that provider from the Federal healthcare programs for a discretionary period (in which event the Secretary must direct the relevant State agency(ies) to exclude that provider from the State health program), and may consider imposing administrative civil sanctions of $50,000 per kickback violation.  42 U.S.C. § 1320a-7a(a).

76.    The enactment of these various provisions and amendments demonstrates Congress' commitment to the fundamental principle that Federal healthcare programs will not tolerate the payment of kickbacks.  Thus, compliance with the AKS is a prerequisite to a provider's right to receive or retain reimbursement payments from Medicaid and other Federal healthcare programs.  Reimbursement is also prohibited by the general legal principle that

providers who are corrupt or unethical or violate the integrity of a Government program involving Government funds are not entitled to payment from the public for the resulting claims.

77.     Violation of the AKS is expressly defined to constitute grounds for liability under the Federal FCA.  42 U.S.C. § 1320a-7(b)(g), as amended by the Affordable Healthcare for America Act (eff. March 23, 2010).  Even prior to this express statement by Congress, the courts had interpreted an AKS violation as a proper predicate for FCA liability on the grounds that: 1) healthcare providers expressly undertake to comply with the AKS as a condition of payment, and thereafter certify (expressly and/or impliedly) that they have complied with the AKS as a condition of payment, thereby supporting liability for making false certifications (express and/or implied); and/or 2) violations of the AKS "taint" the claims submitted to the Government and render the claims "factually false" and ineligible for payment because they violate a condition of payment.  *See, e.g., U.S. ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235 (3d Cir. 2004).

78.     With regard to the certification theory of FCA liability, in order to bill Medicare or Medicaid, healthcare providers must sign and submit to CMS various Provider Applications, Provider Agreements, and Claim Forms that include various certifications of compliance with applicable laws – including the AKS.

79.     Although the Medicaid Provider Application varies from state to state, the provider typically affirms and undertakes compliance with all applicable state and Federal laws.

80.     In the standard Medicare Provider Agreement, the provider affirms and undertakes compliance as follows:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [me].  The Medicare laws, regulations, and program instructions are available through the [Medicare] contractor.  I understand that <u>payment of a claim</u> by Medicare is <u>conditioned</u>

28

upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to the Federal Anti-Kickback statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare.

Form CMS-855A (for institutional providers); Form CMS-855I (for physicians and non-physician practitioners; Form 855-S (for Durable Medical Equipment, Prosthetics, Orthotics and Supplies (DMEPOS) Suppliers).

81.     Even where the provider Application and Provider Agreement are construed as an undertaking of future compliance rather than an ongoing express certification of compliance, that undertaking is sufficient to render the ensuing claims for payment an implied certification of compliance with the stated conditions of payment.

82.     In addition, the standardized Claim Form used for Medicare, CHAMPUS, and Medicaid, requires the provider to expressly affirm, respectively:

SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, CHAMPUS, …)

* * *

NOTICE:  Any one [sic] who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

MEDICAID PAYMENTS (PROVIDER CERTIFICATION)

* * *

NOTICE:  This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State

29

funds, and that any false claims, statements, or documents, or concealment of a material

fact, may be prosecuted under applicable Federal or State laws.

FORM CMS-1500 (08-05).  In other words, the provider expressly certifies that they are entitled

to receive payment.

83.     In the present case, all of the healthcare providers who submitted claims for

payment to Medicare and/or Medicaid would have signed the requisite provider Applications,

Provider Agreements and Claim Forms, thereby supporting FCA liability for making false

implied and/or express certifications of compliance with the AKS condition of payment.

**B.     The Prescription Drug Marketing Act**

84.     The Prescription Drug Marketing Act 21 U.S.C. §§ 353, *et seq.,* (the "PDMA"),

governs the distribution of drug samples.

85.     The PDMA permits sales representatives to distribute drug samples to licensed

physicians, but only upon the signed written request from the licensed physician for the drug

samples. 21 U.S.C. § 353(d)(3)(A); 21 C.F.R. § 203.31. Such written requests, which have to be

received before the drug samples are delivered, must, *inter alia,* identify (a) the physician, (b) the

quantity of the particular drug samples requested, and (c) the date of the request. 21 U.S.C.

§ 353(d)(3)(A); 21 C.F.R. § 203.31(a)(1) and (b).

86.     Manufacturers or authorized distributors of record shall not distribute drug

samples on the basis of open-ended or standing requests, but shall require separate written

requests for each drug sample or group of samples." 21 C.F.R. § 203.35.

87.     Physicians are required to sign receipts for all drug samples received from sales

representatives. 21 C.F.R. § 203.31(a)(3) and (c). Such receipts must, *inter alia,* identify (a) the

physician or the physician's designee who acknowledges the delivery of the drug samples, (b)

the quantity of the particular drug samples delivered, and (c) the date of the delivery. 21 C.F.R. § 203.31(c)(1).

88.     "Manufacturers or authorized distributors of record shall not distribute drug samples on the basis of open-ended or standing requests, but shall require separate written requests for each drug sample or group of samples." 21 C.F.R. § 203.35.

89.     Physicians are required to sign receipts for all drug samples received from sales representatives. 21 C.F.R. § 203.31(a)(3) and (c). Such receipts must, *inter alia,* identify (a) the physician or the physician's designee who acknowledges the delivery of the drug samples, (b) the quantity of the particular drug samples delivered, and (c) the date of the delivery. 21 C.F.R. § 203.31(c)(1).

90.     Pursuant to the PDMA, drug manufacturers are required, *inter alia,* to maintain detailed records of (a) all inventories of drug samples, (b) all drug samples distributed to physicians, (c) all sales representatives who distributed drug samples to physicians, and (d) all of the written requests for drug samples made by physicians. 21 U.S.C. § 353(d)(3)(C); 21 C.F.R. § 203.31(d) and (e).

91.     The PDMA mandates that [n]o person may sell, purchase, or trade or offer to sell, purchase, or trade any drug sample." 21 U.S.C. § 353(c)(1).

92.     Accordingly, Allergan shipments of free drugs, which are provided on the condition, or with a mutual understanding, that the health care practitioner will purchase or prescribe Allergan drug products, violate the PDMA.

### C.      Prescription Drug Payment under Federal Health Care and Other Programs

93.      Whether an FDA-approved drug is approved for a particular indication (*i.e.,* use) determines whether a prescription for that use may be properly reimbursed by Government Programs.

#### 1.      The Medicaid Program

94.      Medicaid is a public assistance program providing for payment of medical expenses for approximately 55 million low-income patients.  Funding for Medicaid is shared between the federal government and state governments.  The Medicaid program subsidizes the purchase of more prescription drugs than any other program in the United States.

95.      Between 2001 and the third quarter of 2015, Medicaid reimbursements for Acular® and Acular LS® have totaled $117.9 million. In the same period, Medicaid reimbursements for Pred Forte® have totaled $4 million.  Between 2003 and the third quarter of 2015, Medicaid reimbursements for Zymar® have amounted to $41.8 million.

#### 2.      The Medicare Program

96.      The Medicare Prescription Drug Improvement and Modernization Act of 2003 added prescription drug benefits to the Medicare program.  Medicare serves approximately 43 million elderly and disabled Americans.

97.      The Medicare Prescription Drug benefit covers all drugs that are considered "covered outpatient drugs" under 42 U.S.C. § 1396r-8(k), as described above.

98.      The first stage of the Medicare program, from May 2004 through December 2005, permitted Medicare beneficiaries to enroll in a Medicare-approved drug discount card program.

99.     In addition, low-income beneficiaries, defined as those whose incomes are not more than 135% of the poverty line (those with incomes of no more than $12,569 for a single person or $16,862 for a married couple in 2004) qualified for a $600 credit (funded by Medicare) on their drug discount card for 2004, and again for 2005.

100.    Starting in January 2006, Part D of the Medicare Program provided subsidized drug coverage for all Medicare beneficiaries, with low-income individuals receiving the greatest subsidies.

### 3.     Reimbursement under Other Federal Health Care Programs

101.    In addition to Medicaid and Medicare, the federal government reimburses a portion of the cost of prescription drugs under several other federal health care programs.  For example:

(i)     CHAMPUS/TRICARE is a health care program administered by the Department of Defense for individuals and dependents affiliated with the armed forces.

(ii)    CHAMPVA is a health care program administered by the Department of Veterans Affairs for families of veterans with 100% service-connected disabilities.

(iii)   The Federal Employee Health Benefit Program provides health insurance for federal employees, retirees and survivors, and it is administered by the Office of Personnel Management.

102.    During the time period relevant to this Third Amended Complaint, Allergan's provision of kickbacks resulted in the prescribing of Zymar® for Government Program patients, which caused false claims to be submitted to Government Programs, which claims were simply not eligible for reimbursement under any of the various state and federal health care programs because of the kickbacks.

### D.  Medicare/Medicaid Caps on Reimbursement for Cataract Surgery

#### i.  Background on Cataract Surgery

103.    Cataract surgery involves the removal of the natural lens of the eye (also called "crystalline lens") that has developed an opacification, which is referred to as a cataract. Metabolic changes of the crystalline lens fibers over time lead to the development of the cataract and loss of transparency, causing impairment or loss of vision.

104.    During cataract surgery, a patient's cloudy natural cataract lens is removed and replaced with a synthetic lens to restore the lens's transparency.  Following surgical removal of the natural lens, an artificial intraocular lens implant is inserted or implanted.

105.    Cataract surgery is generally performed by an ophthalmologist in an ambulatory (rather than inpatient) setting, in a surgical center or hospital, using local anesthesia, usually causing little or no discomfort to the patient. Well over 90% of operations are successful in restoring useful vision, with a low complication rate.

106.    The primary type of surgical procedure used is "phacoemulsification." Phacoemulsification involves the use of a machine with an ultrasonic hand piece equipped with a titanium or steel tip. The tip vibrates at ultrasonic frequency (40,000 Hz) and the eye lens material is emulsified. A second fine instrument (sometimes called a "cracker" or "chopper") may be used from a side port to facilitate cracking or chopping of the nucleus into smaller pieces. After the removal of the cataract, an intraocular lens (IOL) is usually implanted into the eye.

107.    The surgical procedure in phacoemulsification for removal of cataract involves a number of steps. First, on the day of surgery, patients are prepared in a pre-operation holding area.

34

108.    There, the patient's pupil is dilated using drops (if the IOL is to be placed behind the iris) to help the surgeon better visualize the cataract.  Anesthesia may be placed topically, and some surgeons, depending on preference, provide antibiotic or steroidal eye drops prior to surgery.

109.    After the IOL is inserted, the surgeon checks that the incision does not leak fluid. This is a very important step, since wound leakage increases the risk of unwanted microorganisms'' gaining access into the eye and predispose to endophathalmitis.

110.    Intra-operatively, an antibiotic/steroid combination eye drop may then be applied, for example Zymar and Pred Forte, depending on the particular surgeon's practice or individual patient medical needs.  Antibiotics may be administered pre-operatively, in the patient holding area, or sometimes intra-operatively, and/or post-operatively immediately after surgery, or in the post-op patient holding area. In addition, a topical corticosteroid may also be used in combination with antibiotics, postoperatively.

111.    Most cataract operations are performed under a local anesthetic, allowing the patient to go home the same day, with a brief recovery period at the surgery site.  While in the recovery holding area, patients are provided discharge instructions, as well as eye drop prescriptions for use post-operatively. These prescriptions typically include an antibiotic, e.g. Zymar/Zymaxid, and a non-steroidal anti-inflammatory drug, e.g. Acular/Acular LS/Acuvail.

112.    Post-surgery, patients will have their eye drop prescriptions filled (if they had not already done so prior to surgery).  Most of these prescriptions are covered by government-funded programs, primarily Medicare Part D.

ii.     Medicare Caps, and Lowers, Reimbursements for Cataract Surgery,
Leading to Financial Pressure

113.    Treatment of cataracts, in particular cataract surgery, is the No. 1 line-item cost of Medicare reimbursement and affect more than 20 million people in the United States. According to the National Eye Institute, in the United States, cataract surgery is the most frequently performed surgical procedure among 30 million Medicare beneficiaries. Approximately 1.35 million cataract operations are performed annually at an estimated cost of $3.5 billion.

114.    Cataracts, which can have devastating effects on the eye, affect 42 percent of the population between the ages of 70 and 80, and 68 percent of the population over the age of 80. By age 80, more than half of all Americans either have a cataract or have had cataract surgery.

115.    Among Medicare beneficiaries, cataract is the most common condition for which eye care services are sought, accounting for 43 percent of visits to ophthalmologists and optometrists combined.

116.    Medicare's average payment to surgeons who perform cataract surgery has steadily fallen in the past decade, currently approximately $900 per eye. Medicare caps its reimbursement and provides one "global" payment for the surgeon and related surgery supplies.

117.    Although some high volume surgery centers perform up to 7,000 cataract surgeries each year, the declining Medicare reimbursement rates have placed financial pressure on cataract surgeons, surgery centers and hospitals to find ways to lower cataract surgery-related expenses, given that their payment is capped by Medicare.

118.    Supplies are seen as one area to reduce expenses, as they are a significant cost factor.  These expenses are related to purchases of intraocular lenses (IOLs), phaco tubing, surgical trays, anesthesia supplies, prescription pads, and medications, e.g. the Allergan drugs.

119.    Medicare does not cover any eye drop drugs that are provided and administered to the patient the day of surgery, including in pre-operative holding area, intra-operatively, or in post-operative recovery, as these drugs are covered under the "integral to a procedure" Medicare reimbursement provisions, which expressly exclude eye drops administered before cataract surgery.

120.    At the same time that the cost of purchasing and providing patients with anti-biotic and other eye drops during the surgery process has been increasing, reimbursement rates have fallen.  Against this economic backdrop, Allergan seized upon an opportunity to entice, i.e. conspire with, cost-conscious cataract surgeons into accepting free drug shipments and other supplies, as long as the result involved the writing of prescriptions for the Allergan drugs.

121.    Allergan knew that the market for eye care drugs used in conjunction with cataract surgeries presented significant opportunities to induce and increase prescriptions of its cataract surgery drugs, by systematically subsidizing the costs of cataract surgeries, thereby increasing catartact surgeons' profits.

### E.    Allergan Adopts PhRMA and AdvaMed Codes on Gifts to Health Care Professionals

122.    In 2002, the Pharmaceutical Research and Manufacturers of America adopted its Interactions with Health Care Professionals, or the "PhRMA Code," as updated in July 2008 and effective in January 2009.  The PhRMA Code purportedly seeks to promote transparency in relationships between health care professionals and the pharmaceutical industry and to ensure

that pharmaceutical marketing activities comport with the highest ethical standards.  The most recent revisions to the PhRMA Code, effective January 2009, restrict or prohibit many activities previously permissible under the prior PhRMA Code, including: a prohibition on any entertainment or recreational events for non-employee health care professionals including strict limitations on meals with physicians; the elimination of non-educational business gifts; restrictions on speaker programs; and clarifications on continuing medical education funding. The updated PhRMA Code also requires that pharmaceutical companies train their representatives on all applicable laws, regulations and industry codes governing interactions with health care professionals.  Complying with the PhRMA Code is not a guarantee that a company is in compliance with the law.

123.    In addition, the Advanced Medical Technology Association's Revised Code of Ethics, or the "AdvaMed Code," also seeks to ensure that medical device companies and health care professionals have collaborative relationships that meet high ethical standards; medical decisions are based on the best interests of patients; and medical device companies and health care professionals comply with applicable laws, regulations and government guidance.  The AdvaMed Code was updated in December 2008 and became effective in July 2009.  The revisions generally follow the 2008 changes in the PhRMA Code and include limitations on consulting arrangements, entertainment, and meals and gifts, among others.  Complying with the AdvaMed Code is not a guarantee that a company is in compliance with the law.

124.    Although Allergan states in its financial statements that its Board has ostensibly "adopted and implemented a compliance program which it believes satisfies the requirements of these laws, regulations and [PhRMA and AdvaMed] codes," as set forth herein, it has

38

nonetheless concealed its widespread violations of even its own compliance program in its marketing of its drugs to health care professionals.

## VII. THE KICKBACK SCHEME WITH REGARD TO THE ALLERGAN DRUGS

### A. Allergan Gives Away Free Goods to Induce Ophthalmologists to Prescribe Allergan Products, Resulting in Improper Government Program Reimbursements

125.   In order to increase sales and profits, Allergan planned and engaged in a Kickback Scheme through which it induced physicians to prescribe its drug products, including Zymar®, Zymaxid®, Acular LS®, and Acuvail®.  At all times material hereto, the Kickback Scheme has been a multi-faceted program to buy business in exchange for free products and supplies, including:

- Free "Custom Care Kits" (CCKs);

- Free drugs;

- Free customized patient instruction sheets; and

- Free customized, pre-printed prescription pads for Allergan drugs.

126.   Allergan knew that the Kickback Scheme was illegal.  Its own compliance policy prohibits employees from using samples as an inducement to healthcare professionals to prescribe the Company's products:

> Allergan employees may never provide samples to induce a health care professional to purchase, prescribe or recommend Allergan products, or to reward a health care professional for doing so.  In other words, providing samples based on a health care professional's past or future prescribing habits is strictly prohibited.  In addition, samples of one Allergan drug may never be provided to induce the prescribing or purchasing of another Allergan drug.

39

Allergan U.S. Health Care Law Compliance Program:  Policies and Procedures 2008 (the "Compliance Manual") at 98.

127.    Nonetheless, as described below, Allergan systematically violated both its own compliance policy and the law by making the provision of free goods the centerpiece of its strategy to illegally induce sales of its drugs.  It did so in order to both organically grow sales, as well as to take market share from competitor Alcon, in a single-minded strategy to buy the business.

128.    Allergan's managers were not only aware of, but were integral drivers of the Kickback Scheme, by training and instructing sales representatives to leverage product samples, CCKs, and other free goods to grow sales.  For example, in an email sent to his Ohio district on April 24, 2009, Area Manager Jon Weidner instructed sales representatives to "Leverage Pred-Forte!!!!!!!!!!!" in order to drive sales of Acular LS®.  Emphasizing even more explicitly that samples of Pred Forte were intended as an inducement *in exchange* for physicians' agreement to prescribe Acular LS®, Weidner continued, "Pred [Forte] costs at least 40-50 bucks per bottle," so we want to not "just leave it lying around" but instead "[m]ake sure we are getting a return for our investment."

129.    In another email, dated October 19, 2009, Weidner sent sales representatives in his district a memorandum including a list of "Senior Training Best Practices," which Weidner received during training at Allergan headquarters in Irvine, California.  The memo discusses how to use the "Resources" (*i.e.*, kickbacks) Allergan provided to induce prescribing of its drugs, and raises the question regarding when to "Pull out resources" – *i.e.*, a reference to when Allergan should stop paying bribes.  Per the memo, "[t]here may come a time when the resources you provide to an office don't have an ROI [return on investment], so when do you pull out?"

According to the memo summarizing the direction from Allergan's senior managers, the "best practices" for all Allergan sales representatives was to "[a]ffix a dollar amount to what you provide in terms of sampling and demonstrate the cost to the office indicating that you want to help the office but you need to see [prescriptions] for acuvail and/or zymar [sic]."  The memo evidences Allergan's *quid pro quo* policies, which were implemented nationwide.

130.    The following are examples of doctors who received high volumes of Acular LS® samples and who were induced by Allergan's kickbacks to subsequently prescribe high volumes of Acular LS® to Medicare Part D patients; each prescription submitted to the government is rendered a false claim by the taint of kickbacks:

- **Dr. Michael Sumsion**, at Riverside Eye Care Professionals at 2801 Park Marina Dr., Redding, CA.  Dr. Sumsion received 60 samples per month between July 2, 2009 and January 1, 2010.  In 2010, he was the highest Medicare prescriber of Acular LS® in the country, with 139 claims (a gross drug cost of $14,996.50).  As a result of the kickbacks provided by Allergan, Dr. Sumsion prescribed Acular LS® to Government Program beneficiaries.

- **Dr. Alan Uliss**, at 110-11 72nd Ave, Forest Hills, NY.  Dr. Uliss received 144 samples per month between March 18, 2009 and September 17, 2009.  In 2010, he was the 2nd highest Medicare prescriber of Acular LS® in the country, with 109 claims (a gross drug cost of $11,802.35).  As a result of the kickbacks provided by Allergan, Dr. Uliss prescribed Acular LS® to Government Program beneficiaries.

- **Dr. Robert McCulloch**, at Horizon Eye Specialists and Lasik at 18325 N. Allied Way #100, Phoenix, AZ.  Dr. McCulloch received 288 samples per month between April 29, 2009 and October 28, 2009.  In 2010, he was the 8th highest Medicare

prescriber of Acular LS® in the country, with 73 claims (a gross drug cost of $7,838.41).   As a result of the kickbacks provided by Allergan, Dr. McCulloch prescribed Acular LS® to Government Program beneficiaries.

- **Dr. John S. Kung**, at 23 Oceanic Ave, Staten Island, NY.  Dr. Kung received 72 samples per month between March 16, 2009 and September 15, 2009.  In 2010, he was the 9th highest Medicare prescriber of Acular LS® in the country, with 66 claims (a gross drug cost of $7,644.08).  As a result of the kickbacks provided by Allergan, Dr. Kung prescribed Acular LS® to Government Program beneficiaries.

131.    The following are examples of doctors who received high volumes of Zymar® samples and who were induced by Allergan's kickbacks to subsequently prescribe high volumes of Zymar® to Medicare Part D patients; each prescription submitted to the government is rendered a false claim by the taint of kickbacks:

- **Dr. Neil Griffin**, of 2170 Midland Road, Southern Pines, NC.  Dr. Griffin had two different contracts which ran from September 23, 2008 to January 22, 2009 and October 2, 2008 to January 22, 2009.  Under these contracts, he received 133 samples per month.  In 2010, he was the 4th highest Medicare prescriber of Zymar® in the country, with 727 claims (a gross drug cost of $53,898.89).  As a result of the kickbacks provided by Allergan, Dr. Griffin prescribed Zymar® to Government Program beneficiaries.

- **Dr. Louis Nichamin**, of 50 Waterford Pike, Brookville, PA.  Dr. Nichamin received 96 samples per month between between October 12, 2008 and April 14, 2009.  In 2010, he was the 14th highest Medicare prescriber of Zymar® in the country, with

561 claims (a gross drug cost of $41,776.33).  As a result of the kickbacks provided

by Allergan, Dr. Nichamin prescribed Zymar® to Government Program beneficiaries.

132.    Each of the preceding examples is indicative of Allergan's common and

widespread use of kickbacks, which resulted in prescribing of Allergan's drugs for Government

Program Beneficiaries, causing false claims to be submitted to state and federal governments.

Frequently, as in the above examples, managers were explicit in telling sales representatives that

the Company's provision of free goods was contingent on receiving prescriptions from

physicians in return.  In other instances, the instruction was implicit.  Whether explicit or

implicit, however, it was always clear to sales representatives – who in turn made it clear to

health care professionals – that Allergan would only provide free products, including drugs and

CCKs, to physicians who agreed to prescribe and continue prescribing its products in return.  For

physicians who did not prescribe Allergan products in sufficient quantity or stopped prescribing

them altogether, Allergan refused to provide, and in many instances even revoked, its provision

of these free goods.

133.    Allergan's offer of free goods, as well as its actual provision of free goods, was

made knowingly and with the intent to induce physicians to write prescriptions for its drug

products that were then reimbursed by Government Programs, through a pattern of corrupt and

illegal conduct, in violation of the federal PDMA, the AKS, and the False Claims Act, 31 U.S.C.

§ 3729.  Moreover, Allergan's kickbacks caused pharmacies and others submitting claims to the

Government to falsely certify compliance with applicable laws and regulations, including that

the claims were not tainted by illegal kickbacks.

134.    Allergan thus knowingly and willfully offered and provided illegal remuneration

in violation of the PDMA and the AKS, 42 U.S.C. § 1320a-7b(h)(2).  As a result, Government

43

Programs paid or reimbursed for prescriptions of Allergan products otherwise ineligible for payment or reimbursement because they were tainted by kickbacks.

135.   As a result of these kickbacks, Government Programs have suffered significant damages.

**B.     Using CCK Agreements to Bribe Healthcare Professionals**

136.   Beginning at least as early as the year 2003, and continuing through December 2008, Allergan designed and implemented a scheme to bribe healthcare professionals, and particularly cataract surgeons, by giving them free patient care CCKs in exchange for prescribing Allergan drugs.  Because the vast majority of cataract patients are Medicare beneficiaries, a substantial portion of these drugs were reimbursed by Government Programs.

137.   CCKs were housed in a blue or black, leather or nylon bag, which frequently had the name of the ophthalmology practice printed on the side.  These free goods, which were attractively packaged with the practice or doctor's name displayed, thus had considerable advertising and marketing value to the physician.  The patients who received these free goods were also obviously pleased and their choice of providers may have been influenced by these valuable free good.  The customized bags included varying combinations, including the following items: a "trade-sized," 10 ml sample of Pred Forte®, which was quantity sufficient for an entire pre- and post-surgical regimen of care; a sample of Acular®/Acular LS®/Acuvail®; a sample of Zymar®/Zymadid®; a sample of Optive® or Refresh® artificial tears; protective sunglasses for post-surgical use; a protective eye shield; tape and gauze to construct a protective eye patch; and an over-the-counter analgesic such as Tylenol or Advil.  The precise makeup of the CCKs was chosen by the individual ophthalmologist, based on a menu of options, in consultation with Allergan.

138.     In most instances, a CCK was provided to the patient by the physician's surgical counselor or coordinator during a pre-surgical visit.  The patient then brought the CCK back to the office for the actual surgery, as well to as any post-surgical appointments.  In many instances, patients who scheduled cataract surgery for their second eye for a date shortly following surgery for the first eye, returned for the second surgery with the same CCK from their first surgery.  In other instances, physicians provided a new CCK for each surgery.

139.     These free CCKs were considered valuable by Allergan's ophthalmologist customers, as the CCKs were also used by competing ophthalmologists (many of whom used competitor kits from Alcon), and thus not having these CCKs would place ophthalmologists at a competitive disadvantage in the growing (and increasingly competitive) market for cataract surgery patients.  As such, these CCKs were valuable and essential marketing tools which Allergan provided for free to medical providers.  In the absence of these free CCKs, the ophthalmologists would have needed to purchase them (which was eventually the case as described below).  Likewise, in the absence of free advertising and marketing provided by the CCKs, ophthalmologists would have needed to pay for these on their own in order not to be at a competitive disadvantage to other ophthalmologists who provide free goods to their patients.

140.     To order CCKs, an ophthalmologist coordinated with an Allergan sales representative, who submitted a "Custom Care Kit Agreement" ("CCK Agreement") on behalf of the ophthalmologist.  The CCK Agreement consisted of a one-page form, which Allergan provided to sales representatives, including Relator Wood, for the purpose of providing free CCKs to ophthalmologists.  The CCK Agreements were periodically updated, and included printing on the bottom left-hand portion that identified the version, such as "APG 3744 REV.  A 7/05 MDR."  The bottom right-hand portion included the Allergan marketing department

facsimile number, "MARKETING FAX (714) 796-3298," to which Allergan sales representatives submitted the completed forms.

141.    Allergan sales representatives generally worked with the surgical coordinator or counselor to determine the mix and quantity of free medications and other goods that an individual practice would receive.  Sections II and III of the CCK Agreement included a menu of options that allowed ophthalmology practices to choose among different versions of CCKs. There were twelve different versions of the CCKs, or "Kit Configurations," including, for example, "Cataract Kit A," "Cataract Kit #6," and "LASIK Kit A".  Medication options included Acular®, Acular LS®, various sides of Pred Forte®, and "other."  Sales representatives and ophthalmologists frequently used this "other" section to order Allergan's over-the-counter artificial tears, Optive® or Refresh®.  Practitioners could also order other surgery-related supplies for inclusion in the CCKs, such as an eye patches, paper or plastic tape, gauze, eye wash, eye shields, and/or sunglasses.  In addition, doctors could order luggage tags with their logos and addresses, which would be affixed to each CCK.

142.    Most ophthalmology practices ordered all CCKs in a single configuration; however, some ophthalmologists, such as Dr. Paul Turgeon of Canton, Ohio (as alleged in detail below), ordered multiple different versions of CCKs.  In certain instances, for its best customers, Allergan agreed to provide a limited number of CCKs with "additional" drugs or other products, above those that it provided in its standard CCKs.

143.    Section IV of the agreement denoted the "MONTHLY FORECAST" and "MAXIMUM 6 MONTH QUANTITY" of CCKs that the practice expected, and that Allergan allowed the practice, to use.  The monthly forecast and six-month maximum quantity were

46

generally based on the monthly number of cataract surgeries performed per month in the entire clinic, not solely by healthcare professional who signed the agreement.

144.    Section IV of the CCK also included a blank line to fill in the "PRICE PER KIT." In every example witnessed by Relator Wood during his employment with Allergan, the price per CCK was always either marked as "0" or left blank.

145.    Orders for CCKs were filled by Allergan's facility in Waco, Texas, through its subsidiary, Allergan Sales LLC, which is located at 8301 Mars Drive, Waco, Texas 76712. Shipping costs for the CCKs were paid entirely by Allergan.

146.    The following is a list of CCK Agreements, which provides just a sample of physicians to whom Allergan provided CCKs in Relator Wood's territory, with the intent to induce them to prescribe Allergan's products, and who did in turn prescribe Allergan's products:

| Name & Address of Physician or Practice | Contract No. & Expiration Date | Effective Dates of the Agreement | Free Drugs Provided in CCKs |
|---|---|---|---|
| Andrew C. Pederzolli, MD 1059 E. State St. Salem, OH 44460 | Contract No.: 0480041809 Expired: 4/24/2008 | 5/01/08-11/01/08 | Pred Forte® Acular LS® |
| Belmont Eye Clinic 3020 Belmont Ave. Youngstown, OH 44505 | Renewal of Agreement Contract No.: 0480049512 Expired: 10/02/2008 | 9/25/08-2/25/09 | Pred Forte® Acular LS® |
| Canton Ophthalmology 2600 W. Tuscarawas, #200 Canton, OH 44708 | Renewal of Agreement Contract No.: 0500056290 Expired: 9/28/2005 | 9/29/05-3/29/06 | Pred Forte® |
| Clear Choice Laser 6960 S. Edgerton Rd. Brecksville, OH 44141 | Renewal of Agreement Contract No.: 0480028013 Expired: Not Listed | 7/16/08-1/16/09 | Pred Forte® Refresh Plus® |
| Cleveland Eye Clinic 2740 Carnegie Ave. Cleveland, OH 44115 | Renewal of Agreement Contract No.: 0480046998 Expired: 8/18/2008 | 10/01/08-3/01/09 | Pred Forte® Acular LS® |
| Fladen Eye Center 1330 Timken Mercy Dr. NW, #310 Canton, OH 44708 | Renewal of Agreement Contract No.: 0480041914 Expired: Not Listed | 7/31/08-2/28/09 | Pred Forte® Refresh Plus® |
| Fladen Eye Center 1330 Timken Mercy Dr. NW, #310 Canton, OH 44708 | Renewal of Agreement Contract No.: 0480036753 Expired: Not Listed | 1/07/08-7/7/08 | Pred Forte® Acular LS® |
| Jeffrey Augustine 6960 S. Edgerton Brecksville, OH 44141 | Contract No.: 0480035010 Expired: Not Listed | 12/10/07-5/10/08 | Pred Forte® Refresh Plus® Optive® |

47

| Name & Address of Physician or Practice | Contract No. & Expiration Date | Effective Dates of the Agreement | Free Drugs Provided in CCKs |
|---|---|---|---|
| Lasik Plus<br>6800 Rockside Rd, #A<br>Independence, OH 44131 | Renewal of Agreement<br>Contract No.: 0480026425<br>Expired: Not Listed | 3/21/07-9/21/07 | Pred Forte®<br>Refresh Plus® |
| Martuccio Eye Care<br>302 Niles Cortland Rd.<br>Warren, OH 44484 | New CCK Agreement<br>Contract No.: Not Listed<br>Expired: Not Listed | 1/10/08-6/10/08 | Pred Forte® |
| Ohio Eye Alliance<br>985 S. Saw Burg Ave.<br>Alliance, OH 44601 | Renewal of Agreement<br>Contract No.: 0480049211<br>Expired: Not Listed | 9/15/08-2/15/09 | Pred Forte®<br>Acular LS® |
| Ophthalmic Physicians, Inc.<br>9485 Mentor Ave., #110<br>Mentor, OH 44060 | Renewal of Agreement<br>Contract No.: 0480049215<br>Expired: 10/01/2008 | 10/20/08-4/20/09 | Pred Forte®<br>Acular LS® |
| Paul Turgeon<br>1330 Mercy Dr. NW, #406<br>Canton, OH 44708 | Renewal of Agreement<br>Contract No.: 0480050683<br>Expired: 10/07/2008 | 9/30/08 – 2/28/09 | Pred Forte®<br>Acular LS® |
| Retina Associates<br>4690 Munson St. NW, #C<br>Canton, OH 44718 | Contract No.: 0480035199<br>Expired: Not Listed | 1/11/08-6/11/08 | Pred Forte® |
| Summit Ophthalmology<br>1 Park West Blvd., #150<br>Akron, OH 44320 | Renewal of Agreement<br>Contract No.: 0480036082<br>Expired: Not Listed | 12/10/07-5/10/08 | Pred Forte®<br>Acular LS® |
| TLC Center<br>6500 Rockside Rd., #100<br>Independence, OH 44131 | Renewal of Agreement<br>Contract No.: 0500058179<br>Expired: Not Listed | 5/10/06-11/10/06 | Pred Forte®<br>Refresh Plus® |
| Todd Fladen<br>1330 Mercy Dr. NW, #312<br>Canton, OH 44708 | Renewal of Agreement<br>Contract No.: 0480033702<br>Expired: 10/05/2007 | 10/23/07-4/23/07 | Pred Forte®<br>Refresh Plus® |
| University Hospitals Ophthalmology<br>9000 Mentor Ave., #102<br>Mentor, OH 44060 | Renewal of Agreement<br>Contract No.: 0480041328<br>Expired: Not Listed | 7/31/08-1/31/09 | Pred Forte® |
| University Ophthalmology Associates<br>1611 S. Green Rd., #306-C<br>S. Euclid, OH 44121 | New CCK Agreement<br>Contract No.: New<br>Expired: Not Listed | 1/10/08-6/10/08 | Pred Forte®<br>Acular LS® |

147.   The physicians listed above (and many others not listed here) were influenced by Allergan's free CCKs, and each of them prescribed Allergan's drugs as a result.  The majority of these prescriptions were written for Government Program patients, mainly Medicare or Medicaid.  These prescriptions resulted in false claims, tainted by Allergan's illegal kickbacks, to be submitted to Government Programs for reimbursement or payment, and which were reimbursed or paid for by these Government programs.   Indeed, the participation of doctors and

pharmacists in the submission of false claims was not only foreseeable, it was an intended consequence of Allergan's schemes.

148.    These CCKs included substantial quantities of free Acular LS®.  During just one six-month period in 2008 and 2009, Allergan provided some 1,209,632 "free" samples of Auclar LS® .4% 1 mL (with an approximate total value of $30.4 million) to 2810 physicians throughout the United States as an inducement so that they would prescribe its drugs.  Of these, according to Allergan's own records, as of February 10, 2009, Allergan provided some 195 physicians over 1000 free samples each of Acular LS®, with the largest being Dr. Kristia Owens, OD, who received some 4,320 Acular LS® "free" samples (worth an estimated $108,864):

| Doctor | City | State | Acular LS® Samples |
|---|---|---|---|
| Kristia Owens OD | Mesa | AZ | 4,320 |
| Brian Ranelle | Hurst | TX | 4,200 |
| Vincent Young MD | Philadelphia | PA | 3,504 |
| Ken Bonfield MD | Morganton | NC | 3,164 |
| Paul Ernst MD | Jackson | MI | 3,000 |
| David Weiser MD | Melbourne | FL | 3,000 |
| Randy Richardson MD | Oxford | MS | 2,688 |
| Darryl Munn OD | Chattanooga | TN | 2,592 |
| Zachary Mccarty OD | Chattanooga | TN | 2,532 |
| James S Lewis MD | Elkins Park | PA | 2,400 |
| William Columbus MD | Trevose | PA | 2,400 |
| John Tye MD | Hickory | NC | 2,400 |
| Jeffrey Fischer MD | Willmar | MN | 2,400 |
| Randy Richardson MD | Oxford | MS | 2,304 |
| Dennis Lockhart MD | Bloomington | IL | 2,304 |
| Michael Woodcock | Fayetteville | NC | 2,236 |
| Steven Wilson OD | New Albany | IN | 2,184 |
| James Harris MD | Hickory | NC | 2,160 |
| Paul Ernst MD | Jackson | MI | 2,136 |
| Anthony Evangelista | Arlington | TX | 2,100 |
| Neil Griffin MD | Southern Pines | NC | 2,088 |

| Doctor | City | State | Acular LS® Samples |
|---|---|---|---|
| Mehrdad Aghai MD | Gardena | CA | 2,016 |
| George Brinning MD | Waterbury | CT | 2,000 |
| Kim Robbins MD | Bridgeport | CT | 2,000 |
| Ricardo Akstein MD | Riverdale | GA | 2,000 |
| Bret Crumpton Do | Columbus | GA | 2,000 |
| Joon Kim MD | Morrow | GA | 2,000 |
| Michael Adams MD | Birmingham | AL | 2,000 |
| Gerald Lubert OD | Knoxville | TN | 2,000 |
| Jay Hellreich MD | Meriden | CT | 1,952 |
| George Brinning MD | Waterbury | CT | 1,952 |
| Mark Latina MD | Stoneham | MA | 1,920 |
| Martin Mizener MD | Omaha | NE | 1,920 |
| Christopher Reynolds | New Milford | CT | 1,808 |
| Steve Higgns MD | Portage | MI | 1,808 |
| Dennis Slochower | Philadelphia | PA | 1,800 |
| Robert Rauer MD | Greenville | NC | 1,800 |
| Veda Moore MD | Greenville | NC | 1,800 |
| Wes Herman MD | Dallas | TX | 1,800 |
| Robert Dinga OD | Oakdale | MN | 1,800 |
| Robert Dinga OD | Maple Grove | MN | 1,800 |
| Darron Bacal MD | Orange | CT | 1,784 |
| Jonathan Stein MD | Milford | CT | 1,760 |
| Howard Distelman MD | Shelton | CT | 1,760 |
| Paul Koch MD | Warwick | RI | 1,728 |
| Mazin Yaldo MD | Dearborn Heights | MI | 1,728 |
| Mazin Yaldo MD | Farmington Hills | MI | 1,728 |
| Brad Bertram MD | Augusta | GA | 1,728 |
| Bruce Wallace MD | Alexandria | LA | 1,728 |
| Calvin Sprik MD | Wausau | WI | 1,728 |
| Bryan Hammer MD | Sioux Falls | SD | 1,728 |
| Dan Omohundro MD | Fairfield | CT | 1,712 |
| David Verdier MD | Grand Rapids | MI | 1,712 |
| Omar Hanuch MD | Rochester | NY | 1,680 |
| Charles Heaton MD | Longview | TX | 1,656 |
| Peter Rapoza MD | Boston | MA | 1,628 |
| Larry Henry OD | Edmond | OK | 1,623 |

| Doctor | City | State | Acular LS® Samples |
|---|---|---|---|
| Natalie Rioux MD | West Springfield | MA | 1,584 |
| Matthew Hughes OD | Jackson | TN | 1,584 |
| Andrew Swan MD | Milford | CT | 1,568 |
| Jason Handza Do | Pinellas Park | FL | 1,536 |
| Arthur Woods MD | Jackson | TN | 1,524 |
| Paul Jorizzo MD | Grants Pass | OR | 1,512 |
| Paul Mitchell MD | Marietta | GA | 1,500 |
| Hersh Chopra MD | Marietta | GA | 1,500 |
| Steven Henslee MD | Columbus | GA | 1,500 |
| Scot Wall MD | Albany | GA | 1,500 |
| Michael Adams MD | Birmingham | AL | 1,500 |
| Charles Heaton MD | Tyler | TX | 1,500 |
| Edward Yee MD | Las Vegas | NV | 1,500 |
| Edward Yee MD | Las Vegas | NV | 1,500 |
| Larry Henry OD | Edmond | OK | 1,479 |
| Gerri Goodman MD | Weymouth | MA | 1,440 |
| David Nelson MD | Carle Place | NY | 1,440 |
| Stanley Berke MD | Lynbrook | NY | 1,440 |
| John Cecconi OD | Lexington | KY | 1,440 |
| David Harper MD | Concord | NC | 1,440 |
| Mark Phelan MD | Abilene | TX | 1,440 |
| Christopher Born MD | La Crosse | WI | 1,440 |
| Kevin Flaherty MD | Wausau | WI | 1,440 |
| Louis Scallon MD | Ames | IA | 1,440 |
| Therese Alban MD | West Des Moines | IA | 1,440 |
| John Marsh MD | Topeka | KS | 1,440 |
| Virginia Lolley MD | Birmingham | AL | 1,428 |
| Victor Gonzalez MD | Harlingen | TX | 1,408 |
| Gregg Moody MD | Athens | AL | 1,404 |
| Robert Arguello MD | Mcallen | TX | 1,404 |
| Peter Gordon MD | Decatur | GA | 1,356 |
| Philip Newman MD | Conyers | GA | 1,356 |
| J Chandler Berg MD | Albany | GA | 1,356 |
| Michael Raizman MD | Boston | MA | 1,340 |
| Fran Bucci MD | Wilkes Barre | PA | 1,325 |
| S Anna Kao MD | La Grange | GA | 1,308 |

51

| Doctor | City | State | Acular LS® Samples |
|---|---|---|---|
| M Sid Moore MD | Macon | GA | 1,308 |
| Paul Mitchell MD | Marietta | GA | 1,308 |
| Sam Allen MD | Lawrence | MA | 1,296 |
| Brent Chalmers MD | Oregon City | OR | 1,272 |
| Keith Thompson MD | Florence | AL | 1,260 |
| Thomas Mckinnon MD | Birmingham | AL | 1,260 |
| John Marsh MD | Topeka | KS | 1,248 |
| Brett Katzen MD | Towson | MD | 1,224 |
| Anthony Pisacano MD | Bronx | NY | 1,216 |
| Johnny Gayton MD | Warner Robins | GA | 1,212 |
| Kent Wellish MD | Las Vegas | NV | 1,208 |
| John Grundy | Ellicott City | MD | 1,200 |
| Charles Davis Do | Cuyahoga Falls | OH | 1,200 |
| Carmelina Gordon MD | Lansing | MI | 1,200 |
| Raphael Addiego MD | Lansing | MI | 1,200 |
| Lance Lemon MD | Lansing | MI | 1,200 |
| Greg Bibart MD | Portage | MI | 1,200 |
| Stanley Tao MD | Monroe | MI | 1,200 |
| David Tukel MD | Dearborn | MI | 1,200 |
| Kenlyn Miller MD | Harrisonburg | VA | 1,200 |
| Glenn Campbell MD | Williamsburg | VA | 1,200 |
| Anthony Johnson MD | Greenville | SC | 1,200 |
| William Schenk MD | Lebanon | TN | 1,200 |
| David Bane OD | Edina | MN | 1,200 |
| Richard Mauer MD | Waterloo | IA | 1,200 |
| Richard Mauer MD | Waterloo | IA | 1,200 |
| Thomas Norton MD | Alexandria | LA | 1,172 |
| Michael Ursic MD | Tuscaloosa | AL | 1,164 |
| James Cannatti MD | Akron | OH | 1,158 |
| Allen Zieker MD | Troy | NY | 1,152 |
| Zane Lazer MD | Parkersburg | WV | 1,152 |
| Anthony Sensoli MD | South Charleston | WV | 1,152 |
| Scott Strickler MD | Parkersburg | WV | 1,152 |
| Scott Strickler MD | Parkersburg | WV | 1,152 |
| Kathleen Keller OD | Indianapolis | IN | 1,152 |
| Robert Clark MD | Brighton | MI | 1,152 |

| Doctor | City | State | Acular LS® Samples |
|---|---|---|---|
| Tobias George MD | Southfield | MI | 1,152 |
| John Barletta MD | Ypsilanti | MI | 1,152 |
| Nossonal Kleinfeldt | Livonia | MI | 1,152 |
| Nossonal Kleinfeldt | Dearborn | MI | 1,152 |
| Ronald Bergman MD | Farmington Hills | MI | 1,152 |
| Martin Apple MD | Southfield | MI | 1,152 |
| Nicole Anderson MD | Flowood | MS | 1,152 |
| Charles Williamson | Baton Rouge | LA | 1,152 |
| Frank Emert MD | Vincennes | IN | 1,152 |
| Frank Emert MD | Vincennes | IN | 1,152 |
| Mark Spurrier MD | Crystal City | MO | 1,152 |
| Michael Coleman MD | Greenwood | MS | 1,152 |
| Jon Wagner OD | Racine | WI | 1,152 |
| Scott Pinter MD | Bloomington | IL | 1,152 |
| Michael Merck MD | Hutchinson | MN | 1,152 |
| Dasa Gangadhar MD | Wichita | KS | 1,152 |
| Brock Bakewell MD | Tucson | AZ | 1,152 |
| Johnny Wu OD | San Diego | CA | 1,152 |
| Anna Nogales MD | Tampa | FL | 1,150 |
| Jeffrey Bunning MD | Bristol | TN | 1,142 |
| Tobias V George MD | Novi | MI | 1,128 |
| Doug Grayson MD | Elmwood Park | NJ | 1,104 |
| Michael Flohr MD | Hastings | MI | 1,104 |
| Bruce Dragoo MD | Grand Rapids | MI | 1,104 |
| Shirley Sherrod MD | Detroit | MI | 1,104 |
| Terry Dawson MD | Cullman | AL | 1,104 |
| Bruce Brumm MD | Omaha | NE | 1,104 |
| Emily Fant MD | Las Vegas | NV | 1,104 |
| John Kay MD | Effingham | IL | 1,080 |
| Mathew Boyer MD | Evansville | IN | 1,080 |
| Ronald Lorfel MD | Livonia | MI | 1,056 |
| Shirley Sherrod MD | Detroit | MI | 1,056 |
| Stanley Tao MD | Monroe | MI | 1,056 |
| Herbert Blatt MD | Douglasville | GA | 1,056 |
| Robert Phillips MD | Birmingham | AL | 1,056 |
| R Doyle Stulting MD | Atlanta | GA | 1,020 |

| Doctor | City | State | Acular LS® Samples |
|--------|------|-------|--------------------|
| Elwin Schwartz MD | Newington | CT | 1,008 |
| David Dean Gossage | Hillsdale | MI | 1,008 |
| Bithika Kheterpal MD | Westland | MI | 1,008 |
| Alan Solway MD | Livonia | MI | 1,008 |
| Veda Moor MD | Greenville | NC | 1,008 |
| Susan Eiland MD | Birmingham | AL | 1,008 |
| Fred Mothershed MD | Tupelo | MS | 1,008 |
| Lawrence Platt MD | Racine | WI | 1,008 |
| Judson Martin MD | Scottsbluff | NE | 1,008 |
| Bruce Cameron MD | Seattle | WA | 1,008 |
| Sam Sprotzer MD | Milford | CT | 1,000 |
| Stephen Zuckerman MD | Cheshire | CT | 1,000 |
| Nauman Chaudry MD | New London | CT | 1,000 |
| Scott Spector MD | Milford | CT | 1,000 |
| Tac Lee MD | Weirton | WV | 1,000 |
| Ghulam Dastgir MD | Jackson | MI | 1,000 |
| Steven Corwin MD | Marietta | GA | 1,000 |
| Joseph Ceravolo MD | Columbus | GA | 1,000 |
| Steven Stetson MD | Atlanta | GA | 1,000 |
| Paul Mitchell MD | Marietta | GA | 1,000 |
| J Gregory Jones MD | Macon | GA | 1,000 |
| James Hays MD | Atlanta | GA | 1,000 |
| Steven Henslee MD | Columbus | GA | 1,000 |
| Alan Kozarsky MD | Atlanta | GA | 1,000 |
| Bradley Jacoby MD | Covington | GA | 1,000 |
| Alan Kozarsky MD | Atlanta | GA | 1,000 |
| Steve Mcquaig MD | Milledgeville | GA | 1,000 |
| Leiv Takle MD | Griffin | GA | 1,000 |
| Brian Long MD | Fayetteville | GA | 1,000 |
| Donald Mccurdy MD | Jasper | AL | 1,000 |

149.    These CCKs also included substantial quantities of free Zymar®.  During just one six-month period in 2008 and 2009, Allergan provided some 409,214 "free" samples of Zymar® .3% 1 mL (with an approximate total value of $7.2 million) to 756 physicians throughout the

United States as an inducement so that they would prescribe its drugs.  Of these, according to Allergan's own records as of February 10, 2009, Allergan provided some 87 physicians over 1000 free samples each of Zymar®, with the largest being Dr. Paul Ernst, MD, Jackson, Michigan, who received some 6,000 Zymar® "free" samples (worth an estimated $105,000):

| Doctor | City | State | Zymar® Samples |
|---|---|---|---|
| Paul Ernst MD | Jackson | MI | 6,000 |
| Mark Freedman MD | Milwaukee | WI | 3,456 |
| James S Lewis MD | Elkins Park | PA | 2,400 |
| Mark Latina MD | Stoneham | MA | 2,304 |
| Jerry Jordan MD | Scranton | PA | 2,304 |
| Amy Stein OD | Garden City | NY | 2,000 |
| Peter Calder MD | Wyomissing | PA | 1,800 |
| Andrew Morgenstern | Rockville | MD | 1,800 |
| Carmelina Gordon MD | Lansing | MI | 1,800 |
| Carmelina Gordon MD | Jackson | MI | 1,800 |
| Thomas Hansted OD | Bismarck | ND | 1,800 |
| Carl Stout MD | Independence | MO | 1,800 |
| Annetta Bulas OD | Orchard Park | NY | 1,752 |
| Dalel Tartak MD | City Of Industry | CA | 1,750 |
| Dalel Tartak MD | City Of Industry | CA | 1,750 |
| Gerri Goodman MD | Weymouth | MA | 1,728 |
| Brett Katzen MD | Towson | MD | 1,728 |
| Mazin Yaldo MD | Dearborn Heights | MI | 1,728 |
| Mazin Yaldo MD | Farmington Hills | MI | 1,728 |
| Avaro Obyrne MD | Lake Charles | LA | 1,728 |
| Michael Raizman MD | Boston | MA | 1,628 |
| Larry Henry OD | Edmond | OK | 1,623 |
| Anthony Pisacano MD | Bronx | NY | 1,600 |
| Anthony Pisacano MD | Bronx | NY | 1,600 |
| Will, Brian MD | Vancouver | WA | 1,600 |
| Paul Mitchell MD | Marietta | GA | 1,500 |
| Hersh Chopra MD | Marietta | GA | 1,500 |
| Edward Yee MD | Las Vegas | NV | 1,500 |
| Edward Yee MD | Las Vegas | NV | 1,500 |

55

| Doctor | City | State | Zymar® Samples |
|---|---|---|---|
| David Nelson MD | Carle Place | NY | 1,440 |
| Dennis Slochower MD | Philadelphia | PA | 1,440 |
| Timothy Mclaughlin | Pensacola | FL | 1,440 |
| Louis Scallon MD | Ames | IA | 1,440 |
| Goertz, John OD | Omaha | NE | 1,440 |
| Marnix Heersink MD | Dothan | AL | 1,248 |
| Douglas Grayson MD | Bloomfield | NJ | 1,200 |
| Doug Grayson MD | Elmwood Park | NJ | 1,200 |
| Mitchell Fineman MD | Cherry Hill | NJ | 1,200 |
| Joseph Maguire MD | Philadelphia | PA | 1,200 |
| Anthony Mannarino MD | Bristol | PA | 1,200 |
| Jeff Augustine  MD | Brecksville | OH | 1,200 |
| Carmelina Gordon MD | Lansing | MI | 1,200 |
| Carmelina Gordon MD | Jackson | MI | 1,200 |
| David Harrell MD | Hastings | MI | 1,200 |
| Lance Lemon MD | Lansing | MI | 1,200 |
| Stanley Tao MD | Monroe | MI | 1,200 |
| Christopher Chow MD | Southfield | MI | 1,200 |
| David Tukel MD | Dearborn | MI | 1,200 |
| David Harman MD | Forest | VA | 1,200 |
| Glenn Campbell MD | Williamsburg | VA | 1,200 |
| Richard Mauer MD | Waterloo | IA | 1,200 |
| Alan Berg MD | Sherman Oaks | CA | 1,200 |
| Calvin Eshbaugh MD | Temple | TX | 1,200 |
| Mark Lebowitz MD | Brooklyn | NY | 1,152 |
| Anthony Sensoli MD | South Charleston | WV | 1,152 |
| Frank Derr MD | Rochester | MI | 1,152 |
| Robert Clark MD | Brighton | MI | 1,152 |
| Tobias George MD | Southfield | MI | 1,152 |
| Nossonal Kleinfeldt | Livonia | MI | 1,152 |
| Nossonal Kleinfeldt | Dearborn | MI | 1,152 |
| John Barletta MD | Ypsilanti | MI | 1,152 |
| Ronald Bergman MD | Farmington Hills | MI | 1,152 |
| Martin Apple MD | Southfield | MI | 1,152 |
| Luis C Gago MD | Chelsea | MI | 1,152 |
| Stanley Tao MD | Monroe | MI | 1,152 |

| Doctor | City | State | Zymar® Samples |
|---|---|---|---|
| Kenneth Wallace MD | Dothan | AL | 1,152 |
| Dasa Gangadhar MD | Wichita | KS | 1,152 |
| Angela Ahrens OD | Tulsa | OK | 1,152 |
| Angela Ahrens OD | Muskogee | OK | 1,152 |
| Terria Winn MD | Wichita | KS | 1,152 |
| John Hovanesian MD | San Clemente | CA | 1,152 |
| Alan Solway MD | Livonia | MI | 1,008 |
| Bruce Cameron MD | Seattle | WA | 1,008 |
| Carolyn Anderson MD | Peabody | MA | 1,008 |
| Sam Sprotzer MD | Milford | CT | 1,000 |
| Mark Milner MD | Hamden | CT | 1,000 |
| Robert Block MD | Meriden | CT | 1,000 |
| Nauman Chaudry MD | New London | CT | 1,000 |
| Scott Spector MD | Norwalk | CT | 1,000 |
| Severin Palydowycz | Middletown | NY | 1,000 |
| Joseph Kesselring MD | Lansdale | PA | 1,000 |
| Tac Lee MD | Weirton | WV | 1,000 |
| Ghulam Dastgir MD | Jackson | MI | 1,000 |
| Steven Corwin MD | Marietta | GA | 1,000 |
| Joseph Ceravolo MD | Columbus | GA | 1,000 |
| Paul Mitchell MD | Marietta | GA | 1,000 |
| James Hays MD | Atlanta | GA | 1,000 |

150.    These CCKs also included substantial quantities of free Pred Forte®.  During just one six-month period in 2008 and 2009, Allergan provided some 1,390,727 "free" samples of Pred Forte® 1% 10 mL (with a total approximate value of $94.5 million) to 3434 doctors throughout the United States as an inducement so that they would prescribe its drugs.  Of these, according to Allergan's own records as of February 10, 2009, Allergan provided some 203 physicians over 1000 free samples each of Pred Forte® 1% 10 mL, with the largest being Dr. David Nelson, MD, Carle Place, New York, who received some 6,048 Pred Forte® "free" samples (worth an estimated $411,264):

57

| Doctor | City | State | Pred Forte® Samples |
|---|---|---|---|
| David Nelson MD | Carle Place | NY | 6,048 |
| Kristia Owens OD | Mesa | AZ | 4,320 |
| Vincent Young MD | Philadelphia | PA | 3,504 |
| Ken Bonfield MD | Morganton | NC | 3,164 |
| David Nelson MD | Carle Place | NY | 3,024 |
| Scott Pastor MD | Atlanta | GA | 2,976 |
| Randy Richardson MD | Oxford | MS | 2,688 |
| Darryl Munn OD | Chattanooga | TN | 2,592 |
| Mark Bearman MD | Birmingham | AL | 2,500 |
| Brian Renelle MD | Hurst | TX | 2,400 |
| Jerry Jordan MD | Scranton | PA | 2,304 |
| Ronald Grand OD | Tampa | FL | 2,304 |
| Randy Richardson MD | Oxford | MS | 2,304 |
| Dennis Lockhart MD | Bloomington | IL | 2,304 |
| John Woode MD | Salem | VA | 2,280 |
| Michael Woodcock | Fayetteville | NC | 2,236 |
| James Harris MD | Hickory | NC | 2,160 |
| Paul Ernst MD | Jackson | MI | 2,136 |
| Neil Griffin MD | Southern Pines | NC | 2,088 |
| Mark Blecher MD | Philadelphia | PA | 2,040 |
| Mehrdad Aghai MD | Gardena | CA | 2,016 |
| George Brinning MD | Waterbury | CT | 2,000 |
| Tony Zacchai MD | King Of Prussia | PA | 2,000 |
| Ricardo Akstein MD | Riverdale | GA | 2,000 |
| Bret Crumpton DO | Columbus | GA | 2,000 |
| Joon Kim MD | Morrow | GA | 2,000 |
| Michael Adams MD | Birmingham | AL | 2,000 |
| Gerald Lubert OD | Knoxville | TN | 2,000 |
| Jay Hellreich MD | Meriden | CT | 1,952 |
| George Brinning MD | Waterbury | CT | 1,952 |
| Mark Latina MD | Stoneham | MA | 1,920 |
| Richard Hairston MD | Largo | FL | 1,920 |
| Martin Mizener MD | Omaha | NE | 1,920 |
| Christopher Reynolds | New Milford | CT | 1,808 |
| Steve Higgns MD | Portage | MI | 1,808 |
| Andrew Morgenstern OD | Rockville | MD | 1,800 |

58

| Doctor | City | State | Pred Forte® Samples |
|---|---|---|---|
| Veda Moore MD | Greenville | NC | 1,800 |
| William Mitchell MD | Huntsville | AL | 1,800 |
| Tom Coffman MD | Lake Worth | FL | 1,800 |
| Wes Herman MD | Dallas | TX | 1,800 |
| Wesley Herman MD | Dallas | TX | 1,800 |
| Robert Dinga OD | Oakdale | MN | 1,800 |
| Robert Dinga OD | Maple Grove | MN | 1,800 |
| Darron Bacal MD | Orange | CT | 1,784 |
| Won Kim MD | Florence | AL | 1,784 |
| Steven Wilson MD | New Albany | IN | 1,776 |
| Jonathan Stein MD | Milford | CT | 1,760 |
| Howard Distelman MD | Shelton | CT | 1,760 |
| Gregory Osmundson MD | Sioux Falls | SD | 1,750 |
| Michael Magbalon MD | Thomasville | GA | 1,728 |
| Peter Polack MD | Ocala | FL | 1,728 |
| Dan Omohundro MD | Fairfield | CT | 1,712 |
| David Verdier MD | Grand Rapids | MI | 1,712 |
| Bruce Cameron MD | Seattle | WA | 1,684 |
| Omar Hanuch MD | Rochester | NY | 1,680 |
| Kim Robbins MD | Bridgeport | CT | 1,664 |
| Charles Heaton MD | Longview | TX | 1,656 |
| Peter Rapoza MD | Boston | MA | 1,628 |
| Sarah Hays MD | Alabaster | AL | 1,616 |
| Natalie Rioux MD | West Springfield | MA | 1,584 |
| Matthew Hughes OD | Jackson | TN | 1,584 |
| Samuel Amstutz MD | Wichita | KS | 1,584 |
| Andrew Swan MD | Milford | CT | 1,568 |
| Jason Handza DO | Pinellas Park | FL | 1,536 |
| Douglas Devries OD | Sparks | NV | 1,536 |
| Arthur Woods MD | Jackson | TN | 1,524 |
| Sarah Hays Bearman | Birmingham | AL | 1,520 |
| Paul Jorizzo MD | Grants Pass | OR | 1,512 |
| Bret Crumpton DO | Columbus | GA | 1,500 |
| Paul Mitchell MD | Marietta | GA | 1,500 |
| Joseph Ceravolo MD | Columbus | GA | 1,500 |
| Hersh Chopra MD | Marietta | GA | 1,500 |

| Doctor | City | State | Pred Forte® Samples |
|---|---|---|---|
| Steven Henslee MD | Columbus | GA | 1,500 |
| Scot Wall MD | Albany | GA | 1,500 |
| Robert Phillips MD | Birmingham | AL | 1,500 |
| Donald Derivaux MD | Huntsville | AL | 1,500 |
| Sarah Hays MD | Birmingham | AL | 1,500 |
| Donald Mccurdy MD | Birmingham | AL | 1,500 |
| Christopher Born MD | La Crosse | WI | 1,488 |
| Larry Henry OD | Edmond | OK | 1,479 |
| M Scott Hearing OD | Lake Worth | FL | 1,472 |
| Gerri Goodman MD | Weymouth | MA | 1,440 |
| John Cecconi OD | Lexington | KY | 1,440 |
| Timothy Mclaughlin | Pensacola | FL | 1,440 |
| Mark Phelan MD | Abilene | TX | 1,440 |
| Christopher Born MD | La Crosse | WI | 1,440 |
| Kevin Flaherty MD | Wausau | WI | 1,440 |
| Dennis Lockhart MD | Bloomington | IL | 1,440 |
| Louis Scallon MD | Ames | IA | 1,440 |
| Therese Alban MD | West Des Moines | IA | 1,440 |
| Virginia Lolley MD | Birmingham | AL | 1,428 |
| Victor Gonzalez MD | Harlingen | TX | 1,408 |
| Gregg Moody MD | Athens | AL | 1,404 |
| Robert Arguello MD | Mcallen | TX | 1,404 |
| William Hart MD | Lake Charles | LA | 1,392 |
| Peter Gordon MD | Decatur | GA | 1,356 |
| Philip Newman MD | Conyers | GA | 1,356 |
| J Chandler Berg MD | Albany | GA | 1,356 |
| Gregg Moody MD | Athens | AL | 1,356 |
| Richard Hairston MD | Largo | FL | 1,344 |
| Michael Raizman MD | Boston | MA | 1,340 |
| Maria Scott MD | Annapolis | MD | 1,308 |
| S Anna Kao MD | La Grange | GA | 1,308 |
| M Sid Moore MD | Macon | GA | 1,308 |
| Paul Mitchell MD | Marietta | GA | 1,308 |
| Greg Sepanski MD | Auburn | AL | 1,308 |
| John Beneke MD | Orlando | FL | 1,288 |
| Brent Chalmers MD | Oregon City | OR | 1,272 |

| Doctor | City | State | Pred Forte® Samples |
|---|---|---|---|
| Keith Thompson MD | Florence | AL | 1,260 |
| Thomas Mckinnon MD | Birmingham | AL | 1,260 |
| Jason Handza DO | Pinellas Park | FL | 1,248 |
| John Marsh MD | Topeka | KS | 1,248 |
| Brett Katzen MD | Towson | MD | 1,224 |
| Anthony Pisacano MD | Bronx | NY | 1,216 |
| Anthony Pisacano MD | Bronx | NY | 1,216 |
| Johnny Gayton MD | Warner Robins | GA | 1,212 |
| Kent Wellish MD | Las Vegas | NV | 1,208 |
| William Columbus MD | Trevose | PA | 1,200 |
| John Grundy | Ellicott City | MD | 1,200 |
| Alan Schein MD | Harrisburg | PA | 1,200 |
| Donna Booth MD | Lutherville | MD | 1,200 |
| Stanley Tao MD | Monroe | MI | 1,200 |
| Christopher Chow MD | Southfield | MI | 1,200 |
| Kenlyn Mill MD | Harrisonburg | VA | 1,200 |
| Anthony Johnson MD | Greenville | SC | 1,200 |
| Charles Woods MD | Decatur | AL | 1,200 |
| William Schenk MD | Lebanon | TN | 1,200 |
| David Bane OD | Edina | MN | 1,200 |
| Jeffrey Fischer MD | Willmar | MN | 1,200 |
| Louis Nichamin MD | Brookville | PA | 1,176 |
| Andrew Michael MD | Richmond | VA | 1,176 |
| Robert Prouty OD | Denver | CO | 1,176 |
| Michael Ursic MD | Tuscaloosa | AL | 1,164 |
| James Cannatti MD | Akron | OH | 1,158 |
| Allen Zieker MD | Troy | NY | 1,152 |
| Robert Arffa MD | Sewickley | PA | 1,152 |
| Scott Strickler MD | Parkersburg | WV | 1,152 |
| Kathleen Keller OD | Indianapolis | IN | 1,152 |
| Tobias George MD | Southfield | MI | 1,152 |
| John Barletta MD | Ypsilanti | MI | 1,152 |
| Nossonal Kleinfeldt | Livonia | MI | 1,152 |
| Nossonal Kleinfeldt | Dearborn | MI | 1,152 |
| Christopher Hogan MD | Gulfport | MS | 1,152 |
| Charles Williamson | Baton Rouge | LA | 1,152 |

61

| Doctor | City | State | Pred Forte® Samples |
|---|---|---|---|
| Robert Sambursky MD | Bradenton | FL | 1,152 |
| Roberto Beraja MD | Coral Gables | FL | 1,152 |
| Joseph Kurstin MD | Miami | FL | 1,152 |
| Mark Spurrier MD | Crystal City | MO | 1,152 |
| Michael Coleman MD | Greenwood | MS | 1,152 |
| Jon Wagner OD | Racine | WI | 1,152 |
| Dasa Gangadhar MD | Wichita | KS | 1,152 |
| Johnny Wu OD | San Diego | CA | 1,152 |
| Johnny Wu OD | San Diego | CA | 1,152 |
| Stuart Brown MD | La Jolla | CA | 1,152 |
| Jeffrey Bunning MD | Bristol | TN | 1,142 |
| Thomas J Byrd | Trenton | MI | 1,128 |
| Tobias V George MD | Novi | MI | 1,128 |
| Carl Stout MD | Independence | MO | 1,128 |
| Doug Grayson MD | Elmwood Park | NJ | 1,104 |
| Michael Flohr MD | Hastings | MI | 1,104 |
| Bruce Dragoo MD | Grand Rapids | MI | 1,104 |
| Shirley Sherrod MD | Detroit | MI | 1,104 |
| Terry Dawson MD | Cullman | AL | 1,104 |
| Peter Whitted MD | Omaha | NE | 1,104 |
| Bruce Brumm MD | Omaha | NE | 1,104 |
| Emily Fant MD | Las Vegas | NV | 1,104 |
| Robert Taylor MD | Las Vegas | NV | 1,100 |
| John Kay MD | Effingham | IL | 1,080 |
| Ronald Lorfel MD | Livonia | MI | 1,056 |
| Shirley Sherrod MD | Detroit | MI | 1,056 |
| Stanley Tao MD | Monroe | MI | 1,056 |
| Herbert Blatt MD | Douglasville | GA | 1,056 |
| Robert Phillips MD | Birmingham | AL | 1,056 |
| Mark Freedman MD | Milwaukee | WI | 1,056 |
| Thomas Hansted OD | Bismarck | ND | 1,032 |
| R Doyle Stulting MD | Atlanta | GA | 1,020 |
| Elwin Schwartz MD | Newington | CT | 1,008 |
| Alex Chop MD | Oregon | OH | 1,008 |
| David Dean Gossage | Hillsdale | MI | 1,008 |
| Bithika Kheterpal MD | Westland | MI | 1,008 |

| Doctor | City | State | Pred Forte® Samples |
|--------|------|-------|---------------------|
| Jeffrey Nestor Do | Garden City | MI | 1,008 |
| Veda Moor MD | Greenville | NC | 1,008 |
| Susan Eiland MD | Birmingham | AL | 1,008 |
| James Roberts MD | Largo | FL | 1,008 |
| Fred Mothershed MD | Tupelo | MS | 1,008 |
| Lawrence Platt MD | Racine | WI | 1,008 |
| Calvin Sprik MD | Wausau | WI | 1,008 |
| Wendell Wong MD | Torrance | CA | 1,008 |
| Seth Meskin MD | Milford | CT | 1,000 |
| Seth Meskin MD | Branford | CT | 1,000 |
| Severin Palydowycz | Middletown | NY | 1,000 |
| Severin Palydowycz | Middletown | NY | 1,000 |
| Steven Corwin MD | Marietta | GA | 1,000 |
| J Gregory Jones MD | Macon | GA | 1,000 |
| Steven Henslee MD | Columbus | GA | 1,000 |
| Bradley Jacoby MD | Covington | GA | 1,000 |
| Steve Mcquaig MD | Milledgeville | GA | 1,000 |
| Leiv Takle MD | Griffin | GA | 1,000 |
| Brian Long MD | Fayetteville | GA | 1,000 |
| Steven Rosenfeld MD | Delray Beach | FL | 1,000 |
| Ravid Reddy MD | Las Vegas | NV | 1,000 |
| Ravi Reddy MD | Las Vegas | NV | 1,000 |
| Peter Egbert MD | Palo Alto | CA | 1,000 |

151.     In addition to free samples of Acular LS®, Pred Forte® and Zymar®, the CCKs included large quantities of other Allergan drugs.  During this same six-month time period in 2008 and 2009, Allergan provided the following illegal inducements:

- 150,600 free samples of FML .1% 5 mL to 384 doctors throughout the United States;

- 247,352 free samples of Optive® 3 mL to 380 doctors throughout the United States;

- 593,477 free samples of Optive Senstive® 5 X 0.4 mL to 1176 doctors throughout the United States;

- 563,216 free samples of Pred Forte® 1% 5 mL to 1288 doctors throughout the United States;

- 19,856 free samples of Refresh Liquidgel 3 mL to 58 doctors throughout the United States; and

- 94,650 free samples of Refresh Plus® 5x .4 mL to 161 doctors throughout the United States.

152.    Relator Wood has provided the Government with numerous CCK Agreements, along with Allergan's databases that summarize thousands of similar agreements that Allergan entered into with physicians throughout the United States, as well as detailed payment records Allergan maintained which closely tracked how kickbacks were influencing, and did influence, prescribing behavior.  These records show number of prescriptions written, geographic region, payer, prescriber, and drug (both Allergan's and its competitor drugs).  Some of these internal Allergan records are referred to as "Trinity" reports.  Allergan corporate compiles prescribing data as part of its ROI analysis, and these detailed doctor specific, Trinity reports, broken out by state and region, are provided to the sales force for tracking and as productivity assessments.

153.    Through CCK Agreements, Allergan provided individual ophthalmology practices with "free" samples that ranged in value from hundreds to thousands of dollars.  Here is a price list Allergan has on its website for the costs of the non-pharmaceutical items included in the CCK, which totals $33.80 per CCK:

**If bags and components are ordered,
components will be packed inside the bags.**

| PART No. | ITEM | PRICE |
|---|---|---|
| 43092 | Blue Bag (minimum order 24) | $2.00 |
| 43093 | Black Bag (minimum order 24) | $2.00 |
| 42822 | ID Tag | $0.25 |
| 4538CP | Cataract Glasses | $1.90 |
| 94777 | Premium Cataract Glasses | $10.00 |
| 40969 | LASIK Glasses | $1.85 |
| 94778 | Premium LASIK Glasses | $10.00 |
| 42240US | Flat Dual Eye Shields | $2.50 |
| 40633 | Plastic Eye Shield | $0.45 |
| 467 2CP | Oval Eye Pad | $0.25 |
| 4646CP | Plastic Tape | $0.85 |
| 4283CP | Paper Tape | $0.85 |
| 4278CP | 3x3 Eye Pad | $0.25 |

154.    Depending on the drugs included and the size of the free drug sample, the cost of the drugs included in the CCKs was substantial.  For example, here are prices during the relevant time period for several Allergan drugs:

- Zymar (gatifloxacin 0.3%) $87.53, 5 mL, generic available late 2010;

- Zymaxid (gatifloxacin 0.5%) $97, 2.5 mL, no generic available;

- Pred Forte (prednisolone acetate 1%) $68, 10 mL, generic available 1998, $21, 10 mL;

- Acular (ketorolac 0.5%) $126 5 mL, generic available October 2009, $74 5 mL;

- Acular LS (ketorolac 0.4%) $126, 5 mL, generic available October 2009 $74, 5 mL; and

- Acuvail (ketorolac 0.45%) no generic available. $123 30 x .5 mL vials (15 day supply).

155.    Because of the significant cost of drugs and supplies included in the CCKs, Allergan only provided them to physicians who agreed to prescribe a significant quantity of Allergan products in return.  Allergan viewed the CCKs and included products as what it called a "resource" to induce physicians to prescribe its drugs, and it sought to ensure that it received an adequate "return on investment" (also called simply "return" or "ROI").  In keeping with that, healthcare professionals who prescribed primarily Alcon drugs and did not agree to switch to

65

Allergan drugs, were not offered CCKs.   For physicians already receiving CCKs, Allergan threatened to cease providing CCKs, and in many instances did cease providing CCKs, if they did not prescribe sufficient quantities of Allergan's drugs.

156.    Sales representatives were themselves responsible for ensuring that CCK Agreements were only offered to physicians who would prescribe Allergan drugs in return; however, managers were responsible for approving representatives' decisions.   Section V of the CCK Agreement requires signatures of the healthcare professional, sales representative, and Area Manager.    In practice, sales representatives obtained verbal approval from the Area Manager and signed on his or her behalf.

157.    Allergan taught Relator Wood, from his arrival at the Company, to leverage CCKs to successfully drive sales of Allergan products.   Relator Wood was hired by Richard Morgan, who also served as Relator Wood's first Area Manager.   (Morgan is now a consultant in Allergan's Eye Care Business Advisor Group.)   During Relator Wood's interviews with Morgan in September of 2008, as well as during several field rides and phone conversations in late 2008, Morgan explained that CCKs were the critical tool to convince ophthalmologists to prescribe Zymar® and Acular LS®, and that the CCKs needed to be strategically leveraged in order to do so.    Indeed, under Morgan's direction, the Ohio team had the highest number of CCK Agreements of any sales area in the country.

158.    Allergan Field Training Manager William Scruggs taught Relator Wood the same lesson – *i.e.*, the importance of strategically leveraging CCKs to drive sales – immediately following Relator's arrival at Allergan.   In an email on November 26, 2008, Scruggs sent Relator Wood an Excel spreadsheet titled "CCK – Game Plan II" as a sample of effective use of CCKs. This "Game Plan" explicitly compared the quantity of CCKs and samples provided to a

physician relative to the prescriptions of Allergan products written.  The spreadsheet recorded the absolute quantity of CCKs and samples provided as well as prescriptions of Acular® and Zymar® written, and it also calculated a "Ratio" comparing CCKs and drugs provided versus prescriptions written.  This "Ratio" was defined as "Script Total" divided by "CCK Totals."  Ratios less than approximately 70% were highlighted in red, while those in excess of this value were black.

159.   The comments in Scruggs' spreadsheet, which are included under the heading "Background / Action Plan," make even more explicit that Allergan intended to (and did) leverage CCKs, samples, and other products to induce physicians to prescribe its drugs.  The following are examples of script-to-CCK "Ratios" listed in the spreadsheet as well as the accompanying "Action Plan":

- **Community Eye Center**, suburban Detroit, Michigan, had received 96 CCKs and written 23 prescriptions for a 24% ratio.  The Action Plan noted that this clinic treated a number of Medicaid patients and that Allergan would "put [a] stop" to "giving away too many free meds."  Another scorecard for a separate time period, included in the same spreadsheet, showed that Community Eye Center had received 144 CCKs and written 26 prescriptions for an 18% ratio.  The Action Plan stated: "No more kits till we see a better return."

- **Great Lakes Ophthalmology**, Michigan had received 480 CCKs and written 50 Allergan prescriptions for a 10% ratio.  The Action Plan stated: "Had talk about Zymar meds only.  He [told] me he likes to give a bottle with script.  Also uses 2 kits per pat[ient].  I explained the situation and he instructed his staff to write 2 scripts per patient to cover the kits.  Goal:  ratio is horrible.  Go in

preceptorship with him.  Find out what[']s really going on."  The "talk" is an explicit reference to Allergan's insistence that Great Lakes prescribe Allergan drugs or else its CCKs would be terminated.

- **Grosin, Spige, & Grey**, Michigan, had received 840 CCKs and written 482 Allergan prescriptions for a 57% ratio.  The Action Plan stated, "[t]oo much [CCKs and samples] going in.  Need higher return. . . .  [N]o more giving Acular away."

- **Dr. Richard A. Kaiserman**, East Tawas, Michigan had received 144 CCKs and written 52 Allergan prescriptions for a 36% ratio.  The Action Plan stated: "25% goes to Medicaid.  Not a beli[e]ver in NSAIDs.  Gives 2 kits per pat[ients].  <u>Goal</u> kits talk about expense . . . can[']t support unless you['re] giving 1 kit per pat[ient]."

- **Lake Lazer Eye Center**, 35776 Harper Avenue, Charter Township of Clinton, Michigan, had received 48 CCKs and written 5 Allergan prescriptions for a 10% ratio.  The Action Plan stated: "Bags.  They are going with Alcon [because] of bags [*i.e.*, equivalent CCKs from Alcon].  No more orders [in] 2006, un[til] they agre[e] to use us."

- **Michigan Glaucoma Specialists**, Royal Oak, Michigan had received 186 CCKs and written 116 Allergan prescriptions for a 62% ratio.  The Action Plan stated, "[h]ad talk with them."  Again, the "talk" with Michigan Glaucoma was the quid pro quo discussion that CCK would stop unless it prescribed Allergan drugs.

- **Northern Eye Ophthalmology**, Alpena, Michigan had received 432 CCKs, and written 123 Allergan scripts, a 28% ratio.  The Action Plan states: "Recently 1

cat[aract surgery] kit per pat[ient], cut back on cat[aract surgeries].  Need 10ml

Pred for 2nd eye.  Goal:  Watch TSS [total prescriptions] and JG Pads [pre-printed

prescription pads], monitor 1-1 ratio."

- **Rohr Eye & Laser**, Grand Blanc, Michigan, had received 396 CCKs and written 250 Allergan prescriptions for a 63% ratio.  The Action Plan stated: "Need better [CCK:prescriptions] ratio.  Look at year[']s numbers to see if match[e]s up with kits.  Huge account can[']t lo[]se, but not to be taken advantage of ..."

- **Wilkinson Eye Center**, Pontiac, Michigan, had received 528 CCKs and written 132 Allergan prescriptions for a 25% ratio.  The Action Plan stated, "POOR Ratio, may cut Wilkinson ... high Medicaid pop[ulation]."

160.   The preceding comments from the spreadsheet that Field Training Manager Scruggs sent Relator Wood were indicative of Allergan's use of CCKs and product samples to induce physicians to prescribe Allergan products.  Field Training Manager Scrugg's comments unequivocally stated in writing Allergan's business model: free goods were, only given and maintained in exchange for a high ratio of prescriptions to free goods, namely the CCKs.  While both sales representatives and their managers made these same calculations and decisions continually throughout Relator Wood's employment at Allergan, they were generally only discussed in person or on the phone (*i.e.*, not in writing), or by using less direct and explicit language.

161.   As a result of growing concern about the illegality of its use of CCKs, in late 2008, Allergan announced to its sales force via conference calls that it was terminating its provision of CCKs, explaining the concern was that the CCKs could be viewed as an inducement to physicians to use Allergan products.  In a PowerPoint presentation, dated November 13, 2008,

Allergan informed its External Disease sales force that CCKs would no longer be available and that free drug samples would only be available for the top 1,000 accounts through "Direct Sample Ship" agreements. The rationale for the revocation of the CCKs was the change in the PhRMA and the AdvaMed Codes. According to the presentation, a "[p]hysician's acceptance of free kits can be interpreted as being in violation of Federal Anti-Kickback statutes."

162.    In response to physicians who complained about the cessation of free CCKs, sales representatives were instructed to inform them that "[v]iolations of the PhRMA [C]ode put the physician, the representative and the company at risk. Any company in violation of these codes puts their customers at risk." Allergan subsequently established a free website where healthcare professionals can order CCKs (that do not include Allergan drugs) at a nominal cost. *See* http://www.allergancustomersupport.com/Assets/804133PCKCatalog.pdf (last visited Feb. 22, 2012).

163.    Sales representatives themselves expressed widespread and considerable displeasure following the announcement of the termination of CCKs. They feared that without CCKs, Allergan would be placed at a competitive disadvantage relative to Alcon, which continued to induce physicians using analogous CCKs. Sales representatives' concern serves as a strong indication of both the centrality and effectiveness of CCKs in Allergan's overall kickback strategy.

164.    To counteract an expected decline in sales were it to cease providing kickbacks altogether, Allergan took two steps to reduce the impact of its decision to halt the CCK program. First, it provided high-prescribing physicians with massive final deliveries of CCKs, which in some instances contained quantities of CCKs sufficient to last six months. Second, Allergan continued using free product samples as inducements to physicians to prescribe its products.

165.    These CCKs were remuneration which provided a valuable inducement to these physicians to prescribe Defendant's products.  The CCKs and other free goods provided the physician with free advertising and promotion of their practices and free goods they passed on to Government Program Beneficiaries which were likely to influence beneficiary selection of a particular provider.

166.    The Kickback Scheme described above constitutes a violation of the AKS, was made with the intent to induce, and which did induce, physicians to prescribe Allergan drug products that were reimbursed by Government Programs and also induced patients to select the physicians who received or passed on the kickback, through a pattern of corrupt and illegal conduct, in violation of the federal False Claims Act, 31 U.S.C. § 3729.  Moreover, Allergan's kickbacks caused pharmacies submitting claims to the Government to falsely certify compliance with applicable laws and regulations, including that the claims were not tainted by illegal kickbacks.

### C.    Using Sample Shipment Agreements to Bribe Healthcare Professionals

167.    When Allergan finally acknowledged it was too risky because of regulatory concerns to continue its use of CCKs, it devised an essentially identical scheme to induce physicians to prescribe its drugs by providing them with large quantities of free drug samples. Similar to the process by which they had ordered CCKs, physicians thereafter coordinated with an Allergan sales representative to submit a "Sample Shipment Agreement" through which they ordered a large, six-month supply of free product samples.

168.    The "Sample Shipment Agreement" consisted of a one-page form, distributed by Allergan to its sales representatives, including to Relator Wood, for the purpose of providing free

drug samples to ophthalmologists.  These forms, which were periodically updated, included print that identified the document (*e.g.*, "APG 4118 REV.  7/09 MDR APC44A109") on the bottom left-hand portion and the Allergan marketing department facsimile number ("MARKETING FAX (866) 257-0281") on the bottom right-hand portion.

169.    In Section II of the Sample Shipment Agreement, ophthalmologists were able to choose from seven listed Allergan drugs, including Acuvail®, Pred Forte®, Optive®, Optive Sensitive® and Refresh Liquigel®.  They could also fill in an "Other" request for an unlisted drug, such as Zymar®.  Section III of the agreement allowed the Practitioner to choose the "MONTHLY FORECAST" and "MAXIMUM 6 MONTH QUANTITY."  The Allergan sales representative generally worked with the surgical counselor or coordinator to estimate the supply of drugs required, which was based on the monthly surgical volume for the entire clinic.

170.    The samples were shipped from Allergan's fulfillment facility in Waco, Texas, by its subsidiary Allergan Sales LLC, located at 8301 Mars Drive, Waco, Texas 76712.  Shipping costs were always paid by Allergan.

171.    The follow are examples of Sample Shipment Agreements that Allergan used to induce physicians to prescribe its drug products and that resulted in prescriptions for its drug products:

| Name & Address of Physician or Practice | Contract No. & Expiration Date | Effective Dates of the Agreement | Free Drugs Provided in Sample Shipment Agreements | Initial Ship Quantity |
|---|---|---|---|---|
| Belmont Eye Clinic 3020 Belmont Ave. Youngstown, OH 44505 | Renewal of Agreement Contract No.: 0480065304 Expires: Not Listed | 08/06/09-02/06/10 | Acuvail® Pred Forte® Optive® Optive Sensitive® | 168 |

| Name & Address of Physician or Practice | Contract No. & Expiration Date | Effective Dates of the Agreement | Free Drugs Provided in Sample Shipment Agreements | Initial Ship Quantity |
|---|---|---|---|---|
| Canton Ophthalmology 2600 Tuscarawas St., W Suite 200 Canton, OH 44708 | Renewal of Agreement Contract No.: "Replace Existing Contract" Expires: Not Listed | 11/03/09-05/03/10 | Acuvail® Pred Forte® Optive® Refresh Liquigel® | 348 |
| Canton Ophthalmology 2600 Tuscarawas St., W Suite 200 Canton, OH 44708 | New Agreement Contract No.: 0480066438 Expires: Not Listed | 09/22/09-02/22/10 | Acuvail® Pred Forte® Optive® | 204 |
| Clearchoice Laser 7001 S. Edgerton Rd. Brecksville, OH 44141 | Renewal of Agreement Contract No.: 0480064174 Expires: 08/10/2009 | 07/10/09-01/10/10 | Pred Forte® Optive Sensitive® | 144 |
| Cleveland Eye Clinic 2740 Carnegie Ave. Cleveland, OH 44115 | Renewal of Agreement Contract No.: 0480064582 Expires: Not Listed | 08/13/09-02/13/10 | Acuvail® Pred Forte® Optive® | 216 |
| Eye Centers of Ohio 800 McKinley Ave., NW Canton, OH 44703 | Renewal of Agreement Contract No.: 0480064607 Expires: Not Listed | 08/13/09-02/13/10 | Acuvail® Pred Forte® Optive® Zymar® | 144 |
| Eye Centers of Ohio 6407 Frank Rd. North Canton, OH 44720 | Renewal of Agreement Contract No.: 0480064646 Expires: Not Listed | 08/13/09-02/13/10 | Acuvail® Pred Forte® Optive® Zymar® | 108 |
| Ohio Eye Alliance 985 Sawburg Alliance, OH 44601 | New Agreement Contract No.: Not Listed Expires: Not Listed | 10/22/09-04/22/10 | Pred Forte® | 144 |
| Ohio Eye Alliance 985 Sawburg Alliance, OH 44601 | Renewal of Agreement Contract No.: 0480064159 Expires: Not Listed | 08/11/09-02/11/10 | Acuvail® Pred Forte® Optive® | 108 |
| Ohio Eye Association 8110 Market St. Youngstown, OH 44512 | Renewal of Agreement Contract No.: 0480064592 Expires: Not Listed | 08/06/09-02/06/10 | Acuvail® Pred Forte® Optive® Zymar® | 204 |
| Ophthalmic Physicians, Inc. 9485 Mentor Ave., #110 Mentor, OH 44060 | New Agreement Contract No.: 0480068575 Expires: Not Listed | 09/30/09-03/30/10 | Acuvail® Pred Forte® Optive® | 120 |
| Roholt Vision Institute 5890 Mayfair North Canton, OH 44720 | Renewal of Agreement Contract No.: 0480064861 Expires: Not Listed | 08/11/09-02/11/10 | Acuvail® Pred Forte® Optive® Optive Sensitive® | 108 |
| The Eye Center 314 Penco Rd. Weirton, WV 26062 | Renewal of Agreement Contract No.: 0480065701 Expires: Not Listed | 08/06/09-02/06/10 | Acuvail® Pred Forte® Optive® Zymar® | 108 |

172.    Relator Wood has provided the Government with hundreds of Sample Shipment Agreements along with a database of thousands of similar agreements entered into throughout the United States between Allergan and health care professionals.

173.    These Sample Shipment Agreements included substantial quantities of free Allergan drugs.  For example, during just one six-month period in 2009, Allergan provided some 953,817 "free" samples of Acular LS® .4% 1 mL (with a total approximate value of $24 million) to physicians throughout the United States as an inducement so that they would prescribe its drugs.  Of these, according to Allergan's own records as of July 23, 2009, Allergan was on schedule to provide some 192 physicians over 1000 free samples of Acular LS®, with the largest being Dr. Martin Mizener, Midwest Eye Care, PC, 4353 Dodge Street, Omaha, Nebraska, who received some 11,520 Acular® samples (worth an estimated $290,304):

| Customer Name | MD Name | Street | City | State | 6 Month Quantity |
|---|---|---|---|---|---|
| Midwest Eye Care PC | Martin Mizener MD | 4353 Dodge St | Omaha | NE | 11,520 |
| St Lukes Cataract And Laser Ins | Katherine Flynn MD | 43309 Us Hwy 19 N | Tarpon Springs | FL | 7,488 |
| Southwestern Eye Center | Krista Owens OD | 2610 E University | Mesa | AZ | 6,048 |
| Omni Eye Services | Paul Ajamiam OD | 5505 Peachtree Dunwoody Rd #300 | Atlanta | GA | 4,320 |
| Northwest Eye Surgeons, PC | Werner Cadera MD | 10330 Meridian Ave North #370 | Seattle | WA | 4,272 |
| Texas Eye And Laser Center | Brian Ranelle MD | 1872 Norwood Dr | Hurst | TX | 4,200 |
| St Lukes Cataract And Laser Ins | James Gills MD | 43309 Us Hwy 19 N | Tarpon Springs | FL | 3,168 |
| Morganton Eye Physicians | Ken Bonfield MD | 335 E Parker Rd | Morganton | NC | 3,164 |
| Laser And Surgical Ctr For Sight | William Lahners MD | 2601 S Tamiami Trail | Sarasota | FL | 2,928 |
| Williamson Eye Institute | Gena Kidd MD | 1400 Teal Rd Ste 8 | Lafayette | IN | 2,880 |

74

| Customer Name | MD Name | Street | City | State | 6 Month Quantity |
|---|---|---|---|---|---|
| Southeast Eye Specialists | Robin Brady MD | 7268 Jarnigan Rd #200 | Chattanooga | TN | 2,592 |
| Boston Eye Surg & Laser Ctr | Michael Raizman MD | 50 Staniford St | Boston | MA | 2,592 |
| Green Bay Eye Clinic | Brad Lavallie OD | 2253 W Mason St #100 | Green Bay | WI | 2,592 |
| Florida Eye Assoc | Ralph Paylor MD | 719 E New Haven | Melbourne | FL | 2,400 |
| David Chaffin MD | David Chaffin MD | 5420 Kietzke  Ln #103 | Reno | NV | 2,400 |
| Lca Vision | Lewis Groden MD | 2202 N West Shore Blvd #100 | Tampa | FL | 2,304 |
| Rayner Surgery Center Inc | William Farmer MD | 1314 Belk Dr | Oxford | MS | 2,304 |
| Southern Eye Associates PC | Sonya Smoak OD | 5350 Poplar Ave #950 | Memphis | TN | 2,304 |
| Northshore Cataract And Laser Ctr | Mark Latina MD | 91 Montvale Ave | Stoneham | MA | 2,304 |
| Eye Clinic Of Racine Ltd | Jennifer Hendee MD | 3805-A Spring St #111 | Racine | WI | 2,304 |
| Gulf South Eye Assoc | Paul Jorizzo MD | 4224 Houma Blvd #100 | Metairie | LA | 2,200 |
| Shoreline Ophthalmology | Ken Otto MD | 1298 E Sherman Blvd | Muskegon | MI | 2,200 |
| Graystone Ophthalmology | James Harris MD | 2424 Century Pl SE | Hickory | NC | 2,160 |
| Koch Eye | Paul Koch MD | 444 Quaker Lane | Warwick | RI | 2,040 |
| Dehaven Surgical Center | Rebecca Jones MD | 1424 E Front St | Tyler | TX | 2,016 |
| Clayton Eye Center | Joon Kim MD | 1000 Corporate Ctr Dr #100 | Morrow | GA | 2,000 |
| Brevard Surgery Center | Paul Befanis MD | 665 Apollo Blvd | Melbourne | FL | 2,000 |
| Shoreline Vision | Agreement | 1266 E Sherman Blvd | Muskegon | MI | 2,000 |
| Heaton Eye Associates | Charles Heaton MD | 3415 Golden Rd | Tyler | TX | 1,872 |
| Tylock Laser Center | Mark Hayes OD | 3100 N Macarthur Blvd | Irving | TX | 1,872 |

75

| Customer Name | MD Name | Street | City | State | 6 Month Quantity |
|---|---|---|---|---|---|
| Vision Quest | Wesley Herman MD | 5421 La Sierra Dr | Dallas | TX | 1,872 |
| Illinois Eye Center | Yannis Kolettis MD | 8921 N Wood Sage Rd | Peoria | IL | 1,872 |
| Illinois Eye Center | Yannis Koletis MD | 8921 N Wood Sage Rd | Peoria | IL | 1,872 |
| Bay Microsurgical Unit | John Hazelton MD | 1200 High Market St | Georgetown | SC | 1,800 |
| Eye Consultants Of Atlanta | Mark Mohney MD | 3225 Cumberland Blvd Se #800 | Atlanta | GA | 1,800 |
| Outpatient Surgery Ctr | Michael Adams MD | 2720 University Blvd | Birmingham | AL | 1,800 |
| Omni Eye Specialists | Robert Prouty OD | 55 Madison Ste 355 | Denver | CO | 1,800 |
| Kleiman Eye Center | Anthony Evangelista MD | 3025 Matlock | Arlington | TX | 1,800 |
| Jervey Eye Centers LLC | William Caldwell MD | 1 Doctors Dr | Greenville | SC | 1,728 |
| Jervey Eye Centers LLC | David Bowden MD | 1 Doctors Dr | Greenville | SC | 1,728 |
| Commonwealth Eye Services | Howell Findley OD | 2353 Alexandria Dr #350 | Lexington | KY | 1,728 |
| Wesson & Mothershed Eye Center | Fred Mothershed OD | 3353 N Gloster | Tupelo | MS | 1,728 |
| Boston Eye Surg And Lsr Ctr | Michael Raizman MD | 52 Second Ave #2500 | Waltham | MA | 1,728 |
| Koch Eye Associates | Paul Koch MD | 566 Tollgate Rd | Warwick | RI | 1,728 |
| Bucci Cataract & Laser Vision Inst | Frank Bucci MD | 158 Wilkes Barre Twnshp Blvd #201 | Wilkes Barre | PA | 1,728 |
| Horizon Eye Specialists And Lasik | Robert McCulloch DO | 18325 N Allied Way #100 | Phoenix | AZ | 1,728 |
| Rocky Mountain Eye Center | Benton Murphy MD | 27 Montebello | Pueblo | CO | 1,728 |
| Carter Eye Center | Harvey Carter MD | 5315 N Central Expy | Dallas | TX | 1,728 |
| Carl Stout MD | Carl Stout MD | 4741 S Cochise Dr | Independence | MO | 1,728 |
| Southern Eye Center | Kiper Nelson MD | 1420 S 28th Ave | Hattiesburg | MS | 1,728 |

| Customer Name | MD Name | Street | City | State | 6 Month Quantity |
|---|---|---|---|---|---|
| Eye Medical Ctr | Suzanne Amith-Luckett MD | 7777 Hennessey #4000 | Baton Rouge | LA | 1,728 |
| La Haye Eye Center | Sue Ellen Meyers OD | 201 Rue Iberville Ste 800 | Lafayette | LA | 1,728 |
| Williamson Eye Center | Charles Williamson MD | 550 Connell Park Ln | Baton Rouge | LA | 1,728 |
| Eye Care Specialist | Mark Freedman MD | 10200 Innovation Dr #700 | Milwaukee | WI | 1,728 |
| Gunderson Clinic | Paul Kuck MD | 2101 Sims Pl | La Crosse | WI | 1,728 |
| Ophthalmology Limited | Gregory Osmundson MD | 6601 S Minnesota Ave #200 | Sioux Falls | SD | 1,728 |
| Eye Care Specialist | Mark Freedman MD | 735 W Wisconsin Ave #400 | Milwaukee | WI | 1,728 |
| Eye Care Specialists | Mark Freedman MD | 10150 W National #100 | West Allis | WI | 1,728 |
| Gailey Eye Clinic | Dennis Lockhart MD | 1008 N Main | Bloomington | IL | 1,728 |
| Clarus Eye Center | Gary Scholes MD | 345 College St Se | Lacey | WA | 1,668 |
| Martin Burger Do | Martin Burger DO | 2501 East College Ave | Bloomington | IL | 1,596 |
| Hughes Eye Center-Matt Hughes MD | Matthew Hughes OD | 112 Stonebridge Blvd | Jackson | TN | 1,584 |
| Tampa Eye Clinic | William Reynolds MD | 3000 W Dr M L King Blvd | Tampa | FL | 1,536 |
| Eye Centers Of Louisville | Don Bennett MD | 4010 Dupont Circle #380 | Louisville | KY | 1,528 |
| Tennesse Vlly Laser Ctr | Bradley Pearman MD | 140 Capital Dr | Knoxville | TN | 1,512 |
| Michigan Vision Institute | Edward Stack MD | 4281 Lennon Rd | Flint | MI | 1,512 |
| Central Georgia Eye Ctr | M Sid Moore MD | 1429 Oglethorpe | Macon | GA | 1,500 |
| Clark - Holder Clinic | S Anna Kao MD | 303 Smith St | La Grange | GA | 1,500 |
| Eyesight Lazer And Surg Ctr | Johnny Gayton MD | 220 Corder Rd | Warner Robins | GA | 1,500 |
| Wall Cataract Eye Care Clinic | Scot Wall MD | 2308 Palmyra Rd | Albany | GA | 1,500 |

77

| Customer Name | MD Name | Street | City | State | 6 Month Quantity |
|---|---|---|---|---|---|
| Alan Bloom MD | Alan Bloom MD | 1065 Senator Keating Blvd | Rochester | NY | 1,500 |
| The Eye Center | Juglinder Luthra MD | 314 Penco Road | Weirton | WV | 1,500 |
| Charles Sandor MD | Charles Sandor MD | 2015 N Main St | Wheaton | IL | 1,500 |
| Bruce Wallace  MD | Bruce Wallace MD | 4110 Parliament Dr | Alexandria | LA | 1,464 |
| Jackson Eye Associates Pllc | Ken Taylor MD | 1190 N State St #403 | Jackson | MS | 1,464 |
| Cabarrus Eye Center | David Harper MD | 500 Lake Concord Road Ne | Concord | NC | 1,440 |
| Cabarrus Eye Center | David Harper MD | 500 Lake Concord Road Ne | Concord | NC | 1,440 |
| Blaydes Clinic | Stephen Blaydes MD | 1109 W Cumberland | Bluefield | WV | 1,440 |
| Dulaney Eye Center | Brett Katzen MD | 901 Dulaney Valley Rd | Towson | MD | 1,440 |
| Ophthalmic Consult Of Long Island | Stanley Berke MD | 360 Merrick Rd 3rd Floor | Lynbrook | NY | 1,440 |
| Tlc Oklahoma City | Chris Lyons MD | 4141 N W Expressway #140 | Oklahoma City | OK | 1,440 |
| Eye Clinic Of Wisconsin Sc | Douglas Edwards MD | 800 N 1st Street | Wausau | WI | 1,440 |
| Northwest Eye Surgeons | Todd Whitaker MD | 2250 Northbank Dr | Columbus | OH | 1,440 |
| V R F Eye Spec Group | Henry Mcquirter OD | 825 Ridgelake Blvd | Memphis | TN | 1,368 |
| Cornerstone Eye | Steve Park MD | 2300 Buffalo Rd Bldg #700 | Rochester | NY | 1,350 |
| Comm Eye Center | Jon Batzer OD | 21275 Olean Blvd | Port Charlotte | FL | 1,296 |
| Tallman Eye Associates | Sam Allem MD | 360 Merrimark St | Lawrence | MA | 1,296 |
| James Finegan MD | James Finegan MD | 246 Roseberry St | Phillipsburg | NJ | 1,296 |
| Nicholas J Barna MD | Jay Tanner OD | 1060 N Church St | Hazleton | PA | 1,296 |
| Mount Ogden Eye Center/Eni | Mark Ballif MD | 4360 Washington Blvd | Ogden | UT | 1,296 |

| Customer Name | MD Name | Street | City | State | 6 Month Quantity |
|---|---|---|---|---|---|
| Central Valley Eye | Stevens Kim MD | 36 W Yokuts Ave #2 | Stockton | CA | 1,296 |
| John Patrick Grundy MD | John Grundy MD | 6011 University Blvd #190 | Ellicott City | MD | 1,224 |
| Capital Eye Consultants | James Powers OD | 3025 Hamaker Ct #101 | Fairfax | VA | 1,224 |
| Commonwealth Eye Care Assoc | Andrew Michael MD | 2303 N Parham Rd #2 | Richmond | VA | 1,224 |
| Rockingham Eye Physicians | Kenlyn Miller MD | 1921 Medical Ave | Harrisonburg | VA | 1,224 |
| Eye Physicians And Surg Of Augusta | Herbert Fechter MD | 1330 Interstate Pkwy | Augusta | GA | 1,200 |
| Eye Physicians & Surgeons | Peter Gordon MD | 1457 Scott Blvd | Decatur | GA | 1,200 |
| Delray Eye Associates | Sgteve Rosenfeld MD | 16201 S Military Trail | Delray Beach | FL | 1,200 |
| Visual Health & Surg | Tom Coffman MD | 2889 10th Ave N #306 | Lake Worth | FL | 1,200 |
| Long Island Eye Surg Ctr | Edward Riegel MD | 601 Suffolk Ave | Brentwood | NY | 1,200 |
| N Colorado Surgery Ctr | Michael Crews MD | 2000 70th Avenue | Greeley | CO | 1,200 |
| Berg Feinfield Vision Correction | Alan Berg MD | 13320 Riverside Dr #114 | Sherman Oaks | CA | 1,200 |
| Dalel Tartak MD | Dalel Tartak MD Med | 17980-1 Castleton Street | City Of Industry | CA | 1,200 |
| Vancouver Eye Care | Richard Bernheimer MD | 505 Ne 87th Ave #100 | Vancouver | WA | 1,200 |
| Northern Eye Institute | Jeffrey Weis MD | 4815 W Arrowhead Rd #120 | Duluth | MN | 1,200 |
| Eyecare Associates | Neal Sher MD | 825 Nicollet Mall #2000 | Minneapolis | MN | 1,200 |
| James S Lewis MD | James S Lewis MD | 8380 Old York Rd | Elkins Park | PA | 1,200 |
| Keystone Eye Associates | Dennis Slochower MD | 2818 Cottman Ave | Philadelphia | PA | 1,200 |
| Bon Secours Health Center | Tom Edmonds MD | 5818 Harborview Blvd | Suffolk | VA | 1,200 |
| Riverside Healthcare Center | Seth Oppenheim MD | 850 Enterprise Pkwy #1000 | Hampton | VA | 1,200 |

| Customer Name | MD Name | Street | City | State | 6 Month Quantity |
|---|---|---|---|---|---|
| Gossage Eye Institute | David George MD | 50 W Carleton Rd | Hillsdale | MI | 1,200 |
| Michiana Eyecare Facial Plas Surg | Richard Weiss MD | 230 E Day Rd #100 | Mishawaka | IN | 1,200 |
| Sight Eye Clinic | Ed Leuschner MD | 111 W 24th St | Holland | MI | 1,200 |
| Hoopes Vision Correction | Phillip Hoopes Jr MD | 10011 S Centennial Pkwy #400 | Sandy | UT | 1,176 |
| Tampa Eye Surgery Ctr | David Leach MD | 4302 N Gomez | Tampa | FL | 1,156 |
| Mountain Empire Eye | Bart Bradley MD | 3185 W State St #2010 | Bristol | TN | 1,152 |
| Antine, Beischel And Kulze MD's | John Kulze MD | 2270 Ashley Crossing Rd #100 | Charleston | SC | 1,152 |
| Richard Carlin MD | David Carlin MD | 2347 Lenora Church Rd | Snellville | GA | 1,152 |
| Premier Medical Management Inc | Richard Duffey MD | 2880 Dauphin St | Mobile | AL | 1,152 |
| Manatee Eye Clinic | Robert Edelman MD | 217 Manatee Ave E | Bradenton | FL | 1,152 |
| Coleman Eye Center | Lee Coleman MD | 2005 Hwy 82 W | Greenwood | MS | 1,152 |
| Jackson Clinic | Stephen Hammond MD | 2863 Hwy 45 Bypass | Jackson | TN | 1,152 |
| Eye Health Vision Center | Kenneth Kenyon MD | 51 State Rd | North Dartmouth | MA | 1,152 |
| Lehigh Valley Eye Center | Howard Kushnick MD | 400 N 17th St #101 | Allentown | PA | 1,152 |
| Laurel Laser & Surgery Surgery Ctr | Louis Nichamin MD | 52 Waterford Pike | Brookville | PA | 1,152 |
| Carroll County Eye Surg Ctr LLC | Wayne Barber MD | 410 Malcolm Dr #B | Westminster | MD | 1,152 |
| South Penn Eye Assoc | John Baer MD - | 250 E Walnut St | Hanover | PA | 1,152 |
| Long Island Eye Surg Ctr (Cck) | John Passarelli MD | 601 Suffolk Ave | Brentwood | NY | 1,152 |
| Fichman Eye Center | Richard Fichman MD | 178 Hartford Rd | Manchester | CT | 1,152 |
| Lasik Today | Zareh Simonian OD | 790 E Colorado Bl #100 | Pasadena | CA | 1,152 |

80

| Customer Name | MD Name | Street | City | State | 6 Month Quantity |
|---|---|---|---|---|---|
| Fishkind & Bakewell MD's | Brock Bakewell MD | 5599 N Oracle Rd | Tucson | AZ | 1,152 |
| Kenneth Snow Do | Kenneth Snow DO | 698 E Wetmore #100 | Tucson | AZ | 1,152 |
| Eagle Eye Surg And Laser Ctr | James Tweeten MD | 3090 Gentry Way #100 | Meridian | ID | 1,152 |
| Idaho Eye Center | Bradley Gardner MD | 2025 E 17th St | Idaho Falls | ID | 1,152 |
| John Wright DO | Brant Gehler OD Meds | 2485 E Pikes Peak Av | Colorado Springs | CO | 1,152 |
| California Eye Care Specialists | Olivia Ong MD | 855 W Foothill Blvd | Monrovia | CA | 1,152 |
| William Linden, O.D. | Alan Limfat Op | 477 E Colorado Blvd | Pasadena | CA | 1,152 |
| Castleman Med Ctr | Andrew Kopstein MD | 113 E Long Lake | Troy | MI | 1,152 |
| Frank Eye Center | Kenneth Frank MD | 1401 S Main St | Ottawa | KS | 1,152 |
| Grene Vision Group | Dasa Gangadhar MD | 655 N Woodlawn | Wichita | KS | 1,152 |
| Grene Vision Group | Terria Winn MD | 834 N Socora St #2 | Wichita | KS | 1,152 |
| Joshua Powell MD | Joshua Powell MD | 6922 S Western #104 | Oklahoma City | OK | 1,152 |
| William Ashford MD PLLC | William Ashford MD | 501 Marshall St #603 | Jackson | MS | 1,152 |
| Davis Duehr Eye Assoc S.C. | John Geanon MD | 1025 Regent St | Madison | WI | 1,152 |
| The Eye Clinic Of North Dakota | Thomas Hansted OD | 620 N 9th St | Bismarck | ND | 1,152 |
| Cleveland Eye Clinic | Thomas Castor OD | 2740 Carnegie Ave | Cleveland | OH | 1,152 |
| Summit Ophthalmology | William Yeakley MD - | 1 Park W Blvd #150 | Akron | OH | 1,152 |
| Ohio Eye Associates | Richard Selser MD | 466 S Trimble Rd | Mansfield | OH | 1,152 |
| Canyon Eye Associates | Aaron Mack MD | 150 Taylor Station Rd #150 | Columbus | OH | 1,152 |
| Erdey Searcy Eye Group | Richard Erdey MD | 50 Mcnaughten Rd #102 | Columbus | OH | 1,152 |

81

| Customer Name | MD Name | Street | City | State | 6 Month Quantity |
|---|---|---|---|---|---|
| Minardi Eye Center | Lawrence Minardi MD | 500 Donnally St | Charleston | WV | 1,152 |
| Eye Physicians Assoc SC | Michael Rissell MD | 1249 W Liebau Rd #102 | Mequon | WI | 1,152 |
| Eye Physicians Assoc SC | Michael Rissell MD | 2801 W K K River Pkwy #170 | Milwaukee | WI | 1,152 |
| Baltimore Washington Eye Center | Arturo Betancourt MD | 200 Hospital Dr S #600 | Glen Burnie | MD | 1,152 |
| Nrv Eye Center | Tedd R Puckett MD - | 106 C S Franklin St | Christiansburg | VA | 1,152 |
| Abrams Eye Care | John Abrams MD | 6920 Parkdale Pl #206 | Indianapolis | IN | 1,152 |
| Community Eye Care | John Latona- | 1400 N Ritter #281 | Indianapolis | IN | 1,152 |
| Eye Center Group | Richard Mangan OD | 321 E Wayne St | Fort Wayne | IN | 1,152 |
| Pankratz Eye Institute | Michael Pankratz MD | 3135 Middle Rd | Columbus | IN | 1,152 |
| Price Vision Group | Francis Price MD | 9002 N Meridian #100 | Indianapolis | IN | 1,152 |
| Grand Traverse Ophthalmology Clinic | Matthew Madion MD | 929 Business Park Dr | Traverse City | MI | 1,152 |
| Andersen Surgery Center | Greg Hazen MD | 5161 Cardinal Park | Saginaw | MI | 1,152 |
| Grosinger Spigelman & Grey | Les Gosinger MD | 1750 S Telegraph #205 | Bloomfield Hills | MI | 1,152 |
| Heartland Eye Care | John Marsh MD | 619 Sw Corporate View | Topeka | KS | 1,140 |
| Montgomery And Riddle Eyecare | Keith Riddle MD | 22995 Hwy 76 E | Clinton | SC | 1,104 |
| Carolina Vision Center | Michael Woodcock MD | 2047 Valleygate | Fayetteville | NC | 1,050 |
| Marietta Eye Clinic | Anisa Threlkeld MD | 895 Canton Rd Bldg 100 | Marietta | GA | 1,028 |
| Schulze Surgery Center | Richard Schulze MD | 728 E 67th St | Savannah | GA | 1,008 |
| Atwal Eye Care | Michael Krieger OD | 3095 Harlem Rd | Cheektowaga | NY | 1,008 |
| Oregon Trail Eye Center | Judson Martin MD | 329 W 40th Str | Scottsbluff | NE | 1,008 |

| Customer Name | MD Name | Street | City | State | 6 Month Quantity |
|---|---|---|---|---|---|
| Vitreo Retinal Assoc | Craig Wells MD | 1221 Madison St #1002 | Seattle | WA | 1,008 |
| Akstein Eye Center | Ricardo Akstein MD | 86 Upper Riverdale Rd #100 | Riverdale | GA | 1,000 |
| Carrollton Eye | Roger Rossomondo MD | 158 Clinic Ave | Carrollton | GA | 1,000 |
| Cobb Eye Center | Bruce Crowley MD | 1680 Mulkey Rd #C | Austell | GA | 1,000 |
| Eye Consultants | Alan Kozarsky MD | 3193 Howell Mill Rd #115 | Atlanta | GA | 1,000 |
| Eye Consultants Of Atlanta | Brian Long MD | 1265 W Hwy 54 #305 | Fayetteville | GA | 1,000 |
| Family Eye Care Assoc/Peach State | Steve Mcquaig MD | 111 Fieldstone Dr #100 | Milledgeville | GA | 1,000 |
| Hubbard-Henslee Ctr For Eye Surg | Steven Henslee MD | 2012 10th Ave | Columbus | GA | 1,000 |
| J Chandler Berg MD | J Chandler Berg MD | 2709 Meredyth Dr #110 | Albany | GA | 1,000 |
| Leiv Takle MD | Leiv Takle MD | 646 S 8th St | Griffin | GA | 1,000 |
| M Gary Carter MD | M Gary Carter MD | 1867 Forsyth St | Macon | GA | 1,000 |
| Michael Pulliam MD | M Michael Pulliam MD | 4167 Hospital Dr Ne | Covington | GA | 1,000 |
| Omni Eye | James Hays MD | 3200 Downwood Cir #200 | Atlanta | GA | 1,000 |
| Piedmont Better Vision | Alan Kozarsky MD | 3193 Howell Mill Rd #115 | Atlanta | GA | 1,000 |
| Premier Ophthalmology LLC | Bradley Jacoby MD | 7170 Hwy 278  #B | Covington | GA | 1,000 |
| The Regional Eye Center | Chanh Tu MD | 1119 E Lamar St | Americus | GA | 1,000 |
| Nevada Eye And Ear | Doug Lorenz DO | 2598 Windmill Pkwy | Henderson | NV | 1,000 |
| Westfield Eye Center | Kenneth Westfield MD | 4475 S Eastern Ave #2400 | Las Vegas | NV | 1,000 |
| Westfield Eye Center | Kenneth Westfield MD | 2575 Lindell Rd | Las Vegas | NV | 1,000 |
| Retina & Vitreous Association | Robert Lee MD | 53822 Generations Drive | South Bend | IN | 1,000 |

83

174.    The drug shipments provided under these agreements were of significant value. Because of the large six-month supplies provided under the agreements, they were frequently valued in the many thousands of dollars.  Just as under its CCK scheme, Allergan recognized the significant cost of fulfilling Sample Shipment Agreements, and as such, only did so for those physicians who agreed to prescribe significant quantities of its drugs in return.  The Sample Shipment Agreements were therefore a blatant *quid pro quo*.  Allergan only offered Sample Shipment Agreements to physicians who already prescribed or agreed to prescribe its products. Agreements were not offered to physicians who prescribed primarily Alcon products such as Vigamox® or Nevanac®.  For physicians with existing agreements who did not prescribe its products in sufficient quantity or switched to a competitor's products, Allergan threatened to revoke or did cease fulfillment of their Sample Shipment Agreements.

175.    Sample Shipment Agreements took the place of CCKs as the centerpiece of Allergan's marketing campaign for Acular LS® and Zymar®, and later for Acuvail®. Recognizing the effectiveness of Sample Shipment Agreements as an inducement, Area Manager Jon Weidner instructed Relator Wood to sign up as many physicians as possible – contingent, of course, on those physicians' agreement to prescribe Allergan products.

176.    Just as they had previously done with regard to CCKs, sales representatives and their managers continued to monitor the quantity of free samples provided to these physicians relative to the quantity of Allergan products that they prescribed.  In an email sent to his district on April 24, 2009, Area Manager Jon Weidner instructed sales representatives to "[m]onitor samples of Acular on MOOSS" (Allergan's online sample management program) and "make sure we are not leaving more than what we are getting [prescribed]."  Under the same heading of "ACULAR LS," Weidner also instructed sales representatives to "Leverage Pred-Forte!!!!!!!!!!!"

84

Emphasizing that samples of Pred Forte® were intended as an inducement to physicians to prescribe Acular LS®, Weidner continued, "Pred [Forte] costs at least 40-50 bucks per bottle," so we want to not "just leave it lying around" but instead "[m]ake sure we are getting a return for our investment."

177.    In the same email, Weidner provided an analogous instruction with regard to Zymar®, telling sales representatives: "Do not over-sample/monitor samples on MOOSS/RX's." Weidner also told representatives, under the heading of "Zymar," to "[a]dd value to Pred-Forte," which appears to correspond with his direction with regard to Acular LS® to "[l]everage Pred-Forte!!!!!!!!!!!"

178.    Beyond providing general advice, Weidner and other Area Managers played an active role in ensuring that their sales representatives achieved a sufficient return on investment on free samples provided to physicians.  Sample Shipment Agreements required not only the signatures of the healthcare professional and sales representative but also that of the Area Manager.  Just as was the case with CCK Agreements, sales representatives usually obtained verbal approval from Area Managers and then signed on their behalf.  Relator Wood understood that Weidner would not grant approval to Sample Shipment Agreements for physicians who did not prescribe a significant quantity of Allergan products.

179.    Kim Johnson, the Senior Territory Manager in Relator Wood's territory, recurrently provided similar instructions to strategically utilize drug samples as inducements.  In an email to Relator Wood on April 5, 2009, which Johnson sent in response to a shipment notice of 100 bottles each of Pred Forte® and Acular LS® to Ohio Eye Associates, Johnson wrote,

> We may want to confirm the need for Acular LS with Kelly at Dr.
> Oh's office.  Also, we shipped them 244 Pred Forte for April.
> Probably that is all they need for the next 3-4 months.  <u>We may</u>

> need to leverage the Pred down the road and we don't want them
> to stock pile it so we have nothing to negotiate.

(emphasis added).

180.    In another email to Relator Wood on April 5, 2009, this one in response to a shipment notice of 120 bottles of Pred Forte® to Dr. Martin Markowitz, Senior Territory Manager, Johnson asked Relator Wood,

> Have we confirmed this number with this office?  I thought I
> remembered their numbers to be much lower – like 60.  Possibly
> they have picked up, but we don't want to send in too much either
> until we get a true commitment to keep using Zymar/Acular.

(emphasis added).

181.    In a final email sent to Relator Wood by Johnson on April 5, 2009, in response to a shipment notice of 250 bottles each of Pred Forte®, Zymar®, and Acular LS®, which were shipped to The Eye Center, Johnson wrote, "[w]e need to discuss the 250 Zymar and Acular.  I don't think this is something we want to ship to them because we will just lose prescriptions."

182.    Both Weidner and Johnson's instructions to leverage mail-order samples as inducements were not exceptional; rather, they were indicative of Allergan's systematic use of Sample Shipment Agreements, just as it had used CCKs, to induce physicians to prescribe its drug products.

183.    Because provision of free samples was contingent on physicians' agreement to prescribe Allergan products, Allergan only offered Sample Shipment Agreements to those who prescribed its drugs.  For example, physicians at Eye Care Associates in Youngstown, Ohio (Drs. John Aey, Hai-Shuh Wang, Lyn Yakubov, Keith Wilson, Sergul Erzurum, Robert Gerberry, Richard Wyzynski) had a long history of prescribing Alcon products and using Alcon surgical equipment.  They were therefore not offered free samples of Allergan drugs under a

86

Sample Shipment Agreement.  In May 2010, the practice agreed to begin prescribing Zymar®, at which point Allergan offered it a Sample Shipment Agreement.  Dr. Aey signed two agreements, one for each of the practice's clinic locations, and began receiving large quantities of Pred Forte®, Zymar®/Zymaxid®, Acuvail®, Optive®, and FML® beginning in June 2010.

184.   Likewise, Allergan ceased providing samples to physicians who failed to prescribe its products in sufficient quantities:

- **Dr. Doug Ripkin**, Clear Vision Centers, 1155 State Route 303, Streetsboro, Ohio 44241.  After Dr. Ripkin switched, in March 2009, from prescribing entirely Zymar® to splitting his anti-infective prescriptions half-and-half between Vigamox® and Zymar®, Allergan reduced his shipments of Pred Forte® accordingly.

- **Dr. Bruce Jacobson**, Ophthalmology Consultants, Inc., 36100 Euclid Avenue Suite 450, Willoughby, Ohio 44094.  After Dr. Jacobson began prescribing Vigamox® and receiving Alcon patient care CCKs in April 2009, his Allergan samples were terminated.

- **Cleveland Eye Clinic**, 7001 S.  Edgerton Rd., Suite B, Brecksville, Ohio 44141.  In January 2010, the clinic began to prescribe Xibrom® instead of Acular LS®/Acuvail®, at which point Allergan stopped providing it with Pred Forte® for its cataract surgeries.  (They were already prescribing Vigamox®.)

- **Drs. Laurence Karns, Gregory Gray and Jerry Macher**, of Eye Centers of Ohio, 6407 Frank Avenue NW North Canton, Ohio 44720.  All switched to Alcon products in February 2010, while Dr. Paul Turgeon continued to use Allergan products.  As a result, Allergan significantly decreased the quantity of Pred

Forte® shipped to Eye Center of Ohio to a quantity only sufficient to cover Dr. Turgeon's surgeries.

- **Dr. James Martuccio**, Warren Eye Clinic, Inc., 302 Niles Cortland Road North East, Warren, Ohio 44484.  In April 2010, Allergan ceased to provide Pred Forte® after Dr. Martuccio began prescribing Alcon's Nevanac® and Vigamox®. Allergan continued provide free samples of Acuvail® in an attempt to induce him to return to Allergan products.

185.    In June 2010, Allergan announced that it would cease providing free product samples to physicians due to liability concerns similar to those that had influenced it to cease providing CCKs eighteen months before.  Dave LeCause, Allergan's Vice President of US Eye Care, announced the change on a conference call with the entire sales force on June 18, 2010. LeCause informed the sales force that the company needed to "change the way we do business so Allergan is not giving the appearance of engaging in any quid pro quo."  "Things in the industry," LeCause said, "are not like they used to be." Allergan is "operating in a heightened state of awareness."  LeCause, as a twenty-year veteran of Allergan, was very familiar with the Company's Kickback Scheme.  His comments that Allergan's sampling scheme created the "appearance" of a *quid pro quo* stemmed from his understanding that, in this case at least, appearance mirrored reality.  The "sampling" scheme was in fact a kickback to induce doctors to prescribe Allergan's drugs which were paid for by the government payers, Medicare and Medicaid.

186.    During a sales meeting on June 22, 2010, Allergan again announced to its sales force that the Company would cease providing free drug samples.  It also informed sales representatives that anyone who put such a quid pro quo offer in writing (in a so-called

88

"homemade" sales tool) would be terminated.  The sin, of course, was to have expressed the inducement in writing, not to have had actually provided it, as Allergan had taught all its ophthalmology sales representatives to do exactly this for years.

187.    As was the situation when Allergan terminated the CCK program, sales representatives again expressed displeasure at the termination of the sampling program.  Both sales representatives' response to the discontinuation of the sampling program, as well as management's explanation of that discontinuation, serve to emphasize the central and illicit role these kickbacks in the form of valuable free goods played in driving sales of Acular®, Acular LS®, Acuvail®, and Zymar®.

188.    During a "breakout session" with Area Manager Jon Weider and sales representatives from Relator Wood's district, held on June 22, 2010 immediately following the announcement of the discontinuation, Weidner and sales representatives discussed their expectation that no longer providing physicians with free samples would result in a significant decline of Acuvail® and Zymaxid® prescriptions.  Specifically referring to the expected decline in Acuvail® and Zymaxid® prescriptions, Weidner stated: "That's going to happen."  He described the "surgical portfolio," *i.e.*, Acuvail® and Zymaxid®, as a "big concern," and asked sales representatives: "How many of those [accounts receiving Pred Forte®] is it really going to make a huge, like a huge deal?"  Sales representative Farley Dillinger responded, "All of them," and sales representative Ali Grumet responded, "I mean they're all going to be pissed."

189.    Relator Wood's district expected many of these physicians, in the absence of Allergan's kickbacks, would begin prescribing cheaper, generic alternatives to Acuvail® and Zymaxid®.  Sales representative Kate Bergan speculated that doctors would react by saying, "Well, . . . we're just going to use generics.  We're just going to write all generics."  Bergan

continued: "I feel like we're getting, we're going to hear that, right?"   Sales Representatives

Grumet and Phil Edmondson as well as a number of other sales representatives answered, "Yes,"

expressing the group's consensus.  The conversation later continued:

| | |
|---|---|
| Bergan: | But don't you think it's going to be easier [for physicians] to continue to write [soon-to-be generic] Zymar®? |
| Edmondson: | They'll say, I'm not going to upgrade to something that's more expensive. |
| Unidentified speaker: | Or I'm not going to [cut off by next speaker] |
| Unidentified speaker: | They won't get samples. |
| Weidner: | They're not going to get resources from us and that's the [cut off by next speaker] |
| Grumet: | I think the bigger resource was the Pred Forte®. |
| Relator Wood: | But what about printing [patient instruction sheets]?  Will we print? |
| Weidner: | There is going to be [sic] accounts that we are going to lose from this.  There is no doubt that [cut off by next speaker] |

190.    Weidner and sales representatives discussed explicitly that Allergan's provision

of free drugs was, and had long been, a quid pro quo.  Weidner stated,

> There are no longer, they [Allergan managers] no longer want us nor should we
> be doing any kind of quid pro quo type of stuff, or you know, going after Alcon
> saying, we'll give you a Pred [Forte®] for this one.  There's not, the days are
> gone where we can like provide 100% of Pred [Forte®] for an account

(emphasis added).  In response, Bergan described Allergan's long-standing provision of CCKs

and free drugs as a "monster": "I mean, this monster was created a long time before any of us got

here, and it's been bit by bit chipped away," referring to the discontinuation of CCKs, "and now this is the final blow."  Sales Representative Maria Zanardo next responded: "Right, for all of us that have been around for a while, this was the way, the law of the land."  And, later in the same June 22, 2010 meeting Area Manager Weidner expressed his own frustration with the change, telling them that "I feel like I've just been to a war."

191.    The Kickback Scheme described above constitutes a violation of the AKS, was made with the intent to induce, and which did induce, physicians to prescribe Allergan drug products that were reimbursed by Government Programs and with the intent to induce, and which did induce, patients to select the physicians who provided the free goods, through a pattern of corrupt and illegal conduct, in violation of the federal False Claims Act, 31 U.S.C. § 3729. Moreover, Allergan's kickbacks caused pharmacies submitting claims to the Government to falsely certify compliance with applicable laws and regulations, including that the claims were not tainted by illegal kickbacks.

### D.      Bribing and Rewarding High Prescribers

192.    As described in the preceding sections, Allergan provided CCKs and Sample Shipment Agreements to many thousands of physicians in order to induce them to prescribe its drugs.  However, for a small subset of the highest-prescribing cataract surgeons, Allergan offered additional, "special" inducements to prescribe its drugs. Allergan provided these high-prescribing cataract surgeons with substantial volumes of free drugs, including trade-size bottles of Acular LS® and Zymar®, which were valued at hundreds of thousands of dollars per year.

### 1.      Eye Centers of Ohio

193.    Dr. Paul Turgeon is the lead surgeon for Eye Centers of Ohio of Canton, Ohio, which is one of the country's largest cataract surgery centers, performing between 200 and

250 cataract surgeries per month. Approximately 75% of the cataract surgeries performed by Eye Centers of Ohio are performed on patients covered by Medicare or Medicaid.

194. Dr. Turgeon routinely prescribed both a topical anti-infective and topical NSAID in conjunction with cataract surgery, and he was aware of the value of his business to Allergan and Alcon. Lacking a strong clinical preference for either Allergan or Alcon drugs, Dr. Turgeon routinely threatened to switch to Alcon products and prescribe Vigamox® and Nevanac® instead of Zymar® and Acular LS®, if Allergan was unwilling to provide his practice with more lucrative concessions in exchange for prescribing its drugs.

195. Around 2007, in order to induce Dr. Turgeon and Eye Centers of Ohio to continue prescribing Allergan products rather than switch to prescribing Alcon products, Allergan agreed to provide Eye Centers of Ohio with copious free, "trade-size" samples of Acular LS® to provide to all its cataract patients. "Trade-size" samples are larger than usual free product samples, in this case 5 ml instead of the standard 1 ml. The 5 ml bottle was the same size as a standard prescription of Acular LS® and sufficient for an entire course of therapy. The provision of trade-size bottles, particularly in the quantity that Allergan provided them to Eye Centers of Ohio, was a special concession that was not offered to smaller customers, and was only provided to Eye Centers of Ohio out of fear of entirely losing its business to Alcon. In exchange for receipt of these trade-size samples, Dr. Turgeon and his colleagues prescribed Zymar® in conjunction with each cataract surgery.

196. At the time, a 5 ml bottle of Acular LS® had a retail cost of between $70 and $100, and Allergan provided a bottle for use with each surgery performed at Eye Centers of Ohio. Allergan therefore provided Eye Centers of Ohio with Acular LS® valued between $180,000 (200 surgeries/month x $70) and $300,000 (250 surgeries/month x $100) annually.

197.    Recognizing the heavy cost of its inducement to Eye Centers of Ohio, in 2008 Allergan sought to stop providing Eye Centers of Ohio with free trade-size bottles of Acular LS®.  However, when told that Allergan planned to cease this special concession, Eye Centers of Ohio threatened to stop prescribing Allergan drugs and switch to a competitor's drugs.  In order to prevent Eye Centers of Ohio from doing so, Allergan sales representative Kim Johnson obtained special approval from Allergan management to continue providing the practice with substantial quantities of free trade-size samples.  This continuance was directly approved by External Disease Marketing Director for Acular LS®, Mary Ellen Esgro.  That Allergan wished to stop providing these trade-size samples, and only continued to do so after being threatened, clearly demonstrates that the trade-size samples were an inducement, only provided contingent on Eye Centers of Ohio's agreement to prescribe Zymar®.

198.    When Allergan launched Acuvail® in September 2009 in anticipation of generic availability of Acular LS®, it reached a similar agreement with Dr. Turgeon and Eye Centers of Ohio to continue receiving free trade-size samples of one Allergan product in exchange for their agreement to prescribe Acuvail®.  In place of Acular LS®, Allergan began providing Eye Centers of Ohio with free trade-size samples of Zymar® (5 ml) and Pred Forte® (10 ml), as well as standard, non-trade-size samples of Acuvail® for use in conjunction with each cataract surgery.  In exchange for Allergan's provision of these free product samples, Dr. Turgeon and other Eye Centers of Ohio surgeons prescribed Acuvail® in conjunction with each cataract surgery.

199.    Allergan similarly provided "special" inducements of trade-size samples of Acular LS®, and later Zymar®, to approximately ten to twenty large cataract surgery centers throughout the country.

93

200.    In addition to free trade-size samples of Acular LS® and Zymar®, Eye Centers of Ohio also received free CCKs (prior to December 2008), free Pred Forte®, free patient instruction sheets, and free prescription pads, all of which were provided in exchange for its agreement to continue prescribing Allergan drugs.

### 2.    Ohio Eye Alliance

201.    In early 2010, Allergan provided a similar "special" inducement to Dr. Richard Lehrer in order to prevent him from switching to a competitor's products.  Dr. Lehrer is an ophthalmologist at Ohio Eye Alliance, 985 S. Sawburg Ave, Alliance, Ohio.  At the time, he split his NSAID prescriptions between Acuvail®/Zymar® and a competitor's drugs, writing half his prescriptions for Allergan products and half for competitor's products.

202.    After trying Acuvail® for several months, in February 2010, Dr. Lehrer and his surgical coordinator, Jan Hobson, as well as his optometrist intern, Dr. Liana Allabadi, informed Relator Wood that Dr. Lehrer was disappointed with the efficacy of Acuvail® relative to Allergan's earlier version, Acular LS®, because Dr. Lehrer believed that Acuvail® did not suppress inflammation as well as Acular LS® did.  In an attempt to find a regimen of Acuvail® that he believed was as effective as Acular LS®, Dr. Lehrer began prescribing Acuvail® at an increased post-operative dose of three times daily.  Dr. Lehrer, however, remained unsatisfied with the results.

203.    In response to Dr. Lehrer's dissatisfaction, and in an attempt to resolve his concerns, Allergan's Director of External Disease Monie Hussain personally met with Dr. Lehrer at a meeting of the American Society of Cataract and Refractive Surgery, which was held in Boston on April 9 through 14, 2010.  Following the meeting, Hussain recommended that Dr. Lehrer speak with Allergan's Medical Director for Acuvail®, Dr. David Hollander, who

Hussain hoped would be able to address Dr. Lehrer's concerns.   Dr. Lehrer spoke to Dr. Hollander via phone; however, his clinical concerns persisted.   Nonetheless, Dr. Lehrer continued to prescribe Acuvail® at a dose of three-to-four times per day in conjunction with approximately half his cataract surgeries.

204.    After hearing of Dr. Lehrer's continued concerns, Hussain offered Dr. Lehrer 216 bottles, of 5 ml trade-size bottles of Acular LS®, in order to engender good will to induce him to continue prescribing Zymar®, and hopefully, eventually, to prescribe Acuvail®.   Hussain calculated that that quantity of Acular LS® would be sufficient to last Dr. Lehrer for three months of cataract surgeries.   As of July 1, 2010, Dr. Lehrer had received 72 of the 216 bottles, enough for the month of June.

205.    Hussain provided Dr. Lehrer with these trade-size bottles of Acular LS® in an attempt to induce Dr. Lehrer to continue prescribing Allergan products.   On information and belief, Hussain's attempt was successful, and Dr. Lehrer continued to prescribe Zymar®.   After Relator Wood provided the trade-size Acular LS® bottles to Dr. Lehrer, Area Manager Jon Weidner complimented Relator Wood for "leveraging samples appropriately," and for his effective use of "cross-functional relationships within the organization" to obtain Hussain's assistance in the matter.

206.    Allergan's use of CCKs and Sample Shipment Agreements to induce physicians to prescribe its brand-name drugs, as indicated by the significant discrepancy in prescribing habits between physicians who were the recipients of these inducements compared to those who were not.   The Cleveland Clinic of Cleveland, Ohio, for example, performs cataract surgeries, but does not accept free samples.   It utilizes largely much cheaper generic anti-infective and non-steroidal drugs in connection with its cataract surgeries.   The Cleveland Clinic's use of generic

anti-infective and non-steroidal drugs significantly lowers the cost of drugs prescribed in conjunction with its cataract surgeries, thereby saving Government Programs significant sums. While a number of factors drive physicians' choice of medication, the significant disjunction between the habits of physicians at one of the nation's leading medical centers and those to whom Allergan leverages its CCKs and product samples is nonetheless suggestive of the substantial influence of Allergan's illicit promotional efforts, as well as the significant cost incurred by Government Programs as a result.

207.    The Kickback Scheme alleged above constitutes a violation of the AKS, was made with the intent to induce, and which did induce, physicians to prescribe Allergan drug products that were reimbursed by Government Programs and with the intent to induce, and which did induce, patients to select the physicians who provided the free goods, through a pattern of corrupt and illegal conduct, in violation of the federal False Claims Act, 31 U.S.C. § 3729.    Moreover, Allergan's kickbacks caused pharmacies submitting claims to the Government to falsely certify compliance with applicable laws and regulations, including that the claims were not tainted by illegal kickbacks.

**E.    Allergan Provides Additional Inducements, Including Pre-Printed Prescription Pads, Patient Instruction Sheets, and Contributions to Physicians' Favored Charities, to Induce Physicians to Prescribe Its Drug Products**

208.    Although Allergan has ceased providing physicians with kickbacks of CCKs and drug samples, the Company continued to provide other inducements to physicians to prescribe its drugs.    These ongoing inducements include free customized patient instruction sheets, free customized prescription pads with pre-printed prescriptions for Allergan drugs, and contributions to physicians' favored charities.

96

209.   In conjunction with their cataract surgeries, most ophthalmologists provide patients with an instruction sheet that outlines the pre- and post-operative drug regimens, and provides other miscellaneous direction – e.g., not to eat on the night prior to surgery.  These patient instruction sheets are almost always customized so that they contain the individual physician or clinic's preferred prescribing regimen, as well as the physician or clinic's name and/or logo.  In addition, the sheets are generally printed in color, on glossy paper, making them relatively expensive. Despite the expense, ophthalmologists generally regard them as a necessity.

210.   Allergan assisted physicians to design (and provided them with) these patient instruction sheets, in exchange for physicians' agreement to prescribe its drugs. Prior to December 2008, an Allergan sales representative worked with a customer to design a customized instruction sheet template. Once the template was finalized, the Allergan sales representative then submitted an order for printing through JG Pads, 759 S. Broadway, Akron, OH 44311, and the finished instruction sheets were shipped to the ophthalmologist.  Ophthalmology practices typically received 1,000 patient instruction sheets per shipment.  Allergan paid for the costs of both printing and shipping the instruction sheets.

211.   In December 2008, in response to revisions to the PhRMA and ADVAMED guidelines, Allergan announced that sales representatives would no long be allowed to assist physicians in the creation of Patient Instruction Sheets.  Physicians, however, could still design and order the instruction sheets themselves through the JG Pads website.  As the PowerPoint presentation announcing the change to sales representatives stated, "Allergan will pay for a subscription to this site on behalf of our customers," and "[t]here will be no cost to customer[s] for this service."

212.     Allergan also provided physicians who prescribed its products with free, customized, pre-printed prescription pads.  Sales representatives assisted physicians to order the pads, usually by faxing an order form to Allergan.  The pads were pre-printed with the physician's name, as well as Allergan drug products.

213.     For example, the "Fax Order" form for the Cleveland Eye Clinic included an order for pads pre-printed with the clinic's logo, address, physician names, and prescriptions for Acuvail®.  The order was for 20 pads of 50 pages each, or 1,000 Acuvail® prescriptions.

214.     The prescription pads were printed by JG Pads, the same company that prints the patient instruction sheets.  Allergan paid all costs associated with the pads, including shipping.  According to the JG Pads website in or around 2010, a standard order of 20 pads currently costs $53.  Pads with special security features were more expensive and could cost as much as $150.

215.     Allergan used patient instruction sheets and pre-printed prescription pads to induce physicians to prescribe its drugs. It only provided patient instruction sheets and pre-printed prescription pads to physicians who prescribed its drugs in significant quantities. Physicians who prescribed largely Vigamox® and Nevanac® were not offered free patient instruction sheets or pre-printed prescription pads, and Allergan revoked its provision of the sheets and pads from physicians who had initially prescribed its products but subsequently switched to a competitor's. Just as with CCKs and Sample Shipment Agreements, managers instructed sales representatives that both patient instruction sheets and pre-printed prescription pads were tools to drive sales.

216.     Ophthalmologists and ophthalmology practices in Relator Wood's territory to which Allergan provided free patient instruction sheets and pre-printed prescription pads included: Drs. Jamie Zucker, Jeffrey Congeni, and Barbara Barchiesi of Canton Ophthalmology

Associates, Canton, Ohio;  Dr. Gregory Eippert of Ophthalmic Physicians Incorporated, Mentor,

Ohio; Drs. Andrew Pederzolli and Bart Brine of Brine and Pederzolli, Alliance, Ohio;

Ophthalmology Consultants, Inc. of Willoughby, Ohio; and Ohio Eye Alliance, Inc. of Alliance,

Ohio. All of these ophthalmologists and ophthalmology practices treated Medicare and/or

Medicaid patients, and as a result of Allergan's provision of kickbacks, prescribed Allergan

drugs that were reimbursed by Government Programs.

217.    During the "breakout session" following Allergan's announcement on June 22,

2010 that it would no longer provide physicians with large quantities of free drug products, Area

Manager Jon Weidner described to sales representatives how, lacking Pred Forte® to use as

kickbacks, they should nonetheless continue to leverage "printing" (*i.e.*, patient instruction sheets

and pre-printed prescription pads) as a kickback. Instructing sales representatives how to respond

to a hypothetical physician who planned to begin prescribing generics to instead continue

prescribing Allergan's products, Weidner stated:

> You know, you kind of gotta like [tell physicians] it's your decision, but I would
> hope that you would look at the resources that we can provide, from Zymaxid®
> rebates, printing.  You don't want to go quid pro quo, but there's a lot of support
> that we can still give you.

Weidner's insistence that providing valuable "resources" and "support" in exchange for

physicians' agreement to prescribe Allergan products does not constitute a "quid pro quo" fails

to mitigate the substance of the transaction, which was a quid pro quo.

218.    The Kickback Scheme described above constitutes a violation of the AKS, was

made with the intent to induce, and which did induce, physicians to prescribe Allergan drug

products that were reimbursed by Government Programs and with the intent to induce, and

which did induce, patients to select the physicians who provided the free goods, through a

99

pattern of corrupt and illegal conduct, in violation of the federal False Claims Act, 31 U.S.C. § 3729. Moreover, Allergan's kickbacks caused pharmacies submitting claims to the Government to falsely certify compliance with applicable laws and regulations, including that the claims were not tainted by illegal kickbacks.

## VIII.   ALLERGAN'S ILLEGAL KICKBACK ACTIVITIES CAUSED THE SUBMISSION OF FALSE CLAIMS TO FEDERAL PROGRAMS AND *QUI TAM* STATES.

219.   Defendant's Kickback Scheme was successful and played a substantial role in securing hundreds of thousands of prescriptions for Allergan's drugs in exchange for the distribution of free Allergan drug products and supplies.  The result has been the improper and illegal submission of claims for reimbursement by Government Programs, and those claims were reimbursed.

220.   As alleged in this TAC, doctors wrote increased prescriptions for the Allergan drugs as a result of kickbacks, which pharmacies then filled, submitting false claims for reimbursement to federal and state healthcare programs in violation of federal and state anti-kickback laws.  These laws are preconditions for reimbursement.  Accordingly, as a result of the kickbacks Allergan offered to physicians, Allergan caused thousands of false claims to be submitted for payment to federal healthcare programs, including Medicare, Medicaid, TRICARE, and the Veterans Administration healthcare programs, as well as state healthcare programs, including Medicaid.

221.   As alleged in this TAC, doctors violated the anti-kickback laws when they wrote prescriptions for the Allergan drugs, knowing that claims for reimbursement would be submitted in connection with those prescriptions, in exchange for Allergan's offer of free goods.  These doctors were aware that Allergan's offer of free goods was contingent upon increasing the

number of prescriptions that they wrote for the Allergan drugs; and (2) that in order to continue receiving free goods, including Allergan drug shipments, that doctors needed to continue prescribing the Allergan drugs.  Accordingly, these doctors knowingly and willfully violated the anti-kickback laws when they wrote prescriptions for the Allergan drugs in exchange for this remuneration, knowing that the prescriptions they wrote would be paid for by Medicare or Medicaid.  Moreover, in order to participate in the government programs that provided reimbursement for those prescriptions, the doctors were required to certify that they were not in violation of state and federal laws, including anti-kickback laws.

222.    Allergan's kickback schemes also violated state kickback laws.  For example, New York's anti-kickback statute, which is similar to the federal statute, provides that no medical assistance provider shall  (a) solicit, receive, accept or agree to receive or accept any payment or other consideration in any form from another person to the extent such payment or other consideration is given: (i) for the referral of services for which payment is made under title eleven of article five of this chapter; or (ii) to purchase, lease or order any good, facility, service or item for which payment is made under title eleven of article five of this chapter; or (b) offer, agree to give or give any payment or other consideration in any form to another person to the extent such payment or other consideration is given: (i) for the referral of services for which payment is made under title eleven of article five of this chapter; or (ii) to purchase, lease or order any good, facility, service or item for which payment is made under title eleven of article five of this chapter.  N.Y. Soc. Serv. Law § 366-d(2).

223.    During the time period that these doctors were offered free goods, they wrote more prescriptions for Allergan drug.   The drugs referenced in these prescriptions later became

the subject of claims for reimbursement that were submitted to federal and state healthcare programs.

224.    Allergan knew, and expected, that its Kickback Scheme would result in Government Program reimbursements for its drugs. Allergan closely tracked the various third party payers that reimbursed its drug products. These sources included government payers such as Medicaid and Medicare. For the Allergan drugs that were reimbursed by Government Programs under retail and/or mail pharmacy benefit programs, Allergan's unlawful schemes resulted in misbranded or tainted prescriptions that were presented to these pharmacies. These pharmacies then submitted kickback-tainted false or fraudulent prescription claims to the federal or state program responsible for approving and facilitating reimbursement of the false claims.

225.    In the case of Medicaid, retail pharmacies were engaged in providing pharmaceutical products to Medicaid recipients throughout the United States. Many of the pharmaceutical products are provided under contractual agreements with the *Qui Tam* States through their Medicaid provider licensure program, whereby the pharmacies agree to provide pharmaceuticals to the *Qui Tam* States' Medicaid patients, and the *Qui Tam* States in turn would reimburse the pharmacies their costs plus a fixed dispensing fee meant to provide the pharmacies with a profit for providing pharmaceutical products to Medicaid patients.

226.    As to Medicaid claims, pharmacies periodically (e.g., once per day) submit their Medicaid claims for reimbursement by "batching them" and submitting them electronically to the *Qui Tam* States (or in some cases, claims are initially submitted to Medicaid Managed Care plans). These claims include the claims tainted by Allergan's illegal kickbacks. As such, the pharmacies unwittingly make false certifications and false claims directly to the *Qui Tam* States concerning Medicaid reimbursement on a daily (or periodic) basis.

227.   As part of each electronic claim, the pharmacies affix their unique Medicaid provider identification numbers, which serve as electronic stamps indicating that (as Medicaid providers) they are in compliance with all applicable federal and state laws.  The pharmacies are then reimbursed on a monthly basis by the *Qui Tam* States for all approved claims.

228.   The *Qui Tam* States are not financially responsible for paying one-hundred percent of the pharmacies' claims for reimbursement.  Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily low-income and disabled persons.

229.   The federal involvement in Medicaid includes providing matching funds and ensuring that the states comply with minimum standards in the administration of the program. The federal share of states' Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on each individual state's per capita income compared to the national average.  Among the states, the FMAP is at least 50 percent, and in some instances, as high as 77 percent.  Through the FMAP process, state Medicaid administrators obtain the Federal Government's share of the pharmacies' reimbursements by submitting a quarterly Form 64 to CMS.  For this reason, claims submitted to state Medicaid agencies, including those in the *Qui Tam* States, are presented to the Federal Government within the meaning of the FCA.

230.   The Federal Government pays Medicaid claims through a continuing line of credit certified by the Secretary of the Treasury in favor of the state payee.  42 C.F.R. § 430.30(d)(3), (4).  The Federal Government authorizes the state payee "to draw Federal funds as needed to pay the Federal share of disbursements."  42 C.F.R. § 430.30(d)(3).  The state can draw down on those funds only to pay the Medicaid claims of health care providers.  42 C.F.R. § 430.30(d). The funds made available to the state thus remain federal funds, in a Federal Reserve account, until they are drawn by the state and used to pay the pharmacies' claims.

231.    The Federal Government also "approves," within the meaning of the FCA, the claims submitted and paid through the Medicaid program.  When a state presents its Form 64 (*i.e.*, the quarterly report of actual expenditures) to CMS, the amounts of any fraudulent claims the state paid will be included in those reports.  Based on the information in the reports, CMS determines and approves whether the claims that the state paid with federal funds were appropriate.  If CMS determines that certain claims paid by the state were improper, CMS may recoup the amount of the erroneously expended funds by reducing the amount of money provided to the state during the next quarter.  Because the Form 64 constitutes the United States' means for approving and paying the amount of federal funds expended by the state, these reports overstate the amount of federal funds to which the state was entitled by the amount fraudulently paid.

232.    These are, therefore, false records or statements knowingly caused to be made or used by Allergan to get false claims paid and approved by the United States in connection with the Medicaid program.

233.    In the case of Medicare, retail pharmacies were engaged in providing pharmaceutical products to Medicare Part D recipients throughout the United States.  Many of the retail pharmaceutical products are provided under contractual agreements with Medicare Part D contractors, whereby the pharmacies agree to provide pharmaceuticals to Medicare-eligible patients, and the Part D contractors would reimburse the pharmacies their costs plus a fixed dispensing fee meant to provide the pharmacies with a profit for providing pharmaceutical products to Medicare patients.

234.    In 2006, with the advent of Medicare Part D, for beneficiaries dually eligible for both Medicaid and Medicare programs, the pharmacies' false claims for reimbursement were

submitted to contractors designated by and under contract with the United States as Medicare Prescription Drug Plans ("PDPs").  Allergan's schemes inflated MA-PDP and PDP drug costs, thereby causing increased Medicare Part D drug costs.

235.    Effective January 1, 2006, Medicare Part D prescription drug coverage for eligible senior enrollees has been provided through Medicare Advantage Prescription Drug Plans ("MA-PDPs") and stand-alone Prescription Drug Plans ("PDPs") administered by private companies, usually health insurers or pharmacy benefit managers.  These Part D programs are subsidized by the Federal Government, which cover the cost of drug payments.  The false or fraudulent drug claims were then included in drug utilization data submitted by plan sponsors to CMS through Prescription Drug Event ("PDE") records.

236.    These false claims embedded within the PDE records were then paid or approved by CMS pursuant to the Medicare Prescription Drug, Improvement, and Modernization Act of 2003.  CMS makes payments to plan sponsors on a monthly basis through estimated subsidy payments and, where needed, at year-end as a result of the payment reconciliation process.  The reconciliation process compares estimated subsidy payments made to plan sponsors throughout the year with the cost data submitted by plan sponsors through PDE records to determine any additional residual payments required by CMS to be paid to MA-PDPs and PDPs.

237.    CMS payments made through the Part D subsidy process, or as a result of additional residual payments to MA-PDPs and PDPs, included payments for false claims that were knowingly caused to be submitted as a result of Allergan's unlawful schemes.

238.    Allergan knew that its unlawful schemes would cause third parties to create materially false records, statements, or claims which would be used to improperly obtain reimbursement or payment from Government Programs, including Medicaid and Medicare.

## IX.     ALLERGAN CAUSED GOVERNMENT PROGRAM PROVIDERS TO FALSELY CERTIFY COMPLIANCE WITH THE LAW

239.    As described in this Third Amended Complaint, Allergan not only caused pharmacies to submit false claims, Allergan also caused physicians and pharmacies to falsely certify their compliance with applicable laws which require express and implied certifications of compliance with conditions of payment.

240.    As to Medicaid, state Medicaid provider agreements include requirements that participating pharmacies and physician providers will comply with all laws, rules, and regulations governing the Medicaid program, including compliance with the prohibitions on kickbacks. These agreements also include provisions that the pharmacies agree that the submittal of any claim by or on behalf of the pharmacy will constitute a certification that the pharmaceutical products for which payment is claimed were furnished in accordance with the requirements of Medicaid, and that the information submitted in, with, or in support of the claim is true, accurate, and complete.

241.    The Medicaid program expressly prohibits reimbursement for claims submitted as a result of kickbacks.  As alleged in this Third Amended Complaint, Allergan's illegal scheme caused the Medicaid-participating pharmacies and physician-providers to falsely certify their compliance with all laws, rules, and regulations governing the Medicaid program, including the anti-kickback laws, which prohibit an entity from knowingly and willingly offering, paying, soliciting, or receiving any remuneration to induce the referral of individuals or the purchase of items for which payment may be made under Medicare, Medicaid, or other federal or state health programs.  These certifications were express, were a condition of payment or reimbursement by

Government Programs, and were material to the government's decision to pay or reimburse for the Allergan drugs.

242.    As to Medicare, physician-providers must sign agreements in which they agree to abide by all applicable Medicare laws and regulations, and certify their understanding that reimbursement of claims under Medicare is conditioned on compliance with the AKS.  These certifications are also included in the claim forms themselves, *see, e.g.,* Forms CMS-855A and CMS855I.  Thus, reimbursement for Medicare claims requires compliance with the Anti-Kickback Statute.

243.    As to Medicare for the pharmacies and Medicare Part D contractors, they are required to abide by and certify compliance with all laws, rules, and regulations governing the Medicare program.  *See e.g.*, 42 C.F.R. § 423.505(k)(3).  When submitting claims data to CMS for payment, Part D plans (and their subcontractors) must certify that the claims data is true and accurate to the best of their knowledge and belief, which includes the absence of any false claims such as those prohibited by the False Claims Act.  As alleged in this Third Amended Complaint, Allergan's illegal scheme caused the Medicare Part D plans to falsely certify their compliance with all laws, rules, and regulations governing the Medicare program, including the False Claims Act and the anti-kickback statute, 42 U.S.C. § 1320a-7b(b).  These certifications were express, were a condition of payment or reimbursement by Government Programs, and were material to the government's decision to pay or reimburse for the Allergan drugs.

244.    Allergan knowingly caused pharmacies and Part D plans to falsely certify compliance with applicable laws, rules, and regulations, which caused state and federal Government Programs to reimburse or pay for Allergan's drugs not otherwise eligible for reimbursement or payment.

X.  **ALLERGAN ACKNOWLEDGES ITS VIOLATION OF THE ANTI-KICKBACK STATUTE, AND CHANGES ITS BUSINESS PRACTICES**

245.    In late 2008, and then in June 2010, and finally again in January 2011, Allergan announced it was changing its long-standing business practices of providing free CCKs, and free drug shipments, out of concern that they were illegal.

246.    Allergan's first change occurred in late 2008, when it announced to its sales force via conference calls that the practice of providing the free CCKs was being discontinued, since providing the CCKs could be viewed as inducements to use Allergan products.   Allergan's decision was turned into a PowerPoint presentation dated November 13, 2008, which Allergan presented to its eye care sales force. According to the PowerPoint presentation, (a) the CCKs would no longer be available; (b) its representatives would no longer be able to assist in creating "Patient Instruction Sheets," although Allergan still was providing these free, as well as the free prescription pads; and (c) the practice of providing free drug shipments would only be available for the top one thousand accounts and would be called "Direct Sample Ship" agreements (this top 1000 limit was quickly dropped due to push-back from Allergan Sales).   In the presentation, Allergan acknowledged that its long-standing business practice of providing free CCKs to ophthalmologists was unlawful: "[P]hysician's acceptance of free kits can be interpreted as being in violation of Federal Anti-Kickback statutes."

247.    In lieu of the free CCKs, Allergan announced its new policy was to charge its ophthalmologist customers a fee for each CCK or part thereof.  However, Allergan announced it would continue its business practice of providing free drug shipments, customized prescription pads, and customized patient instruction sheets.

248.    Then, as described above, on or about June 18, 2010, Allergan announced to its sales force that Allergan would no longer continue the practice of providing the free drug shipments to physicians due to the fact that the practice may be interpreted by the Government as a *quid pro quo*.  Instead, Allergan scaled back its shipments, but instituted the industry practice of providing actual "samples" (as opposed to mass shipments), particularly of Zymaxid®, which sampling continued as Allergan's strategy was to switch all Zymar prescriptions over to Zymaxid®.

249.    This announcement was reinforced at the June 21, 2010 Allergan National Sales Meeting in Memphis, Tennessee, which Relator Wood attended. There, Allergan's Vice President of Sales, Joseph Schultz elaborated on Allergan's discontinuance of free drug shipments.  Also in attendance at this meeting was the Zymaxid® Product Manager, Luke Greenwald, Relator Wood's manager John Weidner, and sales representatives Kimberly Mott, Phillip Edmonson, Kim Johnson, Scott Meredith, Farley Dilinger, Kate Bergin, and Alison Grumett.

250.    At the Zymaxid® Breakout Workshops, the sales force, including Relator Wood, was trained on, and focused on role play activities, which primarily dealt with (1) informing doctors of Allergan's abrupt discontinuation of providing free drugs, including free Pred Forte® samples, (2) anticipating and countering strong objections to the same, and (3) convincing cataract surgeons to switch over to Zymaxid®, rather than Zymar®, on the basis that Zymaxid has the highest concentration of gatifloxacin ophthalmic solution in the United States market.

251.    Allergan did not, however, change its practices of providing free customized prescription pads, free customized patient instruction sheets.

252.    On Monday, January 17, 2011, Allergan informed its sales representatives that they would no longer be sampling, detailing, or supporting Pred Forte®, Acuvail®, or Zymaxid®, and would no longer be paid bonus or commission on these products.  Allergan explained to its sales force that the promotion is "not profitable," and falsely claimed that, after paying for royalties, samples, rebates, and JGPads printing, the net profit was no longer worth the investment in resources or time.  However, given the fact that the Zymar®/Zymaxid® franchise alone earns $120 million a year in revenue, Allergan's rationale for ceasing its illegal activity is merely a pretext to conceal its long-standing illegal kickback schemes.

253.    Allergan publicly spun a different story why it changed its illegal business practices. In an April 2011 interview with *Cataract & Refractive Surgery Today*, Allergan spokeswoman Crystal Muilenburg, quoted in an article entitled *Pharmaceutical Manufacturers Alter Sampling Policies,* said that Allergan's sudden change in policy was because of an issue of capacity:  "It's due to the prioritization of Allergan's eye care sales force against the successful launch of Lumigan 0.01% and Lastacaft, which were recently approved by [the] FDA, and the continued growth of Restasis. If a physician requests a sample for Zymaxid or Acuvail, instead of the sales force providing them directly, it would be shipped out by a third party."  Allergan thus misleadingly ignoring Allergan's long-standing practice of providing direct, large-scale drug shipments as *quid pro quos* for over a decade.

## XI.    ALLERGAN FALSELY CERTIFIES ITS COMPLAINCE WITH CALIFORNIA HEALTH AND SAFETY CODE SECTIONS 119400 AND 119402

254.    Despite its adoption of a compliance program, since 2005, Allergan has falsely certified its compliance with the State of California's "Comprehensive Compliance Program"

which requires an effective compliance program, as required by the PhRMA Code, and California Health and Safety Code sections 119400 and 119402.

255.    Allergan has publicly represented that it is committed to establishing and maintaining a comprehensive and effective compliance program in accordance with California Health and Safety Code sections 119400 and 119402 and the "Compliance Program Guidance for Pharmaceutical Manufacturers," published by the Office of Inspector General, U.S. Department of Health and Human Services (the "HHS-OIG Guidance").   Allergan has misleadingly boasted that its U.S. Healthcare Law Compliance Program is one of the key components of its commitment to the highest standards of corporate conduct.

256.    Allergan's California Health and Safety Code compliance declarations have falsely declared that on or before July 1, 2005 Allergan has managed its operations and dealings with California medical or health professionals in compliance with its Comprehensive Compliance Program and California Health and Safety Code sections 119400 and 119402.

257.    Allergan's certification of compliance with California Health and Safety Code sections 119400 and 119402 was false, misleading, and intended to cover-up Allergan's corporate-wide policies as described in this Third Amended Complaint, which caused the State of California to pay or reimburse for Allergan's drug products otherwise ineligible for payment or reimbursement.

## XII.    ALLERGAN'S RETALIATION AGAINST RELATOR WOOD

258.    On July 6, 2010 Allergan terminated Relator Wood's employment in retaliation for his whistle-blowing activities.   Prior to July 6, 2010, Relator Wood received favorable performance reviews, and had never been subject to any disciplinary action.   Rather than act on

Relator Wood's reports of compliance violations, Allergan chose to use Relator Wood as a scapegoat to cover Allergan's long-standing illegal conduct.

259.   Relator Wood's termination was a direct result of Allergan's corporate policies which valued profits over lawful behavior.  In accordance with these policies, in April 2010, Relator Wood prepared a written proposal, embodied in a simple informal term sheet, for Novus Clinic, a group of ophthalmologists, for the purpose of winning back its business away from rival Alcon, since Alcon was discontinuing the free provision of its branded steroid Omnipred®.  The written term sheet was similar in form to term sheets that Relator Wood had prepared in the past, that other Allergan sales representatives had prepared, and that Relator Wood's own managers had approved.  Allergan would later refer to Relator Wood's proposal as a "home-made sales piece."

260.   The Novus Clinic proposal included terms that were entirely consistent with existing Allergan policy that fostered and condoned the Fraudulent Marketing and Kickback Schemes.

261.   Relator Wood's Area Manager, Jon Weidner, had previously approved similar verbiage related to the distribution of free samples, and was present for many negotiations of these terms with ophthalmology clinics, like the Novus negotiations.  As such, Relator Wood was only doing exactly what his manager had on numerous occasions approved, in fact encouraged.

262.   Shortly after giving the proposal to Novus Clinic, Relator Wood was notified that an Alcon sales representative had lodged a complaint against him based on the offer to provide free drugs to Novus Clinic (a policy Alcon itself had only discontinued in January 2010),

presumably because Allergan had not changed its policy of bribing ophthalmologists to win business.

263.    Relator Wood was summoned to attend a June 15, 2010 conference call with three Allergan lawyers, Damon Burrows, Kimberly Denham, and Ryan Brown.   During this call, Relator Wood was asked questions about the Novus proposal.   Relator Wood responded that he had merely prepared a summary proposal for Novus Clinic, that the proposal was entirely consistent with Allergan's schemes to "win" business, and that he was only following company policy, including directions he had been given by his manager Jon Weidner and others.

264.    The next day, June 16, 2010, during a field ride with his Area Manager, Jon Weidner, Relator Wood discussed the conference call where he was summoned to attend to discuss the Novus Clinic proposal. Relator Wood then showed Weidner the Novus Clinic proposal sheet.  Weidner responded that the sheet did not look like a home-made sales piece, but rather looked like a summary of Relator Wood's discussions with Novus Clinic to promote Allergan products, and was in line with Allergan's long-standing business practices.  According to Weidner, Relator Wood's only mistake was to put the Allergan proposal in writing and in an e-mail. As such, Weidner predicted that Relator Wood would only receive a written warning from Allergan.

265.    Relator Wood later obtained information that a sales representative in Salt Lake City, Utah, Matt Nielsen, had also been accused of creating a "home-made sales piece."  Nielsen was apparently fired by Allergan (along with his manager, who was also fired), but was offered "hush" money by Allergan due to the fact that he had a recorded voice mail from his manager directing him to engage in this practice.  Nielsen also apparently provided to Allergan Human

Resources and the Compliance Department documents that evidenced Allergan's illegal and fraudulent schemes.

266.    Allergan's continuing policy of bribing ophthalmologists, while rival Alcon had only recently discontinued the policy, created an environment where its principal competitor could accuse Allergan Sales representatives of violating the law, even though their activities had been at the direction of senior Allergan management.  Relator Wood was thus unfairly caught up in middle of the Allergan-Alcon struggle and Allergan's own illegal practices.  These illegal practices were the subject of considerable "spin" by Allergan trainers.  Notably, Allergan misled Relator Wood and its sales force into believing that providing the free kickbacks to physicians described in this complaint was lawful, as long as the sales representatives themselves believed that it benefitted the patient.

267.    Allergan thus unfairly singled Relator Wood out as a scapegoat to use as an excuse to cover up its own widespread unlawful conduct.

268.    Allergan's written compliance rules encourage employees to express any concerns they may have about certain Allergan practices without fear of retaliation.  In reliance, Relator Wood reported his concerns about the illegal sampling and kickback scheme to Allergan's Compliance Department, as well as to the company's human resources department.

269.    Prior to his July 6, 2010 termination, Relator Wood relied upon Allergan's reporting policy and provided the aforementioned Allergan personnel with specific information regarding sampling directives and activities that he believed, in good faith, were in violation of Allergan's policies and Federal law insofar as the company had for many years (i) provided inducements to health care professionals with the intent to influence these persons to recommend or purchase health care products that may be reimbursed by a federal health care program;

114

(ii) provided something to health care professionals in exchange for any implicit or explicit agreement or understanding to use, purchase, order, recommend, prescribe or dispense any Allergan product; and (iii) improperly used prescription drug samples other than in response to a licensed practitioner's written request.

270.   In response to his complaints, on July 6, 2010, Relator Wood's supervisors retaliated against him by terminating his employment.

271.   It is no coincidence that Relator Wood was terminated just after he internally reported violations of company policy and Federal and State law relating to illegal sampling and kickbacks being committed by his managers and other company personnel.

272.   Plainly, Allergan sought to (and did) intimidate, punish, and retaliate against Relator Wood for his lawful and proper decision to follow company policy and report what he (accurately) considered to be illegal directions and activities by his supervisors and Allergan.   As such, the company improperly retaliated against Relator Wood as a result of his whistle-blowing activity.

273.   As a direct result of Allergan's unlawful retaliation, Relator Wood has suffered, and continues to suffer, severe emotional distress.

274.   Relator Wood was discharged, threatened, harassed, and discriminated against by Allergan because of his lawful acts in investigating and reporting compliance violations.   As such, Relator Wood is entitled to reinstatement, two times the amount of his back pay, interest on the back pay, and compensation for all damages allowed by law, including but not limited to special damages, and damages for emotional distress, sustained as a result of his unlawful termination.

## COUNT I
## (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1), § 3729(a)(1)(A))[6]

275.    Relator incorporates herein by reference the preceding paragraphs of the Third Amended Complaint as though fully set forth herein.

276.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the United States of America false or fraudulent claims for payment or approval for the Allergan drugs, in violation of 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A).

277.    As a result of Defendant's actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

## COUNT II
## (Violation of False Claims Act, 31 U.S.C. § 3729(a)(2), § 3729(a)(1)(B))[7]

278.    Relator incorporates herein by reference the preceding paragraphs of the Third Amended Complaint as though fully set forth herein.

279.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B).

---

[6] To the extent wrongdoing occurred after May 20, 2009, the Third Amended Complaint should be deemed to include violations of the Federal False Claims Act's recent amendments.
[7] To the extent wrongdoing occurred after May 20, 2009, the Third Amended Complaint should be deemed to include violations of the Federal False Claims Act's recent amendments.

280.    The United States of America, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid and may continue to be paying or reimbursing for the Allergan drugs, including Zymar® prescribed to patients enrolled in Federal Programs.

281.    As a result of Defendant's actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

## COUNT III
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(3), § 3729(a)(1)(C))[8]

282.    Relator incorporates herein by reference the preceding paragraphs of the Third Amended Complaint as though fully set forth herein.

283.    As detailed above, Defendant knowingly conspired, and may still be conspiring, with the various health care professionals identified and described herein (as well as other unnamed co-conspirators) to commit acts in violation of 31 U.S.C. §§ 3729(a)(1) & (a)(2); 31 U.S.C. §§ 3729(a)(1)(A) & (a)(1)(B).   Defendant and these health care professionals committed overt acts in furtherance of the conspiracy as described above.

284.    As a result of Defendant's actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

## COUNT IV
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(7), § 3729(a)(1)(G))[9]

285.    Relator incorporates herein by reference the preceding paragraphs of the Third Amended Complaint as though fully set forth herein.

---

[8] To the extent wrongdoing occurred after May 20, 2009, the Third Amended Complaint should be deemed to include violations of the Federal False Claims Act's recent amendments.
[9] To the extent wrongdoing occurred after May 20, 2009, the Third Amended Complaint should be deemed to include violations of the Federal False Claims Act's recent amendments.

286.     As alleged in detail above, Allergan knowingly avoided or decreased its obligation to pay or transmit money to the Government.  Specifically, Allergan: (i) made, used, or caused to made or used, a record or statement to conceal, avoid, or decrease an obligation to the United States; (ii) the records or statements were in fact false; and (iii) it knew that the records or statements were false.

287.     As a result of Defendant's actions as set forth above, the United States of America has been, and may continue to be, severely damaged.

### COUNT V
### (Violation of False Claims Act, 31 U.S.C. § 3730(h))

288.     Relator incorporates herein by reference the preceding paragraphs of the Third Amended Complaint as though fully set forth herein.

289.     As a result of Relator's lawful acts in furtherance of protected activities in the investigation and reporting of fraud, Defendant retaliated against Relator.

290.     Relator's termination of employment was a direct result of Defendant's retaliatory acts, causing Relator to suffer, and continue to suffer, substantial financial and emotional damage in an amount to be proven at trial.

### COUNT VI
### (Violation of California False Claims Act)

291.     Relator incorporates herein by reference the preceding paragraphs of the Third Amended Complaint as though fully set forth herein.

292.     This is a civil action brought by Relator, on behalf of the State of California, against Defendant under the California False Claims Act, Cal. Gov't Code § 12652(c).

293.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

118

presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Cal. Gov't Code § 12651(a)(1).

294.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Cal. Gov't Code § 12651(a)(2).

295.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of California, or its political subdivisions, in violation of Cal. Gov't Code § 12651(a)(7).

296.    The State of California, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of state and state subdivision funded health insurance programs.

297.    As a result of Defendant's actions, as set forth above, the State of California and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT VII
### (Violation of Colorado Medicaid False Claims Act)

298.    Relator incorporates herein by reference the preceding paragraphs of the Third Amended Complaint as though fully set forth herein.

299.    This is a civil action brought by Relator, on behalf of the State of Colorado, against Defendant under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-306(2).

300.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Colorado, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Colo. Rev. Stat. § 25.5-4-305(a).

301.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Colo. Rev. Stat. § 25.5-4-305(b).

302.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Colorado, or its political subdivisions, in violation of Colo. Rev. Stat. § 25.5-4-305(f).

303.    The State of Colorado, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of state and state subdivision funded health insurance programs.

120

304.    As a result of Defendant's actions, as set forth above, the State of Colorado and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT VIII
## (Violation of Connecticut False Claims Act)

305.    Relator incorporates herein by reference the preceding paragraphs of the Third Amended Complaint as though fully set forth herein.

306.    This is a civil action brought by Relator, on behalf of the State of Connecticut, against Defendant under the Connecticut False Claims Act for Medical Assistance Programs, Conn. Gen. Stat. § 17b-301d.

307.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Connecticut, or its political subdivisions, false or fraudulent claims for payment or approval under a medical assistance program administered by the Department of Social Services, in violation of Conn. Gen. Stat. § 17b-301b(1).

308.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to secure the payment or approval by the State of Connecticut, or its political subdivisions, false or fraudulent claims under a medical assistance program administered by the Department of Social Services, in violation of Conn. Gen. Stat. § 17b-301b(2).

121

309.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Connecticut, or its political subdivisions, under a medical assistance program administered by the Department of Social Services, in violation of Conn. Gen. Stat. § 17b-301b(7).

310.    The State of Connecticut, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of state and state subdivision funded health insurance programs.

311.    As a result of Defendant's actions, as set forth above, the State of Connecticut and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT IX
### (Violation of Delaware False Claims and Reporting Act)

312.    Relator incorporates herein by reference the preceding paragraphs of the Third Amended Complaint as though fully set forth herein.

313.    This is a civil action brought by of Relator, on behalf of the State of Delaware, against Defendant under the Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, § 1203(b).

314.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an

officer or employee of the State of Delaware, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Del. Code Ann. tit. 6, § 1201(a)(1).

315.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Delaware, or its political subdivisions, in violation of Del. Code Ann. tit. 6, § 1201(a)(2).

316.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Delaware, or its political subdivisions, in violation of Del. Code Ann. tit. 6, § 120l(a)(7).

317.    The State of Delaware, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of healthcare programs funded by the State of Delaware.

318.    As a result of Defendant's actions, as set forth above, the State of Delaware and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT X**
**(Violation of District of Columbia False Claims Act)**

319.    Relator incorporates herein by reference the preceding paragraphs of the Third Amended Complaint as though fully set forth herein.

320.     This is a civil action brought by Relator, on behalf of the District of Columbia, against Defendant under the District of Columbia False Claims Act, D.C. Code § 2-308.15(b).

321.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the District, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of D.C. Code § 2-308.14(a)(l).

322.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly used or caused to be used, and may continue to use or cause to be used, false records or statements to get false claims paid or approved by the District, or its political subdivisions, in violation of D.C. Code § 2-308.14(a)(2).

323.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or used, or caused to be made or used, and may still be making or using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the District, or its political subdivisions, in violation of D.C. Code § 2-308.14(a)(7).

324.     The District of Columbia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of health insurance programs funded by the District.

325.    As a result of Defendant's actions, as set forth above, the District of Columbia and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XI
### (Violation of Florida False Claims Act)

326.    Relator incorporates herein by reference the preceding paragraphs of the Third Amended Complaint as though fully set forth herein.

327.    This is a civil action brought by Relator, on behalf of the State of Florida, against Defendant under the Florida False Claims Act, Fla. Stat. § 68.083(2).

328.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Florida, or its agencies, false or fraudulent claims for payment or approval, in violation of Fla. Stat. § 68.082(2)(a).

329.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(b).

330.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(g).

125

331.    The State of Florida, or its agencies, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of health insurance plans funded by the State of Florida or its agencies.

332.    As a result of Defendant's actions, as set forth above, the State of Florida and/or its agencies have been, and may continue to be, severely damaged.

## COUNT XII
### (Violation of Georgia False Medicaid Claims Act)

333.    Relator incorporates herein by reference the preceding paragraphs of the Third Amended Complaint as though fully set forth herein.

334.    This is a civil action brought by Relator, on behalf of the State of Georgia, against Defendant pursuant to the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.2(b).

335.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the Georgia Medicaid program false or fraudulent claims for payment or approval, in violation of Ga. Code Ann. § 49-4-168.1(a)(1).

336.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Georgia Medicaid program, in violation of Ga. Code Ann. § 49-4-168.1(a)(2).

337.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Georgia, or its political subdivisions, in violation of Ga. Code Ann. § 49-4-168.1(a)(7).

338.    The State of Georgia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of Medicaid.

339.    As a result of Defendant's actions, as set forth above, the State of Georgia and/or political subdivisions have been, and may continue to be, severely damaged.

## COUNT XIII
### (Violation of Hawaii False Claims Act)

340.    Relator incorporates herein by reference the preceding paragraphs of the Third Amended Complaint as though fully set forth herein.

341.    This is a civil action brought by Relator, on behalf of the State of Hawaii, against Defendant under the Hawaii False Claim Act, Haw. Rev. Stat. § 661-25.

342.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Hawaii, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Haw. Rev. Stat. § 661-21(a)(l).

127

343.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made and used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Hawaii, or its political subdivisions, in violation of Haw. Rev. Stat. § 661-21(a)(2).

344.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Hawaii, or its political subdivisions, in violation of Haw. Rev. Stat. § 661-21(a)(7).

345.    The State of Hawaii, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of state funded health insurance programs.

346.    As a result of Defendant's actions, as set forth above, the State of Hawaii and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XIV**
**(Violation of Illinois False Claims Whistleblower Reward and Protection Act)**

347.    Relator incorporates herein by reference the preceding paragraphs of the Third Amended Complaint as though fully set forth herein.

348.     This is a civil action brought by Relator, on behalf of the State of Illinois, against Defendant under the Illinois False Claims Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. 175/4(b).

349.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Illinois, or a member of the Illinois National Guard, false or fraudulent claims for payment or approval, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(A).

350.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false record or statements material to get false or fraudulent claims paid or approved by the State of Illinois, or its political subdivisions, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(B).

351.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to conceal, avoid or decrease an obligation to pay or transmit money to the State of Illinois, or its political subdivisions, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(G).

352.     The State of Illinois, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of those claims

129

and/or statements, paid, and may continue to pay, for prescription drugs for recipients of state funded health insurance programs.

353. As a result of Defendant's actions, as set forth above, the State of Illinois and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XV**
**(Violation of Indiana False Claims and Whistleblower Protection Act)**

354. Relator incorporates herein by reference the preceding paragraphs of the Third Amended Complaint as though fully set forth herein.

355. This is a civil action brought by Relator, on behalf of the State of Indiana, against Defendant under the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5-4(a).

356. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented, or caused to be presented, and may still be presenting or causing to be presented, false claims to the State of Indiana, or its political subdivisions, for payment or approval, in violation of Ind. Code § 5-11-5.5-2(b)(l).

357. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to obtain payment or approval of false claims from the State of Indiana, or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(2).

358.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to avoid an obligation to pay or transmit money to the State of Indiana, or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(6).

359.     The State of Indiana, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of state funded health insurance programs.

360.     As a result of Defendant's actions, as set forth above, the State of Indiana and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XVI
### (Violation of Louisiana Medical Assistance Programs Integrity Law)

361.     Relator incorporates herein by reference the preceding paragraphs of the Third Amended Complaint as though fully set forth herein.

362.     This is a civil action brought by Relator, on behalf of the State of Louisiana's medical assistance programs, against Defendant under the Louisiana Medical Assistance Programs Integrity Law, La.Rev. Stat. Ann. § 46:439.1.

363.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims, in violation of La. Rev. Stat. Ann. § 46:438.3(A).

131

364.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly engaged in misrepresentation, and may still be engaging in misrepresentation, to obtain, or attempt to obtain, payment from medical assistance programs funds, in violation of La. Rev. Stat. Ann. § 46:438.3(B).

365.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly submitted, and may continue to submit, claims for goods or supplies which were medically unnecessary or which were of substandard quality or quantity, in violation of La. Rev. Stat. Ann. § 46:438.3(D).

366.     The State of Louisiana, its medical assistance programs, political subdivisions and/or the Department, unaware of the falsity of the claims and/or statements made by Defendant, or their actions as set forth above, acted in reliance, and may continue to act in reliance, on the accuracy of Defendant's claims and/or statements in paying for prescription drugs for medical assistance program recipients.

367.     As a result of Defendant's actions, as set forth above, the State of Louisiana, its medical assistance programs, political subdivisions and/or the Department have been, and may continue to be, severely damaged.

## COUNT XVII
## (Violation of Massachusetts False Claims Act)

368.     Relator incorporates herein by reference the preceding paragraphs of the Third Amended Complaint as though fully set forth herein.

132

369.    This is a civil action brought by Relator, on behalf of the Commonwealth of Massachusetts, against Defendant under the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12 § 5C(2).

370.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Mass. Gen. Laws ch. 12 § 5B(1).

371.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to obtain payment or approval of claims by the Commonwealth of Massachusetts, or its political subdivisions, in violation of Mass. Gen. Laws ch. 12 § 5B(2).

372.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Massachusetts, or its political subdivisions, in violation of Mass. Gen. Laws ch. 12 § 5B(8).

373.    The Commonwealth of Massachusetts, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of health insurance programs funded by the state or its political subdivisions.

374. As a result of Defendant's actions, as set forth above, the Commonwealth of Massachusetts and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XVIII
## (Violation of Michigan Medicaid False Claims Act)

375. Relator incorporates herein by reference the preceding paragraphs of the Third Amended Complaint as though fully set forth herein.

376. This is a civil action brought by Relator, on behalf of the State of Michigan, against Defendant under the Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.610a(1).

377. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false statements or false representations of material facts in an application for Medicaid benefits, in violation of Mich. Comp. Laws § 400.603(1).

378. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made false statements or false representations of a material fact for use in determining rights to a Medicaid benefit, in violation of Mich. Comp. Laws § 400.603(2).

379. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, and may still be concealing or failing to disclose, an event affecting its initial or continued right to receive a Medicaid benefit, or the initial or continued

134

right of any other person on whose behalf Defendant has applied for or is receiving a benefit with intent to obtain a benefit to which Defendant were not entitled or in an amount greater than that to which Defendant were entitled, in violation of Mich. Comp. Laws § 400.603(3).

380.    Defendant, in possession of facts under which they are aware or should be aware of the nature of their conduct and that their conduct is substantially certain to cause the payment of a Medicaid benefit, knowingly made, presented or caused to be made or presented, and may still be presenting or causing to be presented, to an employee or officer of the State of Michigan, or its political subdivisions, false claims under the Social Welfare Act, Mich. Comp. Laws §§ 400.1-400.122, in violation of Mich. Comp. Laws § 400.607(1).

381.    The State of Michigan, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of Medicaid.

382.    As a result of Defendant's actions, as set forth above, the State of Michigan and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XIX
### (Violation of Minnesota False Claims Act)

383.    Relator incorporates herein by reference the preceding paragraphs of the Third Amended Complaint as though fully set forth herein.

384.    This is a civil action brought by Relator, on behalf of the State of Minnesota, against Defendant under the Minnesota False Claims Act, Minn. Stat. § 15C.05(a).

385.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Minnesota, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Minn. Stat. § 15C.02(a)(1).

386.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claim paid or approved by the State of Minnesota, or its political subdivisions, in violation of Minn. Stat. § 15C.02(a)(2).

387.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Minnesota, or its political subdivisions, in violation of Minn. Stat. § 15C.02(a)(7).

388.   The State of Minnesota, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of state and state subdivision funded health insurance programs.

389.   As a result of Defendant's actions, as set forth above, the State of Minnesota and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XX
## <u>(Violation of Montana False Claims Act)</u>

390.    Relator incorporates herein by reference the preceding paragraphs of the Third Amended Complaint as though fully set forth herein.

391.    This is a civil action brought by Relator, on behalf of the State of Montana against, Defendant under the Montana False Claims Act, Mont. Code Ann. § 17-8-406(1).

392.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Montana, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Mont. Code Ann. § 17-8-403(1)(a).

393.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Montana, or its political subdivisions, in violation of Mont. Code Ann. § 17-8-403(1)(b).

394.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Montana, or its political subdivisions, in violation of Mont. Code Ann. § 17-8-403(1)(g).

395.    The State of Montana, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of health insurance programs funded by the state or its political subdivisions.

396.    As a result of Defendant's actions, as set forth above, the State of Montana and/or its political subdivisions have been, and may continue to be, severely damaged.

### COUNT XXI
### (Violation of Nevada False Claims Act)

397.    Relator incorporates herein by reference the preceding paragraphs of the Third Amended Complaint as though fully set forth herein.

398.    This is a civil action brought by Relator, on behalf of the State of Nevada, against Defendant under the Nevada False Claims Act, Nev. Rev. Stat. § 357.080(1).

399.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false claims for payment or approval, in violation of Nev. Rev. Stat. § 357.040(1)(a).

400.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to obtain payment or approval of false claims, in violation of Nev. Rev. Stat. § 357.040(1)(b).

401.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Nevada, or its political subdivisions, in violation of Nev. Rev. Stat. § 357.040(1)(g).

402.     The State of Nevada, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of health insurance programs funded by the state or its political subdivisions.

403.     As a result of Defendant's actions, as set forth above, the State of Nevada and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXII
### (Violation of New Jersey False Claims Act)

404.     Relator incorporates herein by reference the preceding paragraphs of the Third Amended Complaint as though fully set forth herein.

405.     This is a civil action brought by Relator, on behalf of the State of New Jersey, against Defendant pursuant to the New Jersey Fraud False Claims Act, N.J. Stat. Ann. § 2A:32C-5(b).

406.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented or caused to be presented, and may still be presenting or causing to be presented, to an employee, officer or agent of the State of New Jersey, or to any contractor, grantee, or other recipient of State funds, false or fraudulent claims for payment or approval, in violation of N.J. Stat. Ann. § 2A:32C-3(a).

139

407.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of New Jersey, or its political subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3(b).

408.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Jersey, or its political subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3(g).

409.    The State of New Jersey, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of Medicaid.

410.    As a result of Defendant's actions, as set forth above, the State of New Jersey and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXIII**
**(Violation of New Mexico Medicaid False Claims Act)**

411.    Relator incorporates herein by reference the preceding paragraphs of the Third Amended Complaint as though fully set forth herein.

412.     This is a civil action brought by Relator, on behalf of the State of New Mexico, against Defendant under the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-7(B).

413.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the State of New Mexico, or its political subdivisions, false or fraudulent claims for payment under the Medicaid program, in violation of N.M. Stat. Ann. § 27-14-4(A).

414.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to obtain false or fraudulent claims under the Medicaid program paid for or approved by the State of New Mexico, or its political subdivisions, in violation of N.M. Stat. Ann. § 27-14-4(C).

415.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Mexico, or its political subdivisions, relative to the Medicaid program, in violation of N.M. Stat. Ann. § 27-14-4(E).

416.     The State of New Mexico, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims

141

and/or statements, paid, and may continue to pay, for prescription drugs for recipients of health insurance programs funded by the state or its political subdivisions.

417.    As a result of Defendant's actions, as set forth above, the State of New Mexico and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXIV**
**(Violation of New York False Claims Act)**

418.    Relator incorporates herein by reference the preceding paragraphs of the Third Amended Complaint as though fully set forth herein.

419.    This is a civil action brought by Relator, on behalf of the State of New York, against Defendant under the New York False Claims Act, N.Y. State Fin. Law § 190(2).

420.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer, employee or agent of the State of New York, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of N.Y. State Fin. Law § 189(1)(a).

421.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get a false claim paid or approved by the State of New York, or its political subdivisions, in violation of N.Y. State Fin. Law § 189(1)(b).

422.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made

or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New York, or its political subdivisions, in violation of N.Y. State Fin. Law § 189(1)(g).

423.    The State of New York, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of health insurance programs funded by the state or its political subdivisions.

424.    As a result of Defendant's actions, set forth above, the State of New York and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXV
## (Violation of North Carolina False Claims Act)

425.    Relator incorporates herein by reference the preceding paragraphs of the Third Amended Complaint as though fully set forth herein.

426.    This is a civil action brought by Relator, on behalf of the State of North Carolina, against Defendant under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-608(b).

427.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.C. Gen. Stat. § 1-607(a)(1).

428.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made

or used, false records or statements material to false or fraudulent claims, in violation of N.C. Gen. Stat. § 1-607(a)(2).

429.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of North Carolina, or its political subdivisions, in violation of N.C. Gen. Stat. § 1-607(a)(7).

430.    The State of North Carolina, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of health insurance programs funded by the state or its political subdivisions.

431.    As a result of Defendant's actions, as set forth above, the State of North Carolina and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXVI
### (Violation of Oklahoma Medicaid False Claims Act)

432.    Relator incorporates herein by reference the preceding paragraphs of the Third Amended Complaint as though fully set forth herein.

433.    This is a civil action brought by Relator, on behalf of the State of Oklahoma, against Defendant pursuant to the Oklahoma Medicaid Fraud False Claims Act, Okla. Stat. tit. 63, § 5053.2(B)(1).

434.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Oklahoma, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Okla. Stat. tit. 63, § 5053.1(B)(1).

435.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false records or statements to get false or fraudulent claims paid or approved by the State of Oklahoma, or its political subdivisions, in violation of Okla. Stat. tit. 63, § 5053.1(B)(2).

436.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Oklahoma, or its political subdivisions, in violation of Okla. Stat. tit. 63, § 5053.1(B)(7).

437.    The State of Oklahoma, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of Medicaid.

438.    As a result of Defendant's actions, as set forth above, the State of Oklahoma and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXVII**
**(Violation of Rhode Island False Claims Act)**

439.    Relator incorporates herein by reference the preceding paragraphs of the Third Amended Complaint as though fully set forth herein.

440.    This is a civil action brought by Relator, on behalf of the State of Rhode Island, against Defendant pursuant to the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-4(b).

441.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Rhode Island or a member of Rhode Island's National Guard, false or fraudulent claims for payment or approval, in violation of R.I. Gen. Laws § 9-1.1-3(a)(1).

442.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false records or statements to get false or fraudulent claims paid or approved by the State of Rhode Island, or its political subdivisions, in violation of R.I. Gen. Laws § 9-1.1-3(a)(2).

443.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Rhode Island, or its political subdivisions, in violation of R.I. Gen. Laws § 9-1.1-3(a)(7).

146

444.     The State of Rhode Island, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of Medicaid.

445.     As a result of Defendant's actions, as set forth above, the State of Rhode Island and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXVIII
## (Violation of Tennessee Medicaid False Claims Act)

446.     Relator incorporates herein by reference the preceding paragraphs of the Third Amended Complaint as though fully set forth herein.

447.     This is a civil action brought by Relator, on behalf of the State of Tennessee, against Defendant under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-183(b).

448.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the State of Tennessee, or its political subdivisions, false or fraudulent claims for payment under the Medicaid program,, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(A).

449.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false or fraudulent records or statements to get false or fraudulent claims under the

147

Medicaid program paid for or approved by the State of Tennessee, or its political subdivisions, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(B).

450.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false or fraudulent records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the State of Tennessee, or its political subdivisions, relative to the Medicaid program, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(D).

451.    The State of Tennessee, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of the Medicaid program.

452.    As a result of Defendant's actions, as set forth above, the State of Tennessee and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXIX
### (Violation of Texas Medicaid Fraud Prevention Act)

453.    Relator incorporates herein by reference the preceding paragraphs of the Third Amended Complaint as though fully set forth herein.

454.    This is a civil action brought by Relator, on behalf of the State of Texas against, Defendant under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.101(a).

455.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

made or caused to be made, and may still be making or causing to be made, false statements or misrepresentations of material fact that permitted Defendant to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the benefit or payment that was authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(1).

456.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, or caused to be concealed or not disclosed – and may still be concealing or failing to disclose, or causing to be concealed or not disclosed – information that permitted Defendant to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the payment that was authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(2).

457.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, caused to be made, induced or sought to induce, and may still be making, causing to be made, inducing or seeking to induce, the making of false statements or misrepresentations of material fact concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid program, in violation of Tex. Hum. Res. Code Ann. § 36.002(4)(B).

458.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, and may still be making, claims under the Medicaid program for products that were inappropriate, in violation of Tex. Hum. Res. Code Ann. § 36.002(7)(C).

149

459.     The State of Texas, or it political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of Medicaid.

460.     As a result of Defendant's actions, as set forth above, the State of Texas and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXX
### (Violation of Virginia Fraud Against Taxpayers Act)

461.     Relator incorporates herein by reference the preceding paragraphs of the Third Amended Complaint as though fully set forth herein.

462.     This is a civil action brought by Relator, on behalf of the Commonwealth of Virginia, against Defendant under the Commonwealth of Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.5(A).

463.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Va. Code Ann. § 8.01-216.3(A)(1).

464.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Va. Code Ann. § 8.01-216.3(A)(2).

465.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Virginia, or its political subdivisions, in violation of Va. Code Ann. § 8.01-216.3(A)(7).

466.     The Commonwealth of Virginia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of state funded health insurance programs.

467.     As a result of Defendant's actions, as set forth above, the Commonwealth of Virginia and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXXI
### (Violation of Wisconsin False Claims for Medical Assistance Law)

468.     Relator incorporates herein by reference the preceding paragraphs of the Third Amended Complaint as though fully set forth herein.

469.     This is a civil action brought by Relator, on behalf of the State of Wisconsin, against Defendant under the Wisconsin False Claims for Medical Assistance Law, Wis.  Stat. § 20.931(5)(a).

470.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to

151

any officer, or employee, or agent of the State of Wisconsin, or its political subdivisions, false or fraudulent claims for medical assistance, in violation of Wis. Stat. § 20.931(2)(a).

471.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to obtain approval or payment of false claims for medical assistance, in violation of Wis. Stat. § 20.931(2)(b).

472.     The State of Wisconsin, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of state funded health insurance programs.

473.     As a result of Defendant's actions, as set forth above, the State of Wisconsin and/or its political subdivisions have been, and may continue to be, severely damaged.

## PRAYER FOR RELIEF

**WHEREFORE,** Relator prays for judgment against Defendant as follows:

A. That Defendant be ordered to cease and desist from submitting any more false claims, or further violating 31 U.S.C. § 3729 *et seq.*; Cal. Gov't Code § 12650 *et seq.*; Colo. Rev. Stat. § 25.5-4-304 *et seq.*; Conn. Gen. Stat. § 17b-301a *et seq.*; Del. Code Ann. tit. 6, § 1201 *et seq.*; D.C. Code § 2-308.13 *et seq.*; Fla. Stat. § 68.081 *et seq.*; Ga. Code Ann. § 49-4-168 *et seq.*; Haw. Rev. Stat. § 661-21 *et seq.*; 740 Ill. Comp. Stat. § 175/1 *et seq.*; Ind. Code § 5-11-5.5 *et seq.*; La. Rev. Stat. Ann. § 46:439.1 *et seq.*; MD. Code Ann., Health-Gen. § 2-601 *et seq.*; Mass. Gen. Laws ch. 12, § 5A *et seq.*; Mich. Comp. Laws § 400.601 *et seq.*; Minn. Stat. § 15C.01 *et seq.*; Mont. Code Ann. § 17-8-401 *et seq.*; Nev. Rev. Stat. § 357.010 *et seq.*; N.J. Stat. Ann. § 2A:32C-1 *et seq.*; N.M. Stat. Ann.

§ 27-14-1 *et seq.*; N.Y. State Fin. Law § 187 *et seq.*; N.C. Gen. Stat. § 1-605 *et seq.*; Okla. Stat. tit. 63, § 5053 *et seq.*; R.I. Gen. Laws § 9-1.1-1 *et seq.*; Tenn. Code Ann. § 71-5-181 *et seq.*; Tex. Hum. Res. Code Ann. § 36.001 *et seq.*; Va. Code Ann. § 8.01-216.1 *et seq.*; and Wis. Stat. § 20.931 *et seq.*

B.   That judgment be entered in Relator's favor and against Defendant in the amount of each and every false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not less than five thousand ($5,000) or more than ten thousand dollars ($10,000) per claim as provided by 31 U.S.C. § 3729(a), to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

C.   That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and 3730(h), Cal. Gov't Code § 12652(g)(4), Colo. Rev. Stat. § 25.5-4-306(4), Conn. Gen. Stat. § 17b-301e(e), Del. Code Ann. tit. 6, § 1205, D.C. Code § 2-308.15(f), Fla. Stat. § 68.085, Ga. Code Ann. § 49-4-168.2(i), Haw. Rev. Stat. § 661-27, 740 Ill. Comp. Stat. § 175/4(d), Ind. Code § 5-11-5.5-6, La. Rev. Stat. Ann. § 439.4, MD. Code Ann., Health-Gen. § 2-605, Mass. Gen. Laws ch.12, § 5F, Mich. Comp. Laws § 400.610a(9), Minn. Stat. § 15C.13, Mont. Code Ann. § 17-8-410, Nev. Rev. Stat. § 357.210, N.J. Stat. Ann. § 2A:32C-7, N.M. Stat. Ann. § 27-14-9, N.Y. State Fin. Law § 190(6), N.C. Gen. Stat. § 1-610, Okla. Stat. tit. 63, § 5053.4, R.I. Gen. Laws § 9-1.1-4(d), Tenn. Code Ann. § 71-5-183(d), Tex. Hum. Res. Code Ann. § 36.110, Va. Code Ann. § 8.01-216.7, and Wis. Stat. § 20.931(11), including without limitation (i) reinstatement of employment with no diminution of seniority, (ii) double back-pay for the period since his unlawful retaliatory termination, (iii) interest on such back-pay, and (iv) special damages, including reasonable attorneys' fees and litigation costs.

D.  That judgment be entered in Relator's favor and against Defendant in the amount of the damages sustained by the State of California or its political subdivisions multiplied as provided for in Cal. Gov't Code § 12651(a), plus a civil penalty of not less than five thousand dollars ($5,000) per claim or more than ten thousand dollars ($10,000) per claim as provided by Cal. Gov't Code § 12651(a), to the extent such penalties shall fairly compensate the State of California or its political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

E.  That judgment be entered in Relator's favor and against Defendant in the amount of the damages sustained by the State of Colorado or its political subdivisions multiplied as provided for in Colo. Rev. Stat. § 25.5-4-305(1), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each act as provided by Colo. Rev. Stat. § 25.5-4-305(1), to the extent such multiplied penalties shall fairly compensate the State of Colorado or its political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

F.  That judgment be entered in Relator's favor and against Defendant in the amount of the damages sustained by the State of Connecticut multiplied as provided for in Conn. Gen. Stat. § 17b-301b(b)(2), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each act in violation of the State of Connecticut False Claims Act, as provided by Conn. Gen. Stat. § 17b-301b(b)(1), to the extent such multiplied penalties shall fairly compensate the State of Connecticut for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

G.  That judgment be entered in Relator's favor and against Defendant in the amount of the damages sustained by the State of Delaware multiplied as provided for in Del. Code Ann. tit. 6,

154

§1201(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each act in violation of the Delaware False Claims and Reporting Act, as provided by Del. Code Ann. tit. 6, §1201(a), to the extent such multiplied penalties shall fairly compensate the State of Delaware for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

H.   That judgment be entered in Relator's favor and against Defendant in the amount of the damages sustained by the District of Columbia, multiplied as provided for in D.C. Code § 2-308.14(a), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each false claim, and the costs of this civil action brought to recover such penalty and damages, as provided by D.C. Code § 2-308.14(a), to the extent such multiplied penalties shall fairly compensate the District of Columbia for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

I.   That judgment be entered in Relator's favor and against Defendant in the amount of the damages sustained by the State of Florida or its agencies multiplied as provided for in Fla. Stat. § 68.082(2), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each false claim as provided by Fla. Stat. Ann. § 68.082(2), to the extent such multiplied penalties shall fairly compensate the State of Florida or its agencies for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

J.   That judgment be entered in Relator's favor and against Defendant in the amount of the damages sustained by the State of Georgia or its political subdivisions multiplied as provided for in

Ga. Code Ann. § 49-4-168.1(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim as provided by Ga. Code Ann. § 49-4-168.1(a), to the extent such multiplied penalties shall fairly compensate the State of Georgia or its political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

K.  That judgment be entered in Relator's favor and against Defendant in the amount of the damages sustained by the State of Hawaii, multiplied as provided for in Haw. Rev. Stat. § 661-21(a), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) as provided by Haw. Rev. Stat. § 661-21(a), to the extent such multiplied penalties shall fairly compensate the State of Hawaii for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

L.  That judgment be entered in Relator's favor and against Defendant in the amount of the damages sustained by the State of Illinois, multiplied as provided for in 740 Ill. Comp. Stat. § 175/3(a)(1)(A), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) as provided by 740 Ill. Comp. Stat. § 175/3(a)(1)(A), and the costs of this civil action as provided by 740 Ill. Comp. Stat. § 175/3(a)(1)(B), to the extent such penalties shall fairly compensate the State of Illinois for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

M. That judgment be entered in Relator's favor and against Defendant in the amount of the damages sustained by the State of Indiana, multiplied as provided for in Ind. Code § 5-11-5.5-2(b), plus a civil penalty of at least five thousand dollars ($5,000) as provided by Ind. Code § 5-11-5.5-2(b), to the extent such penalties shall fairly compensate the State of Indiana for losses resulting

156

from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

N.  That judgment be entered in Relator's favor and against Defendant in the amount of the damages sustained by Louisiana's medical assistance programs, multiplied as provided for in La. Rev. Stat. Ann. § 46:438.6(B)(2), plus a civil penalty of no more than ten thousand dollars ($10,000) per violation or an amount equal to three times the value of the illegal remuneration, whichever is greater, as provided for by La. Rev. Stat. Ann. § 46:438.6(B)(1), plus up to ten thousand dollars ($10,000) for each false or fraudulent claim, misrepresentation, illegal remuneration, or other prohibited act, as provided by La. Rev. Stat. Ann. § 46:438.6(C)(l)(a), plus payment of interest on the amount of the civil fines imposed pursuant to Subsection B of § 438.6 at the maximum legal rate provided by La. Civil Code Art. 2924 from the date the damage occurred to the date of repayment, as provided by La. Rev. Stat. Ann. § 46:438.6(C)(l)(b), to the extent such multiplied fines and penalties shall fairly compensate the State of Louisiana's medical assistance programs for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

O.  That judgment be entered in Relator's favor and against Defendant for restitution to the Commonwealth of Massachusetts or its political subdivisions in the amount of a civil penalty of not less than five thousand dollars ($5,000) dollars and not more than ten thousand dollars ($10,000), plus three times the amount of damages, including consequential damages, sustained by Massachusetts as the result of Defendant's actions, plus the expenses of the civil action brought to recover such penalties and damages, as provided by Mass. Gen. Laws ch 12. § 5B, to the extent such penalties shall fairly compensate the Commonwealth of Massachusetts or its political subdivisions

157

for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

P.  That judgment be entered in Relator's favor and against Defendant for restitution to the State of Michigan or its political subdivisions for the value of payments or benefits provided as a result of Defendant's unlawful acts, plus a civil penalty of triple the amount of damages suffered by Michigan as a result of Defendant's unlawful conduct, as well as not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) per claim, as provided by Mich. Comp. Laws § 400.612(1), as well as the costs incurred by both Michigan and Relator, as provided by §§ 400.610a(9) and 400.610b, in order to fairly compensate the State of Michigan or its political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

Q.  That judgment be entered in Relator's favor and against Defendant for restitution to the State of Minnesota or its political subdivisions for the value of payments or benefits provided as a result of Defendant's unlawful acts, plus a civil penalty of triple the amount of damages suffered by Minnesota as a result of Defendant's unlawful conduct, as well as not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per claim, as provided by Minn. Stat. § 15C.02(a), as well as the costs incurred by both Michigan and Relator, as provided by Minn. Stat. § 15C.12, in order to fairly compensate Minnesota or its political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

R.  That judgment be entered in Relator's favor and against Defendant for restitution to the State of Montana or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendant's unlawful acts, as provided for in Mont. Code Ann. § 17-8-

403, multiplied as provided for in Mont. Code Ann. § 17-8-403(2), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each false claim, pursuant to Mont. Code Ann. § 17-8-403(2), to the extent such multiplied penalties shall fairly compensate the State of Montana or its political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

S.   That judgment be entered in Relator's favor and against Defendant for restitution to the State of Nevada for the value of payments or benefits provided, directly or indirectly, as a result of Defendant's unlawful acts, as provided for in Nev. Rev. Stat. § 357.040, multiplied as provided for in Nev. Rev. Stat. § 357.040(1), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each act, pursuant to Nev. Rev. Stat. § 357.040(1), to the extent such multiplied penalties shall fairly compensate the State of Nevada for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

T.   That judgment be entered in Relator's favor and against Defendant in the amount of the damages sustained by the State of New Jersey or its political subdivisions multiplied as provided for in N.J. Stat. Ann. § 2A:32C-3, plus a civil penalty of not less than and not more than the civil penalties allowed under the federal False Claims Act (31 U.S.C. § 3729 *et seq.*) for each false or fraudulent claim, to the extent such multiplied penalties shall fairly compensate the State of New Jersey or its political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

U.   That judgment be entered in Relator's favor and against Defendant for restitution to the State of New Mexico or its political subdivisions for the value of payments or benefits provided,

159

directly or indirectly, as a result of Defendant's unlawful acts, as provided for in N.M. Stat. Ann. § 27-14-4, multiplied as provided for in N.M. Stat. Ann. § 27-14-4, to the extent such multiplied penalties shall fairly compensate the State of New Mexico or its political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

V.  That judgment be entered in Relator's favor and against Defendant for restitution to the State of New York or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendant's unlawful acts, as provided for in N.Y. State Fin. Law § 189(1), multiplied as provided for in N.Y. State Fin. Law § 189(1), plus a civil penalty of not less than six thousand dollars ($6,000) or more than twelve thousand dollars ($12,000) for each false claim, pursuant to N.Y. State Fin. Law § 189(1), to the extent such multiplied penalties shall fairly compensate the State of New York or its political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

W.  That judgment be entered in Relator's favor and against Defendant for restitution to the State of North Carolina for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.C.Gen. Stat. § 1-607, multiplied as provided for in N.C. Gen. Stat. § 1-607(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) as provided by N.C. Gen. Stat. § 1-607(a), to the extent such multiplied penalties shall fairly compensate the State of North Carolina for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

X.  That judgment be entered in Relator's favor and against Defendant in the amount of the damages sustained by the State of Oklahoma or its political subdivisions multiplied as provided for in Okla. Stat. tit. 63, § 5053.1(B), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) as provided by Okla. Stat. tit. 63, § 5053.1(B), to the extent such multiplied penalties shall fairly compensate the State of Oklahoma or its political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

Y.  That judgment be entered in Relator's favor and against Defendant in the amount of the damages sustained by the State of Rhode Island or its political subdivisions multiplied as provided for in R.I. Gen. Laws § 9-1.1-3(a), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) per claim as provided by R.I. Gen. Laws §  9-1,1-3(a), to the extent such multiplied penalties shall fairly compensate the State of Rhode Island or its political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

Z.  That judgment be entered in Relator's favor and against Defendant for restitution to the State of Tennessee for the value of payments or benefits provided, directly or indirectly, as a result of Defendant's unlawful acts, as provided for in Tenn. Code Ann. § 71-5-182, multiplied as provided for in Tenn. Code Ann. § 71-5-182(a)(l), plus a civil penalty of not less than five thousand dollars ($5,000) or more than twenty-five thousand dollars ($25,000) pursuant to Tenn. Code Ann. § 71-5-182(a)(l), to the extent such multiplied penalties shall fairly compensate the State of Tennessee for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

161

AA.      That judgment be entered in Relator's favor and against Defendant for restitution to the State of Texas for the value of payments or benefits provided, directly or indirectly, as a result of Defendant's unlawful acts, as provided for in Tex. Hum. Res. Code Ann. § 36.052(a), multiplied as provided for in Tex. Hum. Res. Code Ann. § 36.052(a)(4), the interest on the value of such payments or benefits at the prejudgment interest rate in effect on the day the payment or benefit was paid or received, for the period from the date the payment or benefit was paid or received to the date that restitution is made to the State of Texas, pursuant to Tex. Hum. Res. Code Ann. § 36.052(a)(2), plus a civil penalty of not less than five thousand dollars ($5,000) or more than fifteen thousand dollars ($15,000) for each unlawful act committed that resulted in injury to an elderly or disabled person, and of not less than one thousand dollars ($1,000) or more than ten thousand dollars ($10,000) for each unlawful act committed that did not result in injury to an elderly or disabled person, pursuant to Tex. Hum. Res. Code Ann. §§ 36.052(a)(3)(A) and (B), to the extent such multiplied penalties shall fairly compensate the State of Texas for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

BB.      That judgment be entered in Relator's favor and against Defendant in the amount of the damages sustained by the Commonwealth of Virginia, multiplied as provided for in Va. Code Ann. § 8.01-216.3(A), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) as provided by Va. Code Ann. § 8.01-216.3(A), to the extent such multiplied penalties shall fairly compensate the Commonwealth of Virginia for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

CC.	That judgment be entered in Relator's favor and against Defendant in the amount of the damages sustained by the State of Wisconsin or its political subdivisions multiplied as provided for in Wis. Stat. § 20.931(2), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) as provided by Wis. Stat. § 20.931(2), to the extent such multiplied penalties shall fairly compensate the State of Wisconsin or its political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

DD.	That Defendant be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

EE.	That judgment be granted for Relator against Defendant for all costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relator in the prosecution of this suit; and

FF.	That Relator be granted such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(a), plaintiffs hereby demand a trial by jury of all issues so triable.

Dated:  May ____, 2016                              Respectfully submitted,

 

 

_____

Sherrie R. Savett *(admitted pro hac vice)*
Arthur Stock *(admitted pro hac vice)*
Lane L. Vines *(admitted pro hac vice)*
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone:  (215) 875-3000
Facsimile:  (215) 875-4604

    -and-

W. Scott Simmer *(pro hac vice pending)*
Thomas J. Poulin *(pro hac vice pending)*
Simmer Law Group PLLC
The Watergate, Suite 10-A
600 New Hampshire Ave, NW
Washington, DC 20037
Telephone:  (202) 333-7352
Facsimile:  (202) 337-1039

*Counsel for Plaintiff/Relator*